1              **UNITED STATES DISTRICT COURT**

2             **FOR THE DISTRICT OF ARIZONA**

3                     _____

4

**Bryan Hunton**, an individual,  )
5                                  )   No.  **2:16-cv-00539-DLR**
          Plaintiff,               )
6                                  )
          vs.                      )        Phoenix, Arizona
7                                  )        March 29, 2018
**American Zurich Insurance,**     )        1:15 p.m.
8  **Company, dba Zurich American** )
**Insurance Company,**             )
9                                  )
               Defendant.          )
10  _____)

11

12

13        BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE

14

15        REPORTER'S *EXCERPTED* TRANSCRIPT OF PROCEEDINGS

16             JURY TRIAL - DAY 3 (P.M. SESSION)

17

18

19

20

21  Official Court Reporter:
    Robin G. Bobbie, RMR, CRR, FCRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, SPC 37
23  Phoenix, Arizona  85003-2151
    (602)  322-7248
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

For the Plaintiff:
3       DAWSON & ROSENTHAL, P.C.
        By:  **Steven C. Dawson**, Esq.
4            **Anita Rosenthal**, Esq.
             **Sander R. Dawson**, Esq.
5       25 Schnebly Hill Road
        Sedona, AZ 86336-4233
6
For the Defendant:
7       RENAUD COOK DRURY MESAROS, PA
        By:  **John Anthony Klecan**, Esq.
8            **William W. Drury, Jr.**, Esq.
             **Kelly Ann Hedberg**, Esq.
9       1 N. Central Ave., Ste. 900
        Phoenix, AZ 85004-4417
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**<u>I N D E X</u>**

2

**<u>SUMMARY OF PROCEEDINGS</u>**                                  **<u>PAGE:</u>**

3

Proceedings Outside Presence of the Jury          70, 124

4

5

**<u>WITNESS:</u>**                    **<u>DIRECT</u>**   **<u>CROSS</u>**    **<u>REDIRECT</u>**  **<u>RECROSS</u>**

6

  Lynell Brown                     4

7

8

9

10

**<u>INDEX OF EXHIBITS</u>**

11

**<u>EXHIBIT</u>**                                          **<u>RECEIVED</u>**

12

<u>NO</u>.     <u>DESCRIPTION</u>

13

14

        None marked

15

16

17

18

19

20

21

22

23

24

25

LYNELL BROWN - DIRECT                                    4

                    **P R O C E E D I N G S**

 1

 2          (Proceedings begin, 1:15 p.m.)

 3          (Jury enters the courtroom.)

 4              THE COURT:  Please be seated.  Plaintiffs may call

 5      their next witness.                                          13:15:51

 6              MS. ROSENTHAL:  Thank you, Your Honor.  We would call

 7      Lynell Brown as our next witness for adverse examination.

 8              THE COURT:  Ma'am, would you come up here, please, and

 9      be sworn?

10          (LYNELL BROWN, duly sworn, testifies as follows:)        13:16:03

11              THE COURT:  You may proceed.

12              MS. ROSENTHAL:  Thank you.

13                          DIRECT EXAMINATION

14      BY MS. ROSENTHAL:

15      Q.  Good afternoon, Miss Brown.                              13:16:40

16      A.  Good afternoon.

17      Q.  Thank you for your patience.  You're the one who was the

18      adjuster on the Bryan Hunton claim that denied this claim;

19      correct?

20      A.  Yes.                                                     13:16:51

21      Q.  And you're also the one who was the adjuster who accepted

22      the claim; correct?

23      A.  Yes.

24      Q.  Where do you work today?

25      A.  I'm currently employed by Mutual Insurance Company.      13:17:00

LYNELL BROWN - DIRECT

1   Q.   Okay.  And are you an adjuster?

2   A.   Yes.

3   Q.   Are you doing basically the same thing that you did when

4   you worked for Zurich?

5   A.   Yes.                                                        13:17:09

6   Q.   All right.  You've been a workmen's compensation adjuster

7   for many years; right?

8   A.   Yes.

9   Q.   How many years?

10  A.   Twenty-six, 27.                                             13:17:18

11  Q.   Twenty-six or 27?

12  A.   Twenty-six or 27.

13  Q.   All right.  When did you start working for Zurich?

14  A.   I believe it was in 2005, maybe the latter part of 2005.

15  Q.   All right.  And when you first began to work for Zurich,   13:17:37

16  were you hired as an adjuster?

17  A.   Yes.

18  Q.   And did you move into different positions during your time

19  period at Zurich?

20  A.   No.                                                        13:17:48

21  Q.   During the time that you worked -- so how long were you

22  working for Zurich, you say 2005 --

23  A.   Um-hum.

24  Q.   -- to 2016; correct?

25  A.   '16, correct.                                              13:18:01

1    Q.  During that time period that you were working for Zurich,

2    other than the Perry case, do you feel that you generally did

3    what Zurich had asked you to do?

4    A.  Yes.  With regard to, you know, claims handling?

5    Q.  Yes.                                                          13:18:21

6    A.  Yes.

7    Q.  Okay.  In preparation for today, did you have a chance to

8    meet with Zurich's attorneys?

9    A.  I did.

10   Q.  All right.  When did you do that?                             13:18:28

11   A.  It was this past Saturday.

12   Q.  Okay.  I want to talk to you a little bit about workmen's

13   compensation law.

14        First of all, as an adjuster, you need to know what

15   the Workmen's Compensation Act says; right?                       13:18:43

16   A.  Yes.

17   Q.  You need to know what the statute requires in terms of

18   what's a compensable claim and what's not a compensable claim?

19   A.  Yes.

20   Q.  At the time that you were working on Bryan Hunton's claim,    13:18:54

21   can we assume that you knew what the law was as far as

22   workmen's compensation?

23   A.  Yes.

24   Q.  You get training on it, do you not?

25   A.  There's training, not per se, you know, training of the      13:19:10

 1   law, but training, you know, just like what I would consider,

 2   like, continuing education credits.

 3   Q.  All right.  And you get, part of that continuing education

 4   is how the Act is to be interpreted by various courts; true?

 5   A.  Various training or education about, like, trending and the          13:19:27

 6   law, or changes in the law.  Things of that nature.

 7   Q.  All right.  You keep up with it; correct?

 8   A.  For the most part, yes, um-hum.

 9   Q.  Now, the jury has heard a little bit about the terms AOE

10   and COE.  You're familiar with those, are you not?                       13:19:46

11   A.  Yes.

12   Q.  All right.  Liz, can you just project?

13            Do you agree with this, that the elements of coverage

14   are the occurrence of an injury by accident that arises out of

15   and in the course of employment?                                         13:20:04

16   A.  Yes.

17   Q.  And AOE, how would you describe that?

18   A.  Arising out of the course of employment.

19   Q.  All right.  And AOE is the occurrence of the injury by

20   accident that arises out of?                                             13:20:16

21   A.  Out of the course, correct.

22   Q.  And the COE is in the course of employment?

23   A.  Correct.

24   Q.  If the facts show that a claimant who submits a claim comes

25   under these two factors, AOE and COE, that's a compensable               13:20:30

1    claim; correct?

2    A.  Correct.

3    Q.  And that's a compensable claim, even if there's a large

4    employer, who is the customer, who doesn't want it paid.

5            Would you agree with that?                          13:20:46

6    A.  I would agree with that.

7    Q.  All right.  In fact, you know it's improper to deny a claim

8    just because an employer wants it denied; right?

9    A.  Correct.

10   Q.  Partly that's because they might not know what the law is;  13:20:54

11   right?

12   A.  They may not.  It could be various of reasons, so...

13   Q.  All right.  But if you know that you're looking at a valid

14   claim, a claim that's compensable because it arises out of and

15   in the course of employment, and an employer says deny it       13:21:12

16   anyway, do you agree you should stand up to that employer and

17   tell them no?

18   A.  Yeah, that is my practice.  That's correct.

19   Q.  You know that as an adjuster failure to provide benefits,

20   medical benefits, to a claimant that has a valid claim, that    13:21:34

21   can cause that claimant to suffer some harm?

22   A.  That is a possibility.

23   Q.  All right.  You know that they can suffer more pain because

24   of it; right?

25   A.  It's subjective, but yes, I would agree.  That's fair.      13:21:48

UNITED STATES DISTRICT COURT

1    Q.  All right.  You know that denial of a claim can have

2    medical consequences for the injured worker, such as not being

3    able to get surgery and other treatments; correct?

4    A.  That is a possibility.

5    Q.  And you also know that failure to provide benefits for a            13:22:05

6    valid claim can have negative financial impact on a claimant?

7    A.  And that is a possibility as well.

8    Q.  Now, turning to Mr. Hunton's claim, you knew when you were

9    handling that claim that this was not a preexisting claim;

10   correct?                                                                13:22:27

11   A.  Meaning he didn't have a prior claim?

12   Q.  No, he had a prior claim; right?

13   A.  Not that I'm aware of.  Are you talking about a worker comp

14   claim?

15   Q.  Okay.  Let me -- let me clear that up.                              13:22:37

16   A.  Okay.

17   Q.  You knew that he had a prior surgery from 2009 right at the

18   very beginning of this claim; correct?

19   A.  Yes.

20   Q.  And you knew that that injury was not considered a                  13:22:46

21   preexisting claim for this new injury; correct?

22   A.  Correct.

23   Q.  You're fully aware of what the term preexisting means under

24   the Workmen's Compensation Act; true?

25   A.  True.                                                              13:23:02

LYNELL BROWN - DIRECT

1   Q.  All right.  Explain to the jury about the 1 percent, how

2   aggravation by 1 percent?

3   A.  So, basically, an insured employer hires a person as they

4   are, and that would include any preexisting injuries that they

5   may have.  And if it's substantiated and the injury that they          13:23:19

6   sustained aggravates the injury by as slight as 1 percent, it

7   would be potentially -- it could be a compensable injury.

8   Q.  And that's one of the reasons you knew that Mr. Hunton's

9   claim was not considered a preexisting claim?

10  A.  When you say preexisting claim, I take that as a                     13:23:38

11  preexisting work comp claim.  He had a preexisting injury, yes.

12  Q.  Right.  But again, you knew that this could not be Mr.

13  Hunton's new claim, or claim could not be denied because of

14  preexisting condition?

15  A.  That's not a basis for denial, correct.                             13:23:52

16  Q.  Okay.  But you did know that that was one of the reasons

17  that the employer, Sundt, wanted it denied; true?

18  A.  Well, they were questioning the claim because of the

19  preexisting condition.  There are some instances where

20  preexisting condition, even if potentially aggravated, may not          13:24:07

21  be compensable as well.

22  Q.  Okay.  But knowing that it wasn't -- that wasn't the case

23  with Mr. Hunton's claim; correct?

24  A.  Meaning, I'm sorry.  Can you clarify?

25  Q.  I think you've already agreed you knew Mr. Hunton's claim           13:24:22

1   could not be denied on preexisting; right?

2   A.  Well, it wasn't denied solely -- you can't deny just solely

3   on the basis of a preexisting injury.  Most people have

4   preexisting problems.

5   Q.  All right.  Well, you say "solely."  I thought you had        13:24:34

6   agreed this is not a claim that should be denied on any level

7   for the fact that he had a prior injury from 2009; isn't that

8   true?

9   A.  No.  There are -- if there is preexisting problems, those

10  are things that you can take into consideration when             13:24:53

11  determining the compensability.  So I'm saying you cannot

12  solely deny based on that reason, but it's certainly definitely

13  appropriate to look to try to see, you know, what the extent of

14  the preexisting injury was.

15  Q.  Didn't you know in this case that this was not a claim that  13:25:10

16  should be denied on any ground involving the fact that he had a

17  prior injury; isn't that true?

18  A.  I think you're asking me the same question, but if the --

19  if your question is, did I deny it because he had a

20  preexisting, if that was the sole purpose of the denial, no.     13:25:29

21  That is not the sole purpose of the denial.

22  Q.  So are you saying today that that was part of the reason

23  that you denied this claim was that he had a prior injury?

24  A.  It was taken into consideration, but that was not the sole

25  basis of denial.                                                 13:25:44

1    Q.  Was it any basis for the denial?

2    A.  It was something that was a red flag, absolutely.  Prior

3    injuries would cause you to take a little further look into see

4    what the prior injury was.

5    Q.  All right.  And one of the things that you do as an                13:25:56

6    adjuster is you begin to -- you have to investigate a claim;

7    correct?

8    A.  Yes.

9    Q.  And did you investigate that prior injury?

10   A.  I think I said I believe I did set up request for the prior        13:26:06

11   medical records.

12   Q.  All right.  And did you not discover that that prior injury

13   had, for the most part, healed.  He had been back at work for

14   over four years after that injury; true?

15   A.  He had been back to work, correct, yes.                            13:26:20

16   Q.  All right.  And so that any aggravation that might have

17   occurred under this new injury that occurred, that would not

18   make it a preexisting injury because it was at least 1 percent

19   aggravated; correct?

20   A.  Well, the injury was still there.  He just potentially             13:26:37

21   could have aggravated it, yes.

22   Q.  All right.  And would you agree it was aggravated to more

23   than 1 percent?

24   A.  I don't know to what percent.  I couldn't answer to what

25   percent, but that is the requirement, that it's only 1 percent        13:26:51

1    is the State's requirement.

2    Q.  All right.  And didn't you understand that, therefore, this

3    was not any ground to deny this claim on.  There had been

4    something else to deny this claim on?

5    A.  There was additional things, yes, I would agree.          13:27:06

6    Q.  You also, in addition to understanding what the term

7    preexisting means, you also have to know what the word

8    "accident" means in the Workmen's Comp. statute; correct?

9    A.  Yes.

10   Q.  You know that in Arizona injuries under the Workmen's       13:27:22

11   Compensation claim are compensable, even if they come on more

12   gradually?

13   A.  Sometimes they can be compensable, it depends.  It's a

14   case-to-case basis.

15   Q.  Right.  But I mean, a more gradual injury can be considered  13:27:39

16   a compensable claim under the Act?

17   A.  It could be.

18   Q.  And that's considered an accident under the Act?

19   A.  It would be -- I mean, for lack of a better term, it would

20   be -- you can consider the accident cumulative trauma is what I  13:27:50

21   think they refer to it.

22   Q.  Okay.  Well, there's a couple of different ways; correct?

23   There's repetitive injury.  That can be compensable?

24   A.  Um-hum.

25   Q.  Correct?                                                    13:28:04

1    A.  Yeah.  Yes, and that would be cumulative.  I would consider

2    that to be cumulative injury as well.

3    Q.  All right.  And there's also injuries that are more

4    gradual, that start at one point and get worse and worse that

5    are due to work activity that are also compensable under the     13:28:17

6    Act?

7    A.  There are some that are, yes.

8    Q.  All right.  So you knew at the time that you were handling

9    Mr. Hunton's claim that there doesn't have to be a single

10   momentary event to be a compensable claim; true?                 13:28:28

11   A.  There -- there doesn't have -- it can be a gradual injury,

12   but typically at some point something happened that you can,

13   you know, put to some specificity to, to know, okay, a minute

14   ago I was okay, but now, you know.  It's in an acute state

15   versus a gradual.                                                 13:28:51

16   Q.  Okay.  So I think I'm understanding you.  What you're

17   saying is that it can be a gradual, or it can be an acute

18   moment that can make this compensable; correct?

19   A.  Correct.

20   Q.  You knew in Mr. Hunton's case he was saying that he started  13:29:05

21   to have pain in the morning that grew that day; correct?

22   A.  I believe that was his claim.

23   Q.  All right.  So that would come under the more gradual kind

24   of injury, would you agree?

25   A.  I would agree.                                                13:29:18

**LYNELL BROWN - DIRECT**

1    Q.  In fact, when you accepted this claim, I believe the date

2    is March 25th, 2015, you accepted it knowing that he, in fact,

3    could not point to a specific incident; true?

4    A.  Did I know?  Yes.  I knew that he couldn't, at that point,

5    point to a specific date; that's correct.                         13:29:42

6    Q.  Right.  And you accepted the claim because you knew it was

7    compensable?

8    A.  I accepted the claim because at that point I had sought

9    counsel and he recommended that based on what he was reviewing

10   that it was more probable that we accept the claim; that it was  13:29:57

11   more, for lack of a better description, we would be able to

12   litigate at the Industrial Commission and then tie, like, a

13   percentage of whether you could win the case or not, and it was

14   his opinion that we should move forward by accepting the claim,

15   and so I accepted the claim.                                      13:30:15

16   Q.  All right.  And just to make sure we're clear, you accepted

17   the claim knowing that there was not a specific momentary

18   incident; correct?

19   A.  I accepted the claim, yes, based off the review from

20   counsel, the information that we had up until that point, and    13:30:28

21   his recommendation to proceed with accepting.

22   Q.  Well, you don't accept claims that you don't feel you owe;

23   is that a fair statement?

24   A.  It's fair, but we also have to weigh all the factors of the

25   case.  And again, case by case, it's different.  There's, I      13:30:43

1   mean, just the little bittest (ph), minute point could change

2   the fact of whether we're going to proceed with litigation or

3   not.

4   Q.  All right.  Fair to say that on March 25th, 2015, when you

5   accepted the claim, you based it on the fact that he did have          13:31:03

6   an injury that arose out of and in the course of employment.

7   Fair enough?

8   A.  I would say I based it on the fact that our attorney felt

9   that it wouldn't be -- it wouldn't be -- it would be like a

10  50/50 percent chance of prevailing on it once we went to                13:31:21

11  hearing.

12          So based on the fact that we had at the time and his

13  opinion as to whether, you know, we should move forward to try

14  to defend the denial, it was his recommendation to accept.  So

15  I agreed with that, because he's the expert in that area and I         13:31:34

16  trust his opinion.

17  Q.  Well, you're something of an expert in that area too, are

18  you not?  You know the law.

19  A.  I do, but I don't -- I don't present in court.  I'm not

20  able to myself, personally, to go and defend in court a denial.       13:31:46

21  Q.  Right.  And we'll get into this in a little while, but just

22  jumping ahead, isn't the reason that the attorney, Mr. Finical,

23  was telling you to accept this claim is because he saw the IME

24  from Dr. Maric that you had done back in November the previous

25  year?                                                                   13:32:09

1    A.  He did review the report.  I think that -- I don't have it

2    right in front of me, but it was just his opinion based on what

3    he -- what he reviewed that what the information we had, if we

4    went to hearing, it would be like a 50/50 percent chance.  And

5    so in those instances, or in that instance, I should say, he          13:32:24

6    recommended that I proceed with accepting the claim.

7    Q.  Okay.  I'm not sure of your answer.  Do you agree that Mr.

8    Finical's discussions with you revolved around the fact that he

9    finally saw the IME that was done by Dr. Maric; isn't that

10   true?                                                                  13:32:47

11   A.  He did see the IME.

12   Q.  Right.  Let me talk to you for a minute about Sundt.  This

13   is a big employer for Zurich; correct?

14   A.  Yes.

15   Q.  It's one of the larger employers at Zurich?                        13:32:59

16   A.  I'm not sure, because I just handle what I handle.  But I

17   know that they are large.  That's fair.

18   Q.  Okay.  And you know -- you work with a woman by the name of

19   Maree Buono?

20   A.  Yes.                                                               13:33:13

21   Q.  You've worked with her for many years?

22   A.  Since my employment -- excuse me -- my employment with

23   Zurich, I think I have been right from the get-go.

24   Q.  And you two have handled many, many claims together?

25   A.  Yes.                                                               13:33:24

1    Q.  And but for a few times bumping heads, you generally agree

2    on things; correct?

3    A.  For the most part sometimes, yes.

4    Q.  All right.  And Maree makes it clear to you what she

5    expects to have done on a claim; fair enough?                13:33:36

6    A.  That's fair of all of the employers, but yes.

7    Q.  Okay.  But Maree makes her opinion known to you; true?

8    A.  She does, um-hum.

9    Q.  And, in fact, she made her opinion known in this case, Mr.

10   Hunton's claim; correct?                                     13:33:51

11   A.  Yes.  It was something that she normally, you know, she's

12   the person that reports the claim, so that's where I would get

13   my information from.

14   Q.  Okay.  Jury has seen these e-mails.  I'm going to run

15   through them quickly, but you received a series of e-mails from   13:34:03

16   Maree at Sundt; correct?

17   A.  Probably.

18   Q.  Right.  Have you gone over them recently?

19   A.  I think I might have looked at them, but I don't --

20   Q.  Okay.                                                     13:34:16

21   A.  You probably recollect my -- refresh my memory as you go

22   through.

23   Q.  Sure.  Liz, if you could pull up Exhibit 41, Bates 588 at

24   page 9.

25         This is from October 9, 2014; right?                   13:34:36

1    A.   Yes.

2    Q.   And Maree is telling you, hey, I just heard from the job

3    that Bryan was also deemed to be a preexisting condition by Dr.

4    Johnston.  Can you confirm and issue the denial, please?  Thank

5    you, lady.                                                        13:34:54

6         Correct?

7    A.   Correct.

8    Q.   So she's letting you know that she wanted to be denied on a

9    preexisting condition; correct?

10   A.   Well, that's what she's indicating on this e-mail.          13:34:59

11   Q.   Right.  Now, this e-mail was not put in the claim file; is

12   that right?

13   A.   If it's -- if it wasn't in there, no, because not all

14   e-mails I put in the file.  I mean, I get volume -- quite a

15   volume of e-mail day to day.                                     13:35:16

16   Q.   All right.  But important e-mails, would you say, should be

17   in the file?

18   A.   Yes.

19   Q.   Okay.  And do you know why this one was not put in the

20   file?                                                            13:35:26

21   A.   I wouldn't -- I mean, I just wouldn't have put it in the

22   file.  She's just asking me a question.  I don't even recall

23   whether I responded.  And it was not -- not abnormal to get a

24   series of e-mails from her.  So I could spend my entire day

25   putting e-mails in files, so I didn't put this in the file.      13:35:44

**LYNELL BROWN - DIRECT**                                                    20

1    Q.  Okay.  In fact, it's not abnormal for Maree to send you

2    e-mails like this on all the cases that you have with her;

3    true?

4    A.  I wouldn't say -- well, you mean, like, saying they are

5    preexisting, or just in general?                                    13:35:59

6    Q.  What she wants done on the case?

7    A.  No, I disagree.  The only time she really pushed any issues

8    if they had some question with regards to the compensability.

9    Q.  All right.  And when she felt that there were issues with

10   compensability, she would let you know about that?                 13:36:15

11   A.  Yes.

12   Q.  Could you pull up Exhibit 41, page 588, at page 9?  I guess

13   at the bottom.  How about Exhibit 41 at 4649, page 11.  This is

14   from October 15th.

15            She says, need to talk to you.  Hey, I need to talk to   13:36:50

16   you as soon as possible about this claim.  I know you are busy,

17   but this is very important.  We need to regain control before

18   it goes further south than it already is; correct?

19   A.  Yes.

20   Q.  What did that mean to you, go further south than it already   13:37:04

21   is?

22   A.  I'm assuming she's meaning that maybe because sometimes if

23   you don't process things, it could get out of control, if you

24   will.  So I'm assuming maybe -- I don't know what she meant.  I

25   take it that she was saying she wanted to get an update or, you   13:37:17

1    know, talk to about where we are or where we're going, that

2    type of thing.

3    Q.  Well, she's already let you know that she's interested in

4    having the claim denied on preexisting at this point; right?

5    A.  Well, yes.  She's questioning the validity of the claim,          13:37:32

6    because they were aware of the prior injury.  That is correct.

7    Q.  And didn't you take this regain control before it goes

8    further south as meaning this is possibly going to turn into an

9    expensive claim?

10   A.  No, I took that as it could.                                      13:37:49

11          MR. KLECAN:  Excuse me, Your Honor.  Object until they

12   establish the foundation that this applies to the Hunton claim,

13   because that's in dispute.

14          THE COURT:  Okay.  Sustained.

15          MS. ROSENTHAL:  All right.                                     13:37:59

16   BY MS. ROSENTHAL:

17   Q.  Is that in dispute that this applied to the Hunton claim?

18   A.  We had so many claims, it could have applied to other

19   claims.  I don't know.  Because I don't know if there's

20   something in the title, unless there was something to indicate       13:38:13

21   that.  But like I said, we -- e-mail was our preferred

22   communication, so it wouldn't be odd that it could be about

23   another claim.  I don't know.

24   Q.  All right.  Well, let's take a look at Exhibit 41, 4647, at

25   page 14.                                                             13:38:29

1          This is from October 17, two days after the last

2    e-mail we just saw; correct?

3    A.  Um-hum.

4    Q.  Yes?

5    A.  Yes.                                               13:38:43

6    Q.  And this says Bryan Hunton; right?

7    A.  Yes.

8    Q.  And she says, I honestly hate to keep bugging you, but...

9          Do you see that?

10   A.  Um-hum, yes.  I'm sorry, yes.                       13:38:50

11   Q.  And does that indicate to you that she has been, in her

12   words, bugging you on getting the status of this claim?

13   A.  Probably this one and several others, but since she has his

14   name, yes, I would agree with that.

15   Q.  And she says, I have to get back to a division manager      13:39:05

16   today on this guy.  Please call me.  I need to know what the

17   status of his denial.  Thank you.

18         Do you see that?

19   A.  Yes.

20   Q.  All right.  Had you already told her that you were going to  13:39:16

21   deny this claim?

22   A.  I don't remember if I did.  At some point, I didn't

23   originally handle the claim, and then it got transferred to me,

24   so I don't know where in that process, where I spoke to her.

25   Q.  Well, you were assigned to the claim at the very beginning,  13:39:32

1  were you not?

2  A.  No.

3  Q.  Well, I'll come back to that.

4       There was for a time period a man by the name of Erik

5  Brong, I believe; correct?                                13:39:49

6  A.  Correct.

7  Q.  And he handled the claim for a brief period; right?

8  A.  Yes.

9  Q.  All right.  You were the one who was originally assigned

10 the case, and then he took over for a brief period; is that  13:40:00

11 right?

12 A.  No.  It was originally assigned to him.

13 Q.  And, in fact, didn't Maree Buono specifically ask that you

14 be assigned?

15 A.  She did.                                               13:40:12

16 Q.  Now, when Ms. Buono is saying to you, I need to know what

17 the status of his denial, you say you don't remember if you had

18 already told her by then that you were going to deny this

19 claim?

20 A.  I'm pretty sure that I had a conversation or at some point  13:40:27

21 along that they were questioning -- questioning the claim, and

22 depending where we were with regard to the notification date,

23 that could have been a conversation we had, yes.

24 Q.  All right.  And do you think it is that you told her that,

25 yes, I'm probably going to deny this claim?               13:40:43

LYNELL BROWN - DIRECT                                                    24

1    A.  I can't say with certainty that that's what happened, but

2    I'm pretty sure that we discussed it.  And based on the

3    information as I was reviewing that was in the file and where

4    we were going with it, there's a possibility we had that

5    discussion.                                               13:40:58

6    Q.  All right.  Now, you agree that just because Sundt wants it

7    denied, you're not going to deny it; right?

8    A.  That is correct.

9    Q.  What investigation had you done by October 17th as to what

10   the circumstances were surrounding this claim?           13:41:12

11   A.  I can't recall what date I actually got the file, so I'm

12   going to assume that being the correct date.  I would have

13   reviewed the information that was in the file at that point and

14   figured out where else we needed to go, whether I needed to

15   request prior medical records, obtain a medical evaluation.  We 13:41:26

16   review prior medical records, prior auto claims, prior GL

17   claims, things of that nature.

18   Q.  Did you do any investigation as to what happened on

19   September 18th, 2014, the date of injury?

20   A.  The prior adjuster had already did the contact with the  13:41:44

21   injured worker, so that was already in the file.  And then I

22   believe that I had the 102 report as well as, if I recall

23   correctly, I think the employer's report of injury was in the

24   file as well.

25   Q.  Did you do any kind of interviews of anyone that might have 13:42:00

1  been working with him that day?

2  A.  I did not.

3  Q.  Let me go to Exhibit 41, 4648, page 13.  And if you could

4  pop that out.  Yeah.

5       This is October 17th, that same day.  Can you give me          13:42:44

6  an update?  I need to -- I need to let the job site know if

7  this claim has been denied.

8  A.  Yes, that's not related to this case.  That's another case.

9  Q.  All right.  It does say Raymond Perry at the top; correct?

10 A.  Yes.                                                              13:43:03

11 Q.  Was the Raymond Perry claim about to be denied at that

12 point?

13 A.  I don't remember.  I'm assuming so.  That's what she was

14 asking.  I don't remember all the facts of the case, but this

15 is a common, you know, thing that she would do is just like the  13:43:17

16 status where are we.

17 Q.  All right.  And then if we can go to the top part of that,

18 it's the same day.  It says, so sorry to bother you, I know

19 you've been working on it, but they are having issues with

20 Bryan onsite so they need to know the status.  As soon as you    13:43:37

21 can tell me, I'd appreciate it.  What is the deal with some guy

22 named Erik?

23       And she's referring you think to Erik Brong?

24 A.  Probably.

25 Q.  He said he's been calling me, but I don't have a message       13:43:48

1    from him.  Should I call him?  Is he handling Brian's claim?

2    If so, why?

3           Did you talk with her about assuring her that you were

4    going to be on the claim that you were taking the claim?

5    A.  I normally handled their claims, so I would -- I made the          13:44:03

6    assumption that it would, at some point, be transferred to me.

7    Q.  All right.  If we could go to Exhibit 41, 4648, at page 13

8    at the top.  I'm sorry, exhibit -- page 41, page 601, at

9    page 17.

10          Now, this is Tuesday, October 21st, 2014; right?             13:44:46

11   A.  Yes.

12   Q.  This is the day before you have -- you have 21 days to make

13   a decision, accept or deny a claim; correct?

14   A.  Twenty-one days from the date of notification, that is

15   correct.                                                             13:44:59

16   Q.  All right.  October 21st she's saying, call me, please.  I

17   left you a bunch of messages.  Have to get back to our division

18   manager on this guy.

19          Correct?

20   A.  Yes.                                                             13:45:08

21   Q.  And it was the next day that you, in fact, denied this

22   claim; correct?

23   A.  I don't remember the date, but if that's the date on the

24   note.  Whatever the date on the notice is the date I actually

25   issued the denial.                                                   13:45:23

LYNELL BROWN - DIRECT

1   Q.  Now, you didn't put down what your reasons were for denying

2   this claim in the claim file; true?

3   A.  I think it was documented somewhere in the file, but it may

4   not have been drawn out as a compensability note because we did

5   like status reports and other things, and I kind of seem like I          13:45:40

6   remember seeing that it was documented in a -- maybe in the

7   records section somewhere.

8   Q.  Are you saying that you have recently seen such a document?

9   A.  Well, just in reviewing some of the notes that one of the

10  things that was in the file was a reference, I think it's a              13:45:55

11  case summary report, and I apologize because I don't remember

12  what the name of the report is.  But I think it was addressed

13  in there.

14  Q.  Okay.

15  A.  So it's somewhere in there.                                         13:46:04

16  Q.  All right.  Let me see if I understand what you're talking

17  about.  You did a case summary report the following year before

18  you accepted the claim; correct, March 24th?

19  A.  It probably -- there probably was one even prior to that.

20  Because in order to put a reserve on the file, there has to be          13:46:22

21  some documentation, so I want to say that there might have been

22  something else as well.

23  Q.  Well, the reserve on the file would have been put on before

24  the denial of the claim; correct?

25  A.  It would have -- yeah, it could have been before or after.          13:46:33

1   I'm not sure.  I need to see the document to tell you when it

2   was.  I'm not sure what date, and I'm not sure if the -- if I

3   actually did the documentation, or Erik did.  But I know at

4   some point I put some documentation as to what my basis was,

5   and it may not have been in the file note, but it may have been    13:46:53

6   in the actual -- the -- those documents that are attached to

7   the file.

8   Q.  Okay.  And can you direct us to what documents you're

9   talking about?

10  A.  It would be like a case summary report, or maybe like a        13:47:04

11  status report.  I'm not sure.  I would have -- I don't have the

12  file right in front of me, so I can't take a look to tell you

13  exactly, but I believe there was a note somewhere.

14  Q.  All right.  Do you know when it is -- well, let me ask it

15  this way:  You didn't put down in the claim file around           13:47:18

16  October 22nd what your reasons were.

17        Would you agree with that?

18  A.  Without -- without seeing it, and if that's what you're

19  saying that's in there, I would agree with it.  I don't know,

20  because I don't see it right in front of me, but I would be       13:47:34

21  agreeable to stipulate to that based on what's in the file.

22  Q.  Okay.  Whatever is in the file?

23  A.  Whatever is in the file.

24  Q.  All right.

25  A.  Yes.                                                          13:47:44

1   Q.  Now, would you agree you should be putting your reasons in

2   the claim file so you can go back and look at what you did and

3   why you did it?

4   A.  It should be.

5   Q.  All right.  And it's also important so that others can see          13:48:02

6   what you did and why you did it?

7   A.  That's fair, yes.

8   Q.  Now, on March 25th, if you could pull up Exhibit 41, 737 at

9   page 47.  I'm going to jump ahead to the following year, so

10  just make sure that everyone is clear.  Claim was denied          13:48:30

11  October 22nd, 2014, the prior year.  This e-mail is from

12  March 2nd, 2015; correct?

13  A.  Yes.

14  Q.  Many months have gone by?

15  A.  Right.          13:48:43

16  Q.  And you say Maree I'm following up to confirm our

17  conversation regarding Mr. Hunton's claim denial.  The claim

18  was denied due to the fact that he had preexisting medical

19  condition.  Also, initially when he reported, he did not really

20  indicate a specific incident.          13:49:01

21  A.  Right.

22  Q.  That was the only basis for denial.

23          Do you see that?

24  A.  Yes.

25  Q.  And when you say that's the only basis for denial, you're          13:49:06

**LYNELL BROWN - DIRECT**                                                30

1   referring to these two issues, preexisting and specific

2   incident; correct?

3   A.  Well, I was referring to the specific incident because he

4   didn't have a specific incident.

5   Q.  Okay.  Were you not also referring to the fact the claim          13:49:21

6   was denied due to the fact he had a preexisting medical

7   condition?

8   A.  Well, I did mention that, but what I was saying was that my

9   basis for denial was because he didn't indicate the specific

10  incident.                                                             13:49:35

11  Q.  Okay.  And not because of preexisting?

12  A.  No.

13  Q.  All right.  And I believe you've testified it was just

14  poorly worded?

15  A.  It was poorly worded, um-hum.                                     13:49:43

16  Q.  All right.  When you say that's the only basis for denial,

17  can we take that as being true, that you didn't have any basis

18  for this denial?

19  A.  I think there were other issues.  When we look at a case

20  again, it's a case-by-case basis.  So not always is it just one      13:50:01

21  thing, but sometimes it's a compilation of things.  So -- so I

22  try to take into consideration, you know, all the things that

23  potentially could be an issue on the file.

24  Q.  All right.  But you actually state in here that was the

25  only basis for denial, and you're telling us it was just he          13:50:20

1   didn't indicate a specific incident?

2   A.  At this point, it was because he did not indicate the

3   specific incident.  I had an opportunity to review some medical

4   as well, but there was no, you know, he couldn't quantify when

5   he was injured.  And I understand it was a cumulative injury,          13:50:34

6   but there was some discrepancy with the way he reported it, and

7   then there were -- I think it was a different account that he

8   gave to the physician.

9   Q.  All right.  Well, that's not noted anywhere in this e-mail;

10  correct?                                                               13:50:48

11  A.  No.

12  Q.  All right.  And it's not noted anywhere in the claim file

13  that you know of; correct?

14  A.  I don't recall.

15  Q.  All right.  Is this a new idea that -- that you've had        13:50:55

16  since your deposition, that there was maybe other issues that

17  you were looking at?

18  A.  I do believe that there were other issues that I was

19  looking at, at the time.  I know at the deposition I had some

20  medical.  I didn't have all -- everything.  I don't remember if   13:51:10

21  that was something I was nervous, but I'm just saying there are

22  multiple issues that you look at when you accept or deny a

23  claim.  It's much easier to accept a claim.  So when there are

24  red flags, I have to look at all the red flags as well.  And

25  there was an issue because he didn't go to the doctor the same    13:51:27

1    day, that was an issue, and he didn't have a specific incident.

2            And then the following day when he went to the

3    physician, I think he gave a different account.  And again,

4    this is from just briefly like reviewing some of the records.

5    But those were issues as well.  Those are things that we look                13:51:43

6    at as well.

7    Q.  And you say reviewing some of the records.  You're talking

8    about reviewing them recently?

9    A.  Reviewing them recently and reviewing them at the time of

10   the injury.  I mean, I'm sorry, at the time of, you know, as                 13:51:54

11   you work the claim, those are things you do.  You kind of

12   review them as you go.

13   Q.  So if I'm understanding you correctly, you're saying that

14   this March 2nd, 2015, e-mail, when you say that's the only

15   basis for denial, what you're really saying is you had other                 13:52:09

16   possible bases, but you just didn't bother putting it in this?

17   A.  There could have been possible bases.  Like I said, I get a

18   lot of e-mails from Maree, so lot of times I try to pop out,

19   you know, get it out my inbox and get a response to her.  And

20   at that point in time, that was my response to her.  So that                 13:52:28

21   was my response, so...

22   Q.  All right.  So what were the other -- what was the issue

23   about -- that you're referring to when you say "inconsistent"?

24   A.  Well, he gave more than one account of how he was injured,

25   and again, I'm doing this just off of my memory.  He reported               13:52:43

UNITED STATES DISTRICT COURT

1   to the employer, he reported to the doctor, and then I think he

2   gave a written statement as well.  And there was just different

3   variations of what happened or his recollection of what

4   happened.

5   Q.  All right.  And we'll -- we'll go over those, but let me          13:52:59

6   ask you generally, you understand that people who have been

7   injured and are filling out forms, they might not remember

8   every single moment that -- that's relevant to what happened?

9   Would you agree with that?

10  A.  I would agree with that, but I think they remember, like,        13:53:17

11  you know, like a specific, you know, if -- if I cut my finger,

12  I know I cut my finger.  If I bent over and grab something to

13  pick it up and I had, like, a pinch, I could probably describe

14  that to you.

15  Q.  All right.                                                       13:53:31

16  A.  You didn't have to be in great detail just, you know --

17  just note it.

18  Q.  And we'll go over some of these forms in a few minutes, but

19  generally speaking, he let Zurich know by these forms that,

20  yes, he started at 6:30 in the morning, he developed a pain,        13:53:46

21  and it grew throughout the day; correct?

22  A.  That is what he indicated, yes.

23  Q.  All right.  These other issues that you're now talking

24  about, such as maybe there was something inconsistent, you

25  didn't put that in your case summary report when you sent that      13:54:12

1   over to Sundt, did you?

2   A.  I don't recall.  I think I addressed, because there's a

3   line that addresses like the status of the claim.  So I'm sure

4   I adjust the status.  I don't know exactly what -- what was put

5   in it.                                                    13:54:30

6   Q.  All right.  Well, I believe it talked about late -- well,

7   let's pull it up.  It's from the claim file Exhibit 2, 594.

8   I'm sorry, 591, Liz.  If you could just go to 590 so we could

9   just see the front.

10          This is called a case summary report?            13:54:59

11  A.  That is correct.

12  Q.  And that's what you're referring to?

13  A.  Yes.

14  Q.  Okay.  Date of this report is March 24th, 2015; right?

15  A.  Right.                                                13:55:11

16  Q.  This is the day before you actually accepted the claim?

17  A.  Okay.  I don't remember which date it was.

18  Q.  All right.  And now if you could go to 591, the

19  compensability rationale.  EE stands for employee?

20  A.  That's correct.                                       13:55:34

21  Q.  States he was finishing staking curb and gutter from the

22  east side of 19th Street and felt a pain, felt pain in his low

23  back.  Right?

24          Let me just stop right there.  That's something that

25  he had been consistent about the whole time; right?        13:55:46

1    A.   Yeah, he indicated he was staking.

2    Q.   The insured, and that's Sundt; right?

3    A.   Correct.

4    Q.   The insured questions the validity of the claim because the

5    employee has had prior back injuries, and we've talked about          13:55:59

6    that.

7             The employee did not have a specific incident and

8    delayed reporting of the claim.  So AOE/COE is questionable for

9    treatment of the low back injury; correct?

10   A.   Correct.                                                          13:56:15

11   Q.   Now, you didn't put anything in here about any

12   inconsistencies in reporting; right?

13   A.   I didn't put anything in there, but I want to say that the

14   medical was -- the medical notes are entered below.

15   Q.   Right.  But I'm talking under the compensability rationale?       13:56:26

16   A.   Correct.

17   Q.   You did not put any other reason other than the specific

18   incident, the delayed reporting; right?

19   A.   It is what it reads, correct.

20   Q.   All right.  The fact that you're putting in the preexisting       13:56:40

21   again, is that another example of poorly wording, or poor

22   wording, or are you just letting Sundt know that you're taking

23   their opinion into account that he had prior back injuries?

24   A.   No, I listed it because it's still an issue.  Preexisting

25   is still, again, it could be extent, it could be a number of          13:57:05

1    things.  So it was, even though he had a preexisting injury,

2    that still gets taken into account.  I need to address the fact

3    that, you know, where he was before, where he was after, and it

4    could affect this claim.  So that's why I addressed that.

5    Q.  But, in fact, it didn't; right?  It was not denied for          13:57:25

6    preexisting?

7    A.  It was not denied for preexisting.

8    Q.  Okay.  Thanks.  Go over a couple of requirements that --

9    one last question, just to finish this off on that

10   compensability analysis.  Fair to say you did not put in any       13:57:44

11   other reason other than the ones that we just went over?

12   A.  That's fair to say.

13   Q.  Any problems that you may have had with different --

14   different forms being filled out, that wasn't enough to put it

15   in the compensability rationale; true?                             13:58:01

16   A.  I'm sorry.

17   Q.  Yeah.  Any other issue that you may have had wasn't worthy

18   of being put into that compensability rationale?

19   A.  I wouldn't say that.  Sometimes you know, and in all

20   honesty, I could have been rushing to complete a report.  I        13:58:16

21   don't know.  I'm not saying -- I'm just saying it is what I

22   wrote at that point in time, so...

23   Q.  Well, in fact, we saw the date, March 24th, 2015.  That's

24   many, many months after the claim had been denied; true?

25   A.  Correct.                                                       13:58:29

1   Q.  Let me go over a couple of obligations and see if you agree

2   with these.

3           You know that you owe the duty of good faith and fair

4   dealing to Mr. Hunton; correct?

5   A.  Yes.                                                    13:58:42

6   Q.  And you know that good faith requires that before you do a

7   denial on a claim, you have to do a fair and thorough

8   investigation?

9   A.  Yes.

10  Q.  Part of that investigation, would you agree, is making sure  13:58:52

11  that not ignoring facts that support a claim?

12  A.  Correct.

13  Q.  Would you agree that the Workmen's Compensation Act is

14  intended, or it should be liberally construed.

15          Have you heard that?                                13:59:13

16  A.  I've heard that term.

17  Q.  Okay.  What does that mean to you?

18  A.  Basically, I think it comes into play with -- at the

19  Commission.  Sometimes they give more -- they want to be more

20  to the side of the injured worker when they can, for lack of a  13:59:25

21  better --

22  Q.  Okay.  And that's what the Act is intended for, is it not,

23  to find coverage for workers when -- when they have been

24  legitimately injured on the job?

25  A.  Yeah, that's fair.                                      13:59:38

1    Q.  Okay.  So let's go to some of these forms and basic facts.

2    If we could go to the -- oh, go to the claim file at page 52.

3    That's Exhibit 2.

4            I'm sorry, Liz.  Can I back up one to page 51?

5            These are, they are called note details.                    14:00:12

6    A.  Yes.

7    Q.  Date entered, 9/26/2014.

8            Do you see that?

9    A.  Yes.

10   Q.  And at the bottom, 9/26/2014?                                    14:00:21

11   A.  Yes.

12   Q.  And the dates that you entered these, okay.  And if you go

13   to the next page, and you're being told needs to get an MRI

14   authorized.  Please assign to Lynell Brown.  Have her call me,

15   Maree, and gives her number; right?                                 14:00:42

16   A.  Yes.

17   Q.  So Maree was asking that from September 26th, 2014; right?

18   A.  I can't see the date, but if that's what the date is, yes.

19   Yeah.

20   Q.  Yeah, that was the date, the page before.                       14:00:56

21           Now, you know -- let me -- you understood that -- that

22   Bryan was saying that he did not have one particular moment

23   when he knew, oh, my God, I've injured my back.  He felt some

24   discomfort early in the morning and it grew; correct?

25   A.  That was his claim, that is correct.                            14:01:31

Case 2:16-cv-00539-DLR  Document 363  Filed 05/31/18  Page 39 of 133
**LYNELL BROWN - DIRECT**
39
1  Q.  All right.  And because of that, would you agree it would

2  be difficult for him to be able to set down every single moment

3  of the day that -- that happened up until the end of the day?

4  A.  Well, he could have been, in honesty, because he had

5  preexisting.  He could have been in pain, you know, every day.    14:01:50

6  I mean, there's no, but typically there's usually -- usually

7  when I talk to injured worker, even when they have, like,

8  preexisting, it's something that just, you know, I did this

9  and, boom, it just really start hurting.  Or I, you know -- you

10 know, something that they can put around what changed because,   14:02:09

11 I mean, you could hurt all day with something and not file a

12 claim.  Or, you know, if he had an injury that his pain was

13 such that he had an injury, then he could have maybe quantified

14 what happened.  I bent over this particular time, or I picked

15 something up.  Or when I stood up, I felt this pinch, this pop,  14:02:28

16 this something.

17 Q.  Okay.  And that's what some people are able to do.  They

18 are able to say, I know what happened.  I know it's when I

19 lifted this particular piece of equipment that it happened?

20 A.  I would say mostly, on most of them, yes.                    14:02:42

21 Q.  But again, there are -- there are many claims where that's

22 not true, or somebody doesn't know exactly what they did, but

23 they wound up getting injured, like Mr. Hunton?

24 A.  I'm not saying it's out of the realm of possibility, but

25 typically again you have to take it on a case-by-case basis,     14:02:57

1  and you have to take different things into consideration.

2          So at that point, he hadn't really indicated to me,

3  and even in the writing, that there was some point in time that

4  he has specific incident.  And the fact that he had

5  preexisting, I was, you know, taking that into consideration as          14:03:13

6  well.

7          So he delayed his reporting, and he had questions

8  with, you know, it happened this way.  He gave some different

9  accounts.  He didn't seek treatment right away.  And I can't

10 recall specifically, but I don't think he reported it to the,          14:03:27

11 like, the following day.

12 Q.  Okay.  Well, we'll talk about all these things.

13 A.  Okay.

14 Q.  You never doubted that Bryan was telling the truth, did

15 you?  You didn't think he was faking or fraudulent in any way,          14:03:43

16 did you?

17 A.  I never, even when I deny claims, I never question the

18 person's -- if you say you're hurt, you're hurt.  Who am I to

19 say that you don't, so...

20 Q.  And if you are going to say that you are questioning          14:03:57

21 whether they got hurt on the job, that's something that you

22 need to investigate; fair?

23 A.  Fair.

24 Q.  Yeah.  I mean, you can't just deny a claim because you

25 think maybe someone wasn't hurt on the job.  You have to          14:04:08

1    investigate to see what happened that day; right?

2    A.  Correct.

3    Q.  Now, you had -- you actually had the name of a witness, did

4    you not?

5    A.  I believe there was a witness somewhere listed.                    14:04:29

6    Q.  I think it's -- if you could pull up Exhibit 2 at page 48.

7    And if you could highlight.  Yeah, thank you.

8            You see that?

9    A.  Yes.

10   Q.  Yes.  There was a witness, coworker it says, Don Herrera?    14:05:00

11   A.  Yes.

12   Q.  Who is Don Herrera?

13   A.  I don't know.  I'm assuming it's his coworker.

14   Q.  All right.  And assuming that it's his coworker, why would

15   you not want to contact him to see what he saw or heard that    14:05:11

16   day?

17   A.  So with witness statements, not always do we contact if

18   there is no reason.  And in this case, Bryan didn't have a

19   specific incident.  So the only thing that he really could have

20   tested to that he was working, and I already knew that.  He was  14:05:27

21   working.

22   Q.  Well, in terms of any kind of inconsistency, would Mr.

23   Herrera not be able to help you to know what happened that day?

24   A.  I don't believe that he would have added any value.

25   Q.  How do you know that?                                        14:05:42

1    A.  Well, I don't know that.  But based on what Mr. Hunton was

2    given me as an injury, his description, he didn't know.  So I

3    don't know that the witness would be able to add any value to

4    the fact that he didn't even know.  He probably could have

5    tested maybe that he had some pain or something, but that                 14:05:57

6    wasn't in question.  It was what was the incident.

7    Q.  Okay.  You've mentioned preexisting a number of times.

8    People that work with Mr. Hunton, could they not have helped

9    you to understand whether or not he was feeling pain from his

10   prior injury during all the years from 2009 up to September 18,           14:06:18

11   2014?

12   A.  That wouldn't have been a question that I would have asked

13   them.  That's subjective, I'm in pain.  You know, I could say

14   I'm hurting to what level, and to what extent, to what was the

15   cause.  So I didn't -- I chose not to contact him.                        14:06:33

16   Q.  All right.  So that was a choice that you were making not

17   to contact him?

18   A.  I didn't contact him, because there was no -- no specific

19   incident that he could attest to.  And actually I think at the

20   time this note was in the file, even a prior adjuster didn't              14:06:46

21   really address that, because I don't think he could have

22   contributed anything.

23   Q.  All right.  Again, that was a choice that you made.  I

24   don't really care what it is Mr. Herrera has to say, fair

25   enough?                                                                   14:07:01

A.  Well, no, that's not it.  He could have -- he could have

given an opinion, I guess.  But at the end what I'm looking for

to adjust compensability is, like, what happened.  What

specifically happened that caused him to have this pain, and

Mr. Hunton couldn't tell me what happened.  So I didn't --          14:07:14

there would be no way that Don could say, well, yes, he did

this or he did that, because Mr. Hunton hasn't given us an

explanation.

Q.  Well, let's go to Mr. Hunton's explanation.  If you could

pull up Exhibit 2, claim file, 709 to 710.                          14:07:29

        This is worker and physician report of injury?

A.  Yes.

Q.  And this is an Industrial Commission form?

A.  That is correct.

Q.  And this was, Dr. Johnston is the doctor that Sundt had       14:07:56

sent Bryan to the day following the injury; right?

A.  Yes.

Q.  And he's somebody that you know?

A.  I'm familiar with Dr. Johnston, yes.

Q.  You trust Dr. Johnston?                                        14:08:18

A.  Yes.

Q.  You know he's a doctor that handles Sundt's claims?

A.  Yes.

Q.  You feel you know -- that Dr. Johnston knows what he's

doing?                                                             14:08:28

**LYNELL BROWN - DIRECT**

1    A.  Yes, I have no reason to question.

2    Q.  Right.  I mean, he does workers' compensation reports all

3    the time for Sundt that you've seen?

4    A.  Yes, as well as many other employers as well.

5    Q.  Right.  Have you ever seen Dr. Johnston fill out a form          14:08:39

6    saying that he had some questions about whether or not there

7    was really an injury, or whether it happened on the job?

8    A.  He may question etiology, but he doesn't really get into

9    whether necessarily that the specifics of what the job.  So he

10   may say, you know, the extent of the injury is questionable, it   14:09:03

11   looks like maybe there is some prior.  He can say if there's

12   degenerative problems, some people have arthritis, so he'll

13   address those type of issues.

14   Q.  All right.  And he didn't suggest anything like that in Mr.

15   Hunton's case; correct?                                           14:09:20

16   A.  I just need to look at the report.  I don't see it on here.

17   Q.  All right.  Well, do you have any --

18   A.  I mean, if you wrote it, he wrote it.

19   Q.  At 709, is this 709?  Okay.  Can you pull out the bottom

20   third of that where it says, describe the handwritten.  Right     14:09:48

21   there.

22         This is the ICA form that asks the claimant to

23   describe where and how the accident or cause of disability

24   occurred, including location and/or department; right?

25   A.  Yes.                                                          14:10:10

1    Q.  And it's just a small space to be filled in?

2    A.  Right, correct.

3    Q.  He says, layout for curb stakes at 19th Avenue and Maryland

4    at 6:30 a.m.; got back in truck to move areas, was unable to

5    move without severe pain in lower back; took ibuprofen, but          14:10:27

6    didn't work.  Do you see that?

7    A.  Yes.

8    Q.  He doesn't go into anymore detail as to exactly when it was

9    that he got into his truck or when he took the ibuprofen;

10   right?                                                               14:10:42

11   A.  No, I don't see that.

12   Q.  You received a much more detailed description with much

13   more space to fill out when he did his proof of loss days

14   later?

15   A.  Yeah, I think it has a little more lines on there.               14:10:52

16   Q.  He tells Dr. Johnston, and this is also on 709 at number

17   19, that he had a prior -- described any preexisting impairment

18   or disease affecting present condition.  It's abbreviated.  Had

19   micro vasectomy about four or five years ago.

20          Do you see that?                                              14:11:23

21   A.  Yes.

22   Q.  And again, one of the ones that would be in your mind is

23   whether or not he had recovered from that; true?

24   A.  True.

25   Q.  I mean, isn't that one of the things that witnesses could       14:11:31

1    tell you if they asked him how has he been working for the past

2    four or five years?

3    A.  That wouldn't have been a question that I would have asked.

4    It's pretty much established that, you know, he worked after

5    the surgery.  He went back to work to Sundt after the surgery,          14:11:45

6    so I was aware of that.

7    Q.  If we could go to proof of loss, which is claim file 694 to

8    697.  We'll just go to 694 to see what it is.

9            So this is the proof of loss, proof of claim form that

10   Zurich has claimants fill out; correct?                                14:12:11

11   A.  That is correct.

12   Q.  And if we could go to the next page.  I'm sorry, 697.  One

13   more.  If you could call that out.

14           Now, here you have a much bigger description that he's

15   giving you; correct?                                                   14:12:44

16   A.  Yes, it's a little more --

17   Q.  Descriptive?

18   A.  -- descriptive.

19   Q.  Right.  Laying out curb stakes for crews to do grading.  He

20   carried a 20-pound GPS pole to lay out hubs in the ground.             14:12:54

21           Do you see that?

22   A.  Yes.

23   Q.  And then pound hubs in the ground with a 10-pound

24   sledgehammer; right?

25   A.  I see that.                                                        14:13:05

LYNELL BROWN - DIRECT

1   Q.  And then move to the next, repeat this process every

2   25 feet; correct?

3   A.  Yes.

4   Q.  He states in here, when we first started laying out -- a

5   few lines down -- when we first started at 6:30 laying out,                14:13:20

6   felt discomfort at first in lower back.

7            Right?

8   A.  Um-hum.

9   Q.  And by the time the layout was done, was in pain and back

10  was hurting; correct?                                                        14:13:33

11  A.  Correct.

12  Q.  And it doesn't give you time periods as to how long that

13  was until he -- you really felt he was in pain; right?

14  A.  You mean toward the end of -- I'm assuming, like, toward

15  the end of the day?                                                          14:13:47

16  Q.  Well, just based upon this description, you can't tell was

17  it an hour after they started, two hours.  You just don't

18  really know?

19  A.  If I read it, I would actually say he -- 6:30 a.m. laying

20  out, felt discomfort, that he felt discomfort 6:30 at first in              14:14:00

21  the lower back.

22  Q.  As he was laying it out?

23  A.  Yes, yes.

24  Q.  And his description of what he was doing when he's doing

25  this layout, pounding hubs into the ground with a sledgehammer,             14:14:11

1    do you know what that means, what he was doing?

2    A.  I believe they are putting stakes into the ground.

3    Q.  Okay.

4    A.  Hammering, for lack of a better word, hammering.

5    Q.  All right.  He talks about, we graded the curb that we had    14:14:28

6    just laid out using a 40 to 45-pound level and bipod legs.

7        Do you know what he's talking about there?

8    A.  Some type of equipment.

9    Q.  All right.  Total process was two hours, and then we moved

10   on to another work area for more layout.                         14:14:45

11       Do you see that?

12   A.  Yes.

13   Q.  Back pain got worse through the day, almost making it

14   impossible to move.  The next day was just as bad, and went to

15   the a.m. clinic with Larry?                                      14:14:59

16   A.  Yes.

17   Q.  So that's giving you a fair amount of description as to

18   what he says happened that day?

19   A.  Correct.

20   Q.  Anything in there that sounds odd to you or unbelievable to   14:15:05

21   you?

22   A.  Well, to me, part of it is that he gave -- he did give more

23   description in this one, and that's not what originally he had

24   said.  He did lay out what he was doing through that day, but

25   he also said at 6:30 a.m., it appear s that he was in pain       14:15:18

```
 1   early on.  So he hadn't started working at that point and he
 2   was already having some pain.  That's kind of part of what I
 3   read 6:30 a.m., laying out, felt discomfort at first in lower
 4   back.  So he was having some pain right when he started work.
 5   Q.  Well, doesn't it actually say when we first start at 6:30    14:15:36
 6   laying out, felt discomfort?
 7   A.  Right.
 8   Q.  Isn't that what it says?
 9   A.  That's how I read that.  He might have been in some
10   discomfort at that point.                                        14:15:48
11   Q.  As he started laying out --
12   A.  Correct.
13   Q.  -- doing the work he described?
14   A.  Doing the work, correct.
15   Q.  And are you saying that it's different than the other form   14:15:59
16   that little two to three line space in that first initial
17   injury report?
18   A.  I think it's similar.  He just expanded it quite a bit in
19   this versus what he initially wrote, which was different, I
20   think, than what was in the medical report.                      14:16:15
21        So there was a couple of different variations or, you
22   know, further descriptions, if you will.
23   Q.  Well, these are his descriptions?
24   A.  Correct.
25   Q.  And his descriptions aren't inconsistent.  One is just more  14:16:25
```

```
 1   longer and detailed than the other?
 2   A.  Well, I think I need to see them before I could say, but I
 3   think there were some inconsistencies.  Because I think on here
 4   he was saying by the end of the day that he couldn't work, but
 5   then he didn't -- when he went to the doctor, he reported that    14:16:39
 6   his pain level was different than what he was saying here.
 7   Q.  Okay.  Which doctor are you talking about?
 8   A.  Dr. Johnston.
 9   Q.  All right.  Well, let's just stay with one issue at a time.
10   Right now what I'm just talking about what he wrote in his        14:16:58
11   initial two-line sentence.
12   A.  Um-hum.
13   Q.  With that first office visit versus this more detailed.
14   Those aren't inconsistent, would you agree?
15   A.  They are -- they are different because he gave more detail    14:17:09
16   in this.
17   Q.  Right.
18   A.  So I would concur that it's different because he gave more
19   detail than this statement than he did in the initial.
20   Q.  All right.  But not inconsistent, just more detail?           14:17:22
21   A.  More detail.
22   Q.  Okay.  Now, if you had any questions about any
23   inconsistencies with reports as to what happened, that's the
24   kind of thing you should investigate, would you agree?
25   A.  Yes.                                                          14:17:47
```

LYNELL BROWN - DIRECT

1   Q.  You can call up the doctor if there's a note in there that

2   you're not sure about or you think is inconsistent, would you

3   agree?

4   A.  I would agree and/or review the record.  Whatever he

5   submitted.                                                          14:17:59

6   Q.  All right.  But I mean, if you have a question about

7   something that's in a record that you think might be

8   inconsistent, you need to clarify that.  Would you agree?

9   A.  With the doctor, yes, it would be with regard to medical,

10  you know, his medical opinion.  I might question something with   14:18:10

11  regard to that.

12  Q.  All right.  You can call the doctor up; right?

13  A.  Um-hum, yes.

14  Q.  Okay.  Or call the nurse, if there was a nurse involved?

15  A.  Yes.  I mean, usually the doctor, yes.                         14:18:22

16  Q.  All right.  You didn't do that in this case; right?

17  A.  I don't recall if I spoke with him directly or not.  I

18  talked to him regularly, but I don't recall whether I did or

19  not.

20  Q.  If you had talked to the doctor because you had some kind     14:18:35

21  of a question about inconsistencies, that would be a note that

22  you would put in a claim file?

23  A.  With regard to the medical, yes.  I wouldn't have asked him

24  about inconsistencies in his statement.  I would have addressed

25  with him medical, because he's really just treating the           14:18:48

1    medical.  Now he does give a description of what happened, but

2    if I have questions for the doctor, I'm really like trying to

3    get at the medical issue.

4    Q.  All right.  But if there's a description that's in the

5    doctor note that you think might be inconsistent, that would be          14:19:00

6    something that you'd want to clarify, if you're going to use it

7    as a basis for denial?

8    A.  Well, what's in the doctor's note should be what he

9    reported to the doctor.  So I may not, per se, question that,

10   but I might again, you know, if there's some degenerative                14:19:14

11   problems, well, how long?  Can you age that?  Those type of

12   questions.

13   Q.  But you know after all the years of doing this, you know

14   sometimes medical records can have descriptions of things that

15   are not necessarily accurate.  You can have wrong descriptions,          14:19:29

16   wrong dates, all kinds of wrong information in a medical

17   record.  You're aware of that?

18   A.  That is not to say that can't happen; correct.

19   Q.  Am I correct that you didn't question Dr. Johnston's

20   eventual diagnosis of a herniated disc after he got the MRI?            14:19:55

21   A.  No, I wasn't questioning the medical, no.

22   Q.  Would you agree with me that Dr. Johnston, because

23   sometimes he will question whether or not it was a legitimate

24   injury, or due to something other than what the claimant is

25   reporting, that it appeared Dr. Johnston didn't have any issues         14:20:21

1   with what Mr. Hunton had described?  In other words, he

2   diagnosed him with herniated disc without -- without any

3   questions about the injury?

4   A.  Right.  The medical portion of what he addressed is the

5   medical, so he was addressing the fact that he had herniated                14:20:41

6   disc, and that's not a question he had a herniated disc.  So he

7   was a making a medical opinion, that's correct.

8   Q.  You weren't questioning whether or not Bryan needed medical

9   treatment based on his herniated disc?

10  A.  Correct.                                                                  14:20:59

11  Q.  All right.  And you weren't questioning whether or not he,

12  the herniated disc, happened on or about September 18th when he

13  was pounding stakes into the ground?

14  A.  Was I questioning whether it occurred?

15  Q.  Yeah.  That you didn't have any question that Bryan was at              14:21:15

16  work that day; right?

17  A.  I knew he was at work.

18  Q.  You didn't have any question that he was doing what he

19  described, pounding stakes into the ground?

20  A.  That's what he said he was doing.                                       14:21:25

21  Q.  And you didn't have any question that the herniated disc

22  came from that.  Your problem was that he couldn't point to a

23  specific moment when it happened?

24  A.  Well, medically, the doctor indicated potentially it could

25  have occurred from that, but there was still a question            14:21:37

1  regarding, you know, if that, indeed, was what set that off.  I

2  mean, typically when you have an injury, you can be predisposed

3  to having another injury, so...

4  Q.  And you can call the doctor and ask them about that if you

5  had a question about it?                                          14:21:51

6  A.  If I had a question, yes.

7  Q.  You didn't have a question, didn't call the doctor?

8  A.  He noted everything.  He had already laid it out in the

9  report.

10  Q.  On October 7th, you learned that he was recommending a       14:22:00

11  surgical consult; right?

12  A.  I would agree, if that's the date.  I don't recall the

13  exact date, yes.  I know at some point he did, yes.

14  Q.  Right.  You did not approve that; correct?

15  A.  I do not believe I did.                                       14:22:17

16  Q.  Now, you -- you had a couple of conversations to Maree in

17  addition to a couple e-mails about this claim; right?

18  A.  More than likely.

19  Q.  Okay.  And during those conversations, she's letting you

20  know, basically, what she's letting you know in these e-mails,   14:22:51

21  what she wants done with this claim?

22  A.  I think she's basically saying that they are questioning

23  the claim, which is she's -- she said that from the get-go.

24  Q.  All right.  Now, Bryan filed a protest.  But before I get

25  to that, when you denied the surgical consult, you understood    14:23:17

1  that Dr. Johnston was requesting this because he felt that his

2  herniated disc may very well need surgery?

3  A.  Right.  That wasn't a question.  He did indicate he had

4  herniated disc, so...

5  Q.  Okay.  But you understood that the request for surgical          14:23:37

6  consult was because he thought that the herniated disc may very

7  well need to be surgically fixed; true?

8  A.  Right.  That was his medical opinion, that is correct.

9  Q.  All right.  And you know that denial of the claim can have

10  medical consequences for injured workers; true?                    14:23:55

11  A.  It could.

12  Q.  Right.  You know that delay in surgery can have medical

13  consequences; true?

14  A.  It could, yes.

15  Q.  So Bryan files a protest, and that's what you have to do to     14:24:06

16  be able to get the carrier to overturn the decision overturned;

17  right?

18  A.  I would disagree with that description, but...

19  Q.  Okay.  How would you describe what a protest is?

20  A.  A protest is you can protest many things.  So you just         14:24:23

21  disagree, you're disagreeing with something that a decision

22  that we've made, whatever it is.  It could be -- I mean, if

23  it's something to protest, they can protest.

24  Q.  And Bryan did, in fact, disagree with your decision to deny

25  his claim?                                                         14:24:40

1    A.  He did, he protested.

2    Q.  And would you agree that if a worker doesn't file a protest

3    that, in most instances, that's the end of the claim?

4    A.  If they don't protest.

5    Q.  If they don't protest?                                    14:24:51

6    A.  Yeah, if they don't protest, then they'll just -- becomes

7    final at that point, and they can still protest even after it

8    becomes final.  But if they don't -- they don't pursue it,

9    then, yeah, there would be nothing else that would happen.

10   Q.  All right.  So if Bryan never filed his protest -- well,   14:25:06

11   first of all, there's a certain time period where you have to

12   file?

13   A.  Right.  That is correct.  And I -- when I advised that a

14   claim is going to be denied, I always put that out.  You know,

15   you have 90 days from the date of the notice, itself.          14:25:19

16   Q.  And had Bryan not filed his protest within the appropriate

17   amount of time, this decision would have been final; true?

18   A.  Correct.  If he hadn't protested, that's correct.

19   Q.  Sitting here today, you know that it was, in fact, payable

20   claim because you accepted it?                                 14:25:38

21   A.  I did eventually accept the claim, yes.

22   Q.  Now, you know that having to go through protest and getting

23   a hearing date from the ICA, that can take months?

24   A.  Potentially, yes.

25   Q.  It's not something that you want to do lightly or easily,  14:25:51

LYNELL BROWN - DIRECT

1    would you agree?

2    A.  I would agree.

3    Q.  You shouldn't force a claimant to go through a hearing if

4    you know that it's a valid claim?

5    A.  When you know that it's a valid claim, right.  If it's not          14:26:06

6    being questioned, I would agree.  I mean, if you have a reason

7    to question the claim, I mean, just because somebody -- if I

8    issue a denial and they protest, and I'm pretty good with my

9    denial, and I always will, you know, seek some additional

10   counsel sometimes, depending on the issue.  If my attorney          14:26:23

11   says, yeah, it's a, you know, we can proceed, I'll proceed,

12   so...

13   Q.  All right.  I sort of forget the question I asked you.

14   A.  I'm sorry.

15   Q.  That's okay.          14:26:36

16        Would you agree you want to make sure that you don't

17   put a claimant through the whole process of having to file a

18   protest and wait for a hearing date, unless you really believe

19   that it's legitimately denied?

20   A.  I would say that if -- if there's question on the          14:26:54

21   compensability of a claim, and I think I have a basis, you

22   know, I'm not intentionally trying to put a person in a

23   position to deny their claim or deny benefits.  It's much

24   easier for me to accept the claim and pay the benefits and move

25   on, but there's certain times where there's just issues that          14:27:12

```
 1   arise on the file that require us to issue a denial, and it may
 2   end up in a protest or, you know, in litigation.
 3   Q.  Okay.  You just said -- I'm sorry.  I forget what you said
 4   in the beginning of that.
 5        You agree that a hearing can take months, like it did    14:27:34
 6   here?
 7   A.  Right.
 8   Q.  You're evaluated at Zurich for your performance; correct?
 9   A.  Yes.
10   Q.  How often are you evaluated?                              14:27:46
11   A.  I know it was at least on a minimum, maybe, semiannually.
12   Q.  All right.  I want to pull up the -- some of these
13   evaluations.  I'll use May the 12th, 2014 evaluation, and
14   that's Exhibit 11, 1664, at page 1.
15        Now, this is your -- the employee name is blacked out    14:28:16
16   at the top, but we're going to see that this is, in fact, your
17   evaluation.  You're a Claims Specialist 3; correct?
18   A.  Yes.
19   Q.  And the date of this is May the 12th, 2014; right?
20        MR. DRURY:  Anita, I'm sorry to interrupt.  I think      14:28:38
21   you got the wrong one, just based on the hire date.
22        THE WITNESS:  Yeah, it says 2016.
23        MS. HEDBERG:  Exhibit 9.
24        MS. ROSENTHAL:  Okay.  We'll go ahead and use this
25   one.                                                          14:28:52
```

1    BY MS. ROSENTHAL:

2    Q.  These are the kinds of things that you are measured on, if

3    you could go to the measurement criteria?

4    A.  Yes.

5    Q.  These are some of the things that you're measured on,                    14:29:06

6    customer satisfaction; right?

7    A.  Um-hum, yes.

8    Q.  What does TWS mean?

9    A.  It's some kind of survey.  I don't remember what it stands

10   for.                                                                          14:29:30

11   Q.  All right.  Some kind of a survey in terms of customer

12   satisfaction, or do you know what?

13   A.  I'm not -- I'm not sure if -- I think they had surveys that

14   went to the injured workers, and they have surveys that go to

15   clients, so I'm not sure which one that applies to or if it       14:29:45

16   encompasses both.  I don't recall.  But I do know it was a

17   survey.

18   Q.  All right.  But in any event, your -- you are measured on

19   customer satisfaction; right?

20   A.  Yes.                                                                      14:29:58

21   Q.  And customer satisfaction means the employer, how the

22   employer has filled out surveys and how pleased they are or are

23   not with you; correct?

24   A.  I would agree.

25   Q.  All right.  That's what customer means?                                   14:30:08

1    A.  I have many customers, but yes.

2    Q.  Pardon me?

3    A.  I said I have many customers, but yes.

4    Q.  Right.  But I mean, they are all employers; correct?

5    A.  No, they could be injured workers, too.  That's what I'm          14:30:20

6    saying, they actually if -- I don't recall specifically, but I

7    think they send surveys to the injured workers and to the

8    employers as well.

9    Q.  You say you think they do.  Do you know?

10   A.  I'm not a hundred percent sure, but I think that they, when       14:30:32

11   the claim closed, a survey would go to the injured worker as

12   well just to evaluate their experience, if things went okay, if

13   you got your calls returned or, you know, some generic type

14   questions.

15   Q.  And are you graded on those surveys, do you know?                 14:30:46

16   A.  I don't know if it was included in this.  I mean, I don't

17   know.  And this was, like, a company -- it's not, like, an

18   individual survey.  So it was whatever they established, so...

19   Q.  All right.  You're also graded on your retention rate of

20   CSE-managed accounts; right?                                          14:31:00

21   A.  Yes.

22   Q.  And what does CSE-managed accounts mean?

23   A.  I apologize.  I don't remember.  It has -- I don't remember

24   what it stood for.

25   Q.  Aren't those the accounts that Dana Marvell was helping           14:31:12

```
 1   with as the CSE, who -- who would help be, I believe, Maree

 2   Buono has testified as a liaison between the customer and

 3   Zurich?

 4   A.  Right.  It would be -- I don't know what that stands for,

 5   but it's a retention of accounts, if that makes it easier, yes.   14:31:28

 6   Q.  And retention of accounts means retention of the employer

 7   accounts that they sign up the next year to get?

 8   A.  It's like insurance, just like if you renew your automobile

 9   insurance, if they renewed their policy the following year.

10   Q.  Okay.  And that's something that's important at Zurich, to   14:31:44

11   make sure that you keep these customers coming back and paying

12   their premiums to Zurich; right?

13   A.  Well, I would say it's important to any insurance carrier,

14   you know.  That's where your business lies.

15   Q.  Right.  And you were very good at this; correct?  You had a   14:31:59

16   high retention rate?

17   A.  Well, I don't know what my specific retention rate is, but

18   they measured my -- if I'm not mistaken -- it was by region or,

19   you know, I don't know how they measured it.  It didn't get

20   drilled down to an individual basis.                            14:32:19

21   Q.  If we could go just go to the top of the same page.  Also

22   on the closure ratio, you're also measured -- you're measured

23   on a lot of different things; right?

24   A.  Um-hum, yes.

25   Q.  One of them is your closure ratio?                          14:32:33
```

UNITED STATES DISTRICT COURT

LYNELL BROWN - DIRECT                                                        62

1    A.   Um-hum.

2    Q.   And can you describe for the jury what that means?

3    A.   Basically, it counts when you get a claim and it counts

4    when you close a claim.  I mean, that would be a hundred

5    percent.  So if in a month I got ten claims, then to achieve          14:32:47

6    closure ratio, I would want to try to close ten claims.

7    Q.   All right.  So you're actually expected to close more

8    claims than you get, 102 percent?

9    A.   102 percent, um-hum.

10   Q.   Correct?                                                          14:33:03

11   A.   That would be fair.

12   Q.   All right.  And MO stands for medical only?

13   A.   That is correct.

14   Q.   And what does LT stand for?

15   A.   Lost time.                                                        14:33:13

16   Q.   All right.  And the medical only, those are smaller claims;

17   right?

18   A.   Less significant injuries, not necessarily smaller.

19   Because you can have somebody who has surgery on medical only

20   claim, but because the employer paid them, it wouldn't be a           14:33:25

21   lost time claim, but it could be significant sometimes.

22   Q.   All right.  What are most of your claims?  Were they lost

23   time or medical only?

24   A.   I had a combination.  I don't -- I don't know what the

25   split was, but I handled both.                                        14:33:39

1    Q.  All right.  If we could go to Exhibit 11, 1665, at page 2.

2    And if we could show our customer is down at the bottom.  This

3    is probably what you were talking about before.

4           You request and act on feedback from customers to

5    improve service?                                          14:34:15

6    A.  Yes.

7    Q.  All right.  How do you get feedback?

8    A.  Well, my feedback would come directly from my manager.  I

9    mean, you get feedback if somebody calls you and says you

10   didn't call me back, that type of feedback.  But the -- the    14:34:28

11   majority of the feedback would come back from the manager.

12   Q.  All right.  And also in the measurement criteria is

13   enhanced customer centricity efforts.  If you go back to the

14   page, it's the second line.  Yeah.

15          So you're being measured on how well you enhance      14:35:01

16   customer centricity efforts; correct?

17   A.  Yes, basically customer service.  You know, return your

18   phone calls, you know, try to respond timely.

19   Q.  All right.  And customer centric is kind of a philosophy at

20   Zurich; right, that they talk a lot about customer centric,    14:35:17

21   that they want the customer to be at the center of everything?

22   A.  I don't think that was -- I think, and again, just

23   recollection, centricity was just like the movement throughout

24   the process of the claim, movement, you know.  Like, you should

25   have centricity, if I handle a claim, the next person should    14:35:33

64

1   handle the claim pretty much the same way.  You shouldn't see,

2   like, a lot of difference.  That's how I interpret that, but I

3   don't remember exactly what their verbiage was for that.

4   Q.  Okay.  Do you remember seeing any kind of charts at Zurich

5   that talked about customer centric that would be a diagram of    14:35:49

6   the customer in the center?

7   A.  I don't remember, but I'm not saying that they didn't.  I

8   just don't remember.

9   Q.  If I could go to Exhibit 11 at 1670, page 7.  And this is

10  -- what's a line manager?  Is that a supervisor?                 14:36:13

11  A.  Supervisor.

12  Q.  And your supervisor was Eva Barclay?

13  A.  At the time, yes.

14  Q.  What's stated here is that you have been supportive of our

15  business partners.  And who is she referring to as business     14:36:27

16  partners?

17  A.  That would be insurers, but I don't think this is my

18  review.  But it would be for insureds.

19  Q.  Okay.  You don't think this is your review?

20  A.  I don't think so.  Can you go back to the first page of      14:36:37

21  this?  I think it was somebody else's, because it says the date

22  of hire was 2016, but I was 2005.

23  Q.  Well...  I'm sorry.  Let's go to Exhibit 9.  Okay.  This is

24  entry date, 9/26/2005.  That's when you started?

25  A.  That's correct, yes.                                         14:37:20

LYNELL BROWN - DIRECT                      65

```
 1    Q.  And now if we could go to the line manager.  Okay.  Again,
 2    your name is blocked out here, but clients love her.
 3              Referring to you; correct?
 4    A.  Yes.
 5    Q.  And that is apparent with a TWS responses?          14:37:42
 6    A.  Yes.
 7    Q.  I agree that she needs to improve with message response.  I
 8    see no issues with inbox diaries.  It's rare for her to be
 9    behind; correct?
10    A.  Yes.                                                14:37:55
11    Q.  And if you could pull back out.  It's in Exhibit 9.  These
12    are the same kinds of things that you're being graded on at the
13    top?  92 percent customer satisfaction.
14    A.  It should read the same, because we all have the same.
15    Q.  These are things that you are expected to do; correct?  14:38:18
16    A.  These are the goals.
17    Q.  Right.
18    A.  Yes.
19    Q.  And the goal of a 90 percent retention of CSE-managed
20    accounts.  And I believe CSE stands for customer service   14:38:28
21    executive, Dana Marvell's position; is that right?
22    A.  That's what she was, yes.
23    Q.  Your 90 percent retention of those accounts, that includes
24    Sundt; correct?
25    A.  Yes.                                                14:38:46
```

1    Q.  That includes big employers.  That's when the customer

2    service executive, Miss Marvell, gets involved?

3    A.  It includes all employers, yes, or insureds.  I'm sorry.

4    Q.  All right.  And you're given information as to how it is

5    that you are supposed to be retaining these customers.  You're          14:38:58

6    supposed to be making them happy; correct?

7    A.  Well, not necessarily.  We're supposed to be providing the

8    customer service, and 90 percent of retention doesn't only

9    affect claim handling.  It could be pricing, you know.  It

10   could be their EMOD.  I mean, there could be a number of                14:39:14

11   reasons why we don't retain an account, but obviously people

12   will tend to stay if their customer service is good.

13   Q.  Right.  You say EMOD.  What is that?

14   A.  I'm sorry, experience modification.  So those are things

15   that can just affect pricing of a policy.  It's kind of -- I            14:39:31

16   use auto, because most people can understand that.  It's like

17   your auto, if you have a lot of wrecks, your premium is high.

18   If you don't have many wrecks, your premium will decrease.

19        Same with workers' comp.  You have lot of claims, one

20   big one, one little one, it could be a combination of things.           14:39:47

21   Q.  And the fact is that a company like Sundt is included in

22   that, the more Workmen's Comp. claims they have, the higher

23   their premiums are going to be?

24   A.  Not necessarily, but typically, yes.  I mean, you know,

25   like I said, there's a lot of variations that go into that.            14:40:05

1   That's kind of outside my wheelhouse, but I just know enough

2   that EMOD does affect the premium.

3   Q.  Right.  And, again, what you mean by that is the number of

4   claims that are made affects the premium?

5   A.  Yes.                                                    14:40:20

6   Q.  You also attend calibration conferences with Sundt; right,

7   or you used to?

8   A.  Not calibration.  Basically, it's more like a file review.

9   So they -- I would go out, and whatever claims that they may

10  have open, I mean, sometimes they have 30 claims.  Sometimes it  14:40:40

11  might be ten.  It just depends on when the review was, and we

12  just discuss the claims.  I tell them where we are, basically,

13  just provide them with the overview of the status of the file.

14  Q.  All right.  Now, if you're having a problem, how does the

15  customer service executive, Miss Marvell, handle it?  She comes  14:40:58

16  in and somehow smoothes things over, if there's any kind of a

17  disagreement?

18  A.  Not necessarily.  She's more involved from an aspect of if

19  there's questions about the rating and the price, or if there's

20  an issue, you know, if I'm not responding, she may get involved  14:41:14

21  and say, you know, we got this call, we need to make sure we

22  handle it.  But she never like, per se, stepped in and took

23  care of it.  She would, you know, share that information if

24  there was an issue.

25  Q.  All right.  You're also evaluated on -- they track your   14:41:27

1    reserves?

2    A.   They track them, but I'm not evaluated on them.

3    Q.   All right.  They track the reserves that you post?

4    A.   Meaning Sundt or Zurich?

5    Q.   Zurich.                                                    14:41:46

6    A.   Yes, Zurich monitors to make sure that, because reserving

7    affects the company, you know, the value of the company, and

8    make sure that we have enough money to cover what we owe.

9    Q.   All right.  They track your average paid out on claims;

10   correct?                                                       14:42:03

11   A.   I'm sure they have lots of reports about lots of different

12   measurements.

13   Q.   They track how many claims you are closing?

14   A.   There's reports for that, um-hum.

15   Q.   Now, let me talk about Dr. Maric.  You had scheduled an IME   14:42:15

16   for Mr. Hunton before you denied this claim that hadn't taken

17   place as of the denial date?

18   A.   Yeah, his appointment was after, correct.  Is that what

19   you're referring to, the date of the appointment?

20           Yeah, it was after.  It was after the denial was        14:42:37

21   issued.

22   Q.   Right.  You scheduled it before the denial was issued;

23   correct?

24   A.   Yes.

25   Q.   All right.  And whether or not -- you actually scheduled     14:42:43

1  through a company called PAX, PAX?

2  A.  Yes.

3  Q.  Whether or not you specifically requested Dr. Maric, or

4  they are the ones who requested Dr. Maric, Dr. Maric was the

5  doctor who was hired by Zurich to do the IME; right?          14:43:01

6  A.  Yes.

7  Q.  You're familiar with Dr. Maric, are you not?

8  A.  Yes.

9  Q.  He's done a number of IMEs for you?

10 A.  He's a treating and an IME physician as well.  I have cases  14:43:12

11 with him that he's the actual primary treater.

12 Q.  I'm sorry.

13 A.  I'm sorry.  He does both IMEs, independent medical

14 evaluations, and he's a primary treater as well.  So he does

15 both.                                                         14:43:27

16 Q.  But you've had him as an IME doctor on many cases?

17 A.  That's fair.  I mean, I've been doing it for a long time,

18 so he's been around since I've been around.

19 Q.  All right.  And we may go over some of his reports in this

20 case, but would you generally agree that Dr. Maric usually     14:43:41

21 finds against the claimant and in favor of the insurance

22 company?

23 A.  I would disagree.  He's board certified, and he goes, you

24 know, I've sent cases where I thought I was going to get a

25 report come back say one way, and it come back and say the     14:43:57

**LYNELL BROWN - DIRECT**

70

1    opposite, you know.

2            So I don't feel like -- he really lays out if he's

3    questioning or, I shouldn't say questioning, if he's going to

4    say benefits should be terminated -- wrong word -- if he's

5    saying the person is MMI, if he's a maximum medical             14:44:12

6    improvement, or if treatment needs, he outlines very

7    specifically what his recommendations are, and he usually backs

8    it up with his findings as to why.

9    Q.  All right.  You're talking about MMI?

10   A.  I'm sorry, maximum medical improvement.                     14:44:26

11   Q.  All right.  The reports that he's done for you -- well,

12   we'll get into them shortly --

13   A.  Okay.

14   Q.  -- if we need to.

15           THE COURT:  Is this a good place for a break?           14:44:38

16           MS. ROSENTHAL:  Sure.

17           THE COURT:  Let's take our afternoon recess.  Come

18   back at 3:00.

19       (Jury exits the courtroom.)

20           THE COURT:  You can step down.  Do we have anything to  14:45:03

21   take up?

22           MR. STEVEN DAWSON:  Yes, Your Honor.  Concerning

23   defense counsel's objection to failure to lay a foundation for

24   that one e-mail, not going south, before the claim goes south.

25   We want to mark as an exhibit the subpoena to Sundt, which      14:45:26

1    requested documents relating to plaintiff and plaintiff's

2    claims, communications between Zurich and Sundt relating to

3    plaintiff's claims, and the affidavit of custodian of records

4    that swears that they have submitted documents responsive to

5    that subpoena signed by Ms. Buono, because now they are                   14:45:45

6    claiming we can't prove this document has anything to do with

7    this case, and I think this will make more than a prima facie

8    showing that it does.

9              THE COURT:  Do you object to that?

10             MR. KLECAN:  No, they can put that in, if they want.            14:46:01

11             THE COURT:  All right.

12             MR. KLECAN:  The witness said she couldn't tell

13   whether it was related.

14             THE COURT:  Okay.  Let's get it marked as an exhibit,

15   and it's stipulated into evidence, okay.  Anything else?                  14:46:10

16             MR. STEVEN DAWSON:  Not by me, no.

17             MR. KLECAN:  No, thank you.

18             THE COURT:  Okay.

19        (Recess taken, 2:46 p.m.)

20        (Jury enters the courtroom.)                                          15:02:03

21        (Proceedings resume, 3:02 p.m.)

22             THE COURT:  Please be seated.  Miss Rosenthal, you may

23   continue.

24             MS. ROSENTHAL:  Thank you.

25   BY MS. ROSENTHAL:                                                          15:02:33

1    Q.  Miss Brown, when we took the break, I started to ask you

2    about Mr. Maric's IME.  Would you agree that if Dr. Maric's IME

3    came back saying that he believed it was an industrial-related

4    claim, that you should pay the claim?

5    A.  Well, he was addressing the medical issue, so I would          15:02:50

6    evaluate it for his medical opinion with regard to the injury.

7    I was just looking for him, basically, to see what was going on

8    with the back injury, period, just in general.  He wasn't there

9    to address compensability.  He was there -- I was asking him to

10   address the medical causation or what he felt like if the         15:03:08

11   herniated disc was related or not related.

12   Q.  And didn't you give him very specific questions to answer?

13   A.  There's some generic questions.  They are specific, but I

14   mean, it's standard questions that we ask.

15   Q.  But there are certain questions that you felt this is what     15:03:23

16   I want an answer too; right?

17   A.  Right.

18          MS. ROSENTHAL:  Liz, if we could go to Exhibit 2 claim

19   file, and I think it's 606.

20          Now, this is --  if we could pull out, yeah, number 2.      15:03:42

21   BY MS. ROSENTHAL:

22   Q.  This is one of the questions that you are asking him.

23   Based on objective medical evidence, is Mr. Hunton's diagnosis

24   related to the described incident, or his preexisting condition

25   been aggravated or temporarily exacerbated.                        15:04:00

1              Correct?

2    A.  Yes.

3    Q.  All right.  And that's specific to Mr. Hunton's claim;

4    right?

5    A.  Yes.                                                        15:04:08

6    Q.  That's not a generic question that you ask IMEs about any

7    claim, this is about Mr. Hunton's claim?

8    A.  That's a question that we ask on every claim.  But yes,

9    because I was working on this file, it's addressing him.

10   Q.  Right.  I mean, not everyone has an issue that involves a    15:04:21

11   prior injury; right?

12   A.  Not necessarily, no.  But I'm just saying that the question

13   is not necessarily just specific to him.  It applies in this

14   case, but on most -- on most IME letters, if you were to pull

15   out a ten, I would say, this question would probably be on at    15:04:40

16   least nine.

17   Q.  All right.  Well, whether it's on other -- other IME

18   questionnaires or not, wouldn't you agree this is the question

19   that you want answered among others?

20   A.  Among others.                                                15:04:52

21   Q.  All right.  And one of the things that you want to know is

22   whether or not Mr. Hunton's described incident that we've been

23   talking about, hammering stakes and so forth, could have caused

24   this herniated disc?

25   A.  Yeah, he says it could have.                                 15:05:07

1   Q.  All right.

2   A.  Not that it did, but it certainly could have.

3   Q.  All right.  Well, I mean, he's not clairvoyant.  He can't

4   know for a fact; right?

5   A.  Yeah, and in this same sentence, he's saying assume --          15:05:18

6   Q.  Ms. Brown?

7   A.  I'm sorry.

8   Q.  I'm just asking question --

9   A.  Okay.

10  Q.  -- by question?                                                 15:05:26

11  A.  Okay.

12  Q.  We'll get to it.

13  A.  Okay.

14  Q.  His response is that he does not believe it's preexisting;

15  correct?  And if you could highlight the very bottom.  He says,    15:05:35

16  I do not find evidence that this is a preexisting condition;

17  correct?

18  A.  Correct.  That's what that sentence says, but --

19  Q.  Right, okay.  And based upon that, he is talking about

20  assuming his medical history is correct that the recurrent disc    15:05:56

21  herniation is the direct result of his work activity on

22  9/18/2014; correct?

23  A.  That's what that says, correct.

24  Q.  And you never got any medical information that contradicted

25  that history; right?                                               15:06:11

1   A.  Not -- not that I recall.  I don't -- I know we sent out a

2   request for -- I don't remember if the medical records came in.

3   I don't think he had them.  So I don't think we got any.  I

4   don't remember.

5   Q.  Sorry.                                                          15:06:23

6           THE COURT:  Can you slow down a little bit, please?

7           THE WITNESS:  I'm sorry, yes.

8           THE COURT:  Thank you.

9   BY MS. ROSENTHAL:

10  Q.  My question, and it's really a yes or a no, you never got     15:06:29

11  any medical information that contradicted the history that he's

12  talking about; correct?

13  A.  Correct.

14  Q.  So you had no reason to believe that the old back injury

15  had not resolved; correct?                                         15:06:46

16  A.  I have this information that says he thought that based on

17  his evaluation that it could be as a result of that, but this

18  is only part of the report.  It's hard to answer your question

19  because there's other parts to the report.

20  Q.  My question to you, Miss Brown, is:  You had no reason to      15:07:06

21  believe after you got Dr. Maric's report back that the old back

22  injury had not resolved; isn't that true?  You had nothing to

23  contradict.

24  A.  I didn't have anything to contradict it, correct.

25  Q.  All right.  He talks up here about the work activity that      15:07:19

1    he described certainly could cause a disc herniation to occur.

2            Do you see that?

3    A.  Yes.

4    Q.  You have no reason to disagree with that; isn't that true?

5    A.  Yeah, he says it could cause it, yes.                        15:07:37

6    Q.  And you have no reason to disagree with that; isn't that

7    true?

8    A.  No.  No.  He's saying it could cause it.  I mean, there's

9    many things that could cause it, but he's saying in this report

10   here that his work activities could have caused it.  I'm in     15:07:51

11   agreement with that statement.

12   Q.  Well, that's my question.  Do you have anything to

13   contradict Dr. Maric's opinion that the work activity that

14   Bryan Hunton has described that he did that day could cause a

15   disc herniation to occur?                                       15:08:06

16   A.  Yes and no.  Because earlier in the report, he refers to

17   the fact that he said he didn't have an incident, but what he

18   wrote here I would agree that that's what, you know, I'm in

19   agreement with what he's saying there.

20   Q.  Well, in fact, if you could go to 602.  It's the end of the 15:08:20

21   third paragraph, also in Dr. Maric's report.  He talks about

22   what it was that Mr. Hunton was doing; that he was doing his

23   regular work activities, which include carrying surveying

24   equipment and pounding stakes into the ground.

25            Do you see that?                                        15:08:49

1    A.  Yes.

2    Q.  And that's exactly what he's been describing on all the

3    forms that you've seen; correct?

4    A.  Yeah, he says he was doing his regular activities, which

5    include carrying surveying equipment and pounding stakes, yes.          15:08:59

6    Q.  And isn't that consistent with everything --

7    A.  That's what he --

8    Q.  Let me just finish my question.

9         Isn't that consistent with everything that he had been

10   saying about what he was doing that day?                                 15:09:08

11   A.  That is what he indicated that he was doing that day.

12   Q.  Okay.  And isn't that consistent with all of the reports

13   that you were seeing?  That's what he said he did that day?

14        THE COURT:  That's yes or no.  Yes or no.

15        THE WITNESS:  Okay.  I would agree.                                 15:09:25

16   BY MS. ROSENTHAL:

17   Q.  Okay.  He states that as he did this work he started

18   experiencing low back pain and then pain down into his left

19   leg.

20        Do you see that?                                                    15:09:36

21   A.  Yes.

22   Q.  And he also asks him, or Bryan volunteers, or I did ask him

23   if he recalled the specific incident which caused the acute

24   episode of pain.  And he said he could not recall a specific

25   incident.                                                                15:09:56

1          That's consistent with what he had been saying all

2    along; correct?

3    A.  Correct.  He said that he couldn't recall; that's correct.

4    Q.  All right.  And as we went over early in the deposition,

5    you know there doesn't have to be a specific incident to be a          15:10:05

6    compensable claim under the Workmen's Compensation Act; true?

7    A.  True.  There doesn't have to be a specific incident.  It

8    could be cumulative.

9    Q.  All right.  You said that he started experiencing pain

10   doing his regular work activities.  Did I read that correctly?        15:10:18

11   A.  Yes.

12   Q.  And you have nothing that -- that would contradict that you

13   have no information that says otherwise?

14   A.  That he did some other type of way.

15   Q.  Yeah.  You have nothing to contradict this statement that         15:10:35

16   Bryan told Dr. Maric that he started experiencing pain doing

17   his regular work activities; isn't that true?

18   A.  True.

19   Q.  And after he asks him about whether there was just a moment

20   when the disc herniated or whether he knew that, he then comes        15:10:54

21   to the conclusion, if we could go back to 606, after talking to

22   him about what may or may have caused it, what he was doing

23   that day, Dr. Maric comes to the conclusion that the recurrent

24   disc herniation is a result of his work activity on

25   September 18th, 2014; true?                                           15:11:32

1    A.  Assuming his activity is correct, yes.

2    Q.  And again, you have nothing that contradicts that the

3    history is correct?

4    A.  Right.  He was relying on his -- his -- how he viewed the

5    description of the injury.                                    15:11:48

6    Q.  Right.  And you have nothing that contradicts that

7    information; isn't that true?

8    A.  I don't have anything to contradict that, no.

9    Q.  Did you have any reason to question Dr. Maric's

10   truthfulness when he gives his opinion that the recurrent disc   15:12:08

11   herniation is a result of his work activity on September 18th?

12   A.  I didn't question him.

13   Q.  All right.  You knew that it answered your question whether

14   or not the disc herniation was the result of his work activity.

15   That was your question?                                       15:12:29

16   A.  Right.  I was asking his opinion.

17   Q.  All right.  And you knew that he answered that question?

18   A.  He did.

19   Q.  All right.  And you knew that he answered it favorably to

20   Mr. Hunton?                                                   15:12:36

21   A.  It's favorable.

22   Q.  All right.  Now, you don't know why you didn't accept the

23   claim after this; isn't that true?

24   A.  No, I didn't accept it because I wanted to still get a

25   legal opinion because the -- he was still saying he didn't have   15:12:52

UNITED STATES DISTRICT COURT

1    a, you know, he couldn't recall, like, a specific incident.  So

2    I wanted to make sure that I was covering all my bases.  So I

3    asked my defense attorney, at that point I think I referred to

4    a defense counsel to just ask him take a look and tell me what

5    his thoughts were.                                    15:13:09

6    Q.  All right.  We'll get into that in a few minutes, but you

7    didn't ask defense counsel until the following year; isn't that

8    true?

9    A.  I don't recall when it was, but at some point I sent it to

10   him.                                                  15:13:18

11   Q.  It was many months after you got this Maric report back?

12   A.  Okay.

13   Q.  True?

14   A.  Yeah, I would assume.  I don't have the dates, but whatever

15   date it says that I sent it to him, that would be the date.   15:13:28

16   Q.  All right.  So it's not like you got this report back and

17   said, well, I need to check with my -- my attorney; right?

18   A.  Right.

19   Q.  You spent months with this report and you did nothing with

20   it?                                                   15:13:41

21   A.  Well, the heart of my issue was still, and I understand --

22   Q.  My question --

23   A.  I'm sorry.

24   Q.  -- you spent months knowing this information and you did

25   nothing with this report; isn't that true?           15:13:48

1    A.  I did -- I know -- I know at some point I sent it to him.

2    I don't know the time frame.  And if whatever the time frame

3    was in the file that's document, that would be the correct

4    date.

5    Q.  All right.  In fact, you didn't give this to your counsel          15:14:00

6    until right before the claim was accepted; isn't that true?

7    But we'll go through it --

8    A.  Okay.

9    Q.  -- if you don't remember.

10          My question to you was:  Isn't it true that you               15:14:18

11   couldn't remember why you didn't accept the claim after you got

12   this report; isn't that true?

13   A.  That I couldn't?  I don't remember that I didn't remember.

14   I know that I still had some question.

15   Q.  All right.  Well, let me, if you could play from her             15:14:33

16   deposition, page 103, lines 22, to 104, line 1.

17          (Whereupon, video deposition excerpt was played for

18   the Court and jury.)

19   BY MS. ROSENTHAL:

20   Q.  All right.  So back at your deposition, you couldn't            15:15:05

21   remember why you didn't just accept this claim.

22   A.  Right.  I hadn't looked -- well, I saw some notes, but I

23   couldn't recall specifically why it had been some time.

24   Q.  And you don't dispute that if you have information that

25   tells you a claim is compensable, you should accept that claim       15:15:19

1   at the moment you received that information; agreed?

2   A.  Depending on the case, I would agree.

3   Q.  All right.  And, in fact, you agree that you should have

4   accepted this claim when you got this report; true?

5   A.  Well, from the medical perspective --                      15:15:35

6   Q.  That's a yes or no.

7   A.  I'm sorry.

8   Q.  Isn't it true that --

9   A.  I came to that conclusion, yes.

10  Q.  All right.  And let me make sure that we weren't talking   15:15:42

11  over each other.

12          You agree that when you got Dr. Maric's report and you

13  got it, I believe, November 5th, 2015?

14  A.  Okay.

15  Q.  When you got it on November 5th, 2015, that you should have 15:15:55

16  accepted this claim; true?

17  A.  There were -- I eventually accepted the claim.  It's hard

18  for me to say true or false, because there's some other factors

19  that kind of go into that, so...

20          MS. ROSENTHAL:  Liz, if you could play from her        15:16:13

21  deposition page 106.  123, 19 to 124, 13.

22          MR. KLECAN:  I'm sorry, 106?

23          MS. ROSENTHAL:  No.  I'm sorry, 123.

24          MR. KLECAN:  I'm sorry, Anita.

25          MS. ROSENTHAL:  123, line 19.                           15:16:41

1            (Whereupon, deposition excerpt was played for the

2    Court and jury.)

3    BY MS. ROSENTHAL:

4    Q.  That's what you said at your deposition?

5    A.  Correct.                                                    15:17:53

6    Q.  And -- and -- wouldn't you agree that the reason that you

7    didn't accept the claim back when you got Dr. Maric's opinion

8    is that you knew it would displease Sundt?  You knew what they

9    wanted, and they wanted this claim denied?

10   A.  They wanted a lot of claims denied, so that was not my     15:18:06

11   basis at all.  I mean, we've gone head to toe over many claims

12   that they didn't want accepted that I accepted.  So, I mean,

13   like I said, I've had a lot of claims with them over the years.

14   Q.  Do you remember being asked whether or not you could

15   remember any claims that you actually had denied that, I mean,  15:18:22

16   accepted that Sundt wanted denied?

17   A.  Correct.  I couldn't recall any specific ones.  I mean -- I

18   mean, I have that with every insured, so there's always going

19   to be a difference of opinion on some claims.  Sometimes they

20   think we can deny claims, you know, for some reasons that have  15:18:39

21   absolutely nothing to do with an injury.  So I know that we --

22   you know, we've had issues for several -- over several issues,

23   reserves, response.

24   Q.  So bringing this to a close here, when you got Dr. Maric's

25   report, you think it's fair that you should have accepted.      15:18:59

1    Fair to say you should have accepted, yes?  As we just played

2    from your deposition?

3    A.  Right, but based -- yes.

4    Q.  And you don't remember why you didn't accept it; correct?

5    A.  At the time of the deposition, I didn't.  I hadn't really          15:19:13

6    got a chance to review and go back over, like, you know, dig in

7    the file.  But at that point in time, that was what my answer

8    was, correct.

9    Q.  And whatever review you've done, you did recently with

10   Zurich's attorneys; fair to say?                                       15:19:25

11   A.  I did some review with them, but then I had a chance to

12   look at the file notes because, honestly, sometimes I don't

13   remember what I did last week.  So, you know, I needed an

14   opportunity to just refresh myself with what happened.

15   Q.  You knew that Bryan Hunton was asking for this IME;               15:19:39

16   correct?

17   A.  Yes, I believe I spoke to him at some point.

18   Q.  And you -- you know that it's required that you give the

19   claimant an IME when they ask for it; right?  It's required?

20   A.  Medical records they are entitled to, absolutely.                 15:19:57

21   Q.  All right.  Including an IME?

22   A.  Including an IME.

23   Q.  And you didn't send it to Bryan, did you?

24   A.  He said that he did not receive it.  I thought I had,

25   indeed, sent it.  And I don't recall, like, the timeline on          15:20:08

1    that, because it's just a normal process.  Regardless of

2    whether it's favorable or not favorable, they are entitled to

3    the medical records, and that's just a standard, just throw it

4    in an envelope and just mail it out, so...

5    Q.  Didn't he ask you repeatedly to send it to him?                 15:20:22

6    A.  I talked to him a couple of times, and at some point, he

7    did ask.  I know he asked about it, and I don't remember if --

8    I don't recall exactly when I had it.  But at some point, I

9    thought I was -- I thought I had.  So I don't know whether it

10   went out or not.  I'm not sure if I did.  I'm not sure if I       15:20:37

11   didn't, but he did request that.  I think he requested the

12   file, so...

13   Q.  And several times?

14   A.  More than once, yes.

15   Q.  And he wrote you a letter about it?                            15:20:48

16   A.  He sent a letter.

17   Q.  Saying I've requested this several times; correct?

18   A.  I think he said something to the effect like we spoke, or

19   something, and you said you would send the file, which I

20   probably did.                                                      15:20:58

21   Q.  All right.  I want to move to this -- you mentioned late

22   report.  You knew that Bryan Hunton's claim did not involve a

23   late report; true?

24   A.  It was not late reporting with regard to the statute, but

25   it was late reporting to the insured.  Different insureds have    15:21:13

1    like different time frames, most of them want to know the same

2    day.  So when I say late reporting with respect to that, it was

3    late being reported to the insured, not --

4    Q.  Isn't it true that what you meant by late report, you put a

5    note in the claim file about late report; right?                     15:21:30

6    A.  Yes, I did.

7    Q.  And what you meant to say was it was the employer's late

8    report.  It was Sundt's late report, not Bryan's; correct?

9    A.  Well, it was late reported to the employer.  I was getting

10   that information from them, so I'm taking from them when they        15:21:44

11   said he reported it to them.  That's a standard question.

12          MS. ROSENTHAL:  Play 139, line 15, to 140, line 11.

13          (Whereupon, video deposition excerpt was played for

14   the Court and jury.)

15          THE WITNESS:  That's fair, yes.                                15:23:00

16   BY MS. ROSENTHAL:

17   Q.  So it's not a late report from Bryan?

18   A.  The insured didn't -- yes.

19   Q.  It's a late report from when Sundt reported it to Zurich;

20   correct?                                                              15:23:08

21   A.  When they reported it to Zurich, yes, and -- yes.

22   Q.  All right.  That was a mistake you made?

23   A.  Yes.

24   Q.  Okay.  I want to talk to you about Mr. Finical, who is the

25   lawyer that you went to.                                             15:23:25

1           I want to go through this timeline with you.

2    Exhibit 41, 733, at page 35.  This is an e-mail from Miss

3    Buono.  This is February 11th, 2015; correct?

4    A.  Yes.

5    Q.  She's asking you, still waiting for you to call me on          15:23:56

6    someone else.  Also, can you please send me the denial letter

7    for Bryan Hunton?  He has filed an EEOC claim for Sundt and

8    they need it for their investigation; correct?

9    A.  Yes.

10   Q.  All right.  And if we could then go to Exhibit 41, 734,        15:24:11

11   page 40.  This is February 16th.  Hey, lady, don't forget I

12   need that info on Bryan today.

13           Correct?

14   A.  Correct.

15   Q.  And then if we could go to Exhibit 41.  That's page 43.        15:24:30

16   She's telling you in February 18th, hey, have you been getting

17   my e-mails and messages?  I really need that info on Bryan this

18   morning.  It's a few days last, and she has a deadline.  Thank

19   you.

20           Do you see that?                                           15:24:53

21   A.  Yes.

22   Q.  All right.  So there's a certain amount of pressure on you

23   to come up with the information that Maree at Sundt wants you

24   to give her; right?

25   A.  I thought it had already been made.  The notice when it        15:25:05

1  gets mailed, they are already mailed.  You know they get mailed

2  to the claimant, the employer, and the Industrial Commission at

3  the same time.  And I can't remember the date, but I thought I

4  had already sent it to her.

5  Q.  All right.  But she's telling you day after day you haven't          15:25:18

6  sent it to her; correct?

7  A.  Yes.

8  Q.  So she's putting some pressure on you to get this

9  information to her?

10 A.  To send it to her, um-hum.                                           15:25:27

11 Q.  All right.  Exhibit 41, 736, at page 44.  This is

12 February 20th.  Hey, I'm still waiting for that denial summary

13 for Bryan.  I need today since they have been waiting so long.

14 Hope you're okay.  I don't usually have to bug you to get this

15 info -- to get info.  Let me know if you need to talk or          15:25:56

16 something.

17         Do you see that?

18 A.  Yes.

19 Q.  So you still haven't sent the information; correct?

20 A.  She didn't.  Yeah, based on what she's saying, she didn't      15:26:03

21 have it.  I'm not sure why, but she didn't have it.  And when

22 you say information, I'm referring to the notice.

23 Q.  All right.  And also is she not asking for your reasons for

24 why you denied the claim?

25 A.  She says denial summary, but I think she was referring to      15:26:20

1    the notice.  I'm not sure because we don't issue, like, on the

2    notice, it just says accepted or denied.  There's no additional

3    information on the notice itself.

4    Q.  Right.  And isn't a denial summary, isn't she waiting to

5    hear the reasons why you denied this claim?                          15:26:36

6    A.  Again, I don't know if that's what she meant.  I would

7    refer to this that she's asking me for the notice of -- the

8    actual notice.  They needed to have the notice for whatever

9    reason they were looking for it.  They wanted the actual notice

10   of claim status.                                                     15:26:56

11   Q.  Well, whatever information she's asking for, she's

12   obviously not getting from you?

13   A.  Yes.

14   Q.  Would you agree with that?

15   A.  Yes.                                                             15:27:03

16   Q.  All right.  And you don't answer her.  What you do is you

17   turn to counsel that Zurich hires, Scott Finical; correct?

18   A.  Correct.

19   Q.  And you ask him for help on this claim and his thoughts;

20   correct?                                                             15:27:18

21   A.  Yeah, I asked him to, yeah, look at it and tell me what he

22   thought.

23   Q.  All right.  Exhibit 42, 4980, at page 6.  A few days after

24   that e-mail.  Good morning, Scott.  This is the file I spoke of

25   yesterday.  If you can, let me know your thoughts.  Sundt          15:27:37

1   strongly questioning the claim because he's had prior back

2   complaints and treatment.  Also initially did not report the

3   claim right away.  Thank you for your assistance.

4           Correct?

5   A.  Correct.                                                15:27:50

6   Q.  All right.  So you're asking him for his thoughts on what?

7   A.  I'm asking his thoughts on the compensability of the claim.

8   I'm asking if he thinks that it's worthy of continuing a

9   denial, or if he thought that, you know, based on what his

10  knowledge of the Industrial Commission, whether we should      15:28:06

11  proceed or whether I should accept the claim.  And he

12  ultimately rendered the recommendation to accept.

13  Q.  At this point, he doesn't have -- you haven't sent him the

14  information from Dr. Maric that we've just been going over?

15  A.  I actually copied him on the file, and I think he mentioned 15:28:21

16  that he didn't receive it, and he couldn't read some of the

17  documents.  It's just kind of like a, because he's defense

18  counsel, he's entitled to everything.  So I don't have, like,

19  to go through and pick what to send him.  Just click and send.

20  Q.  Miss Brown, isn't it true you did not send him the Finical  15:28:35

21  IME?

22  A.  It wasn't in the file.  I don't think it was in the file at

23  that point.

24          THE COURT:  You said Finical IME.

25          MS. ROSENTHAL:  I'm sorry, Maric IME.  Let me make      15:28:46

1   sure the record is clear.

2   BY MS. ROSENTHAL:

3   Q.  You did not send Mr. Finical the Maric IME at this point,

4   February 24, 2015; isn't that true?

5   A.  It was not in the transmission that went over, correct.            15:28:59

6   Q.  All right.  And it wasn't in the claim file?

7   A.  I don't think it was in the file.

8   Q.  Exhibit 42 at 4980, page 6 at the top.  Oh, I'm sorry.

9   That's the same one.

10          Exhibit 42, 4978, at page 4.  Mr. Finical writes to         15:29:21

11  you:  I've reviewed the records you sent.  Lynell, I've

12  reviewed the records that you sent.  Although the records from

13  Dr. Johnston's and the AIM clinic were significantly enlarged,

14  so much of the text of those reports were cut off and not

15  readable.  The medical records referred to an IME by Dr. Maric    15:29:54

16  in November of 2014, and some examinations by Dr. Wang and Dr.

17  Lieberman.  I did not see any records from these three

18  physicians which would be helpful to review.  We do not know if

19  those examinations actually occurred.

20          So let me stop right there.  That tells you that you       15:30:13

21  did not, in fact, give him the IME by Dr. Maric; correct?

22  A.  Well, I sent, like I said, I sent electronic file, I

23  believe.  And I don't think those records were in there because

24  he asked for them.  He referenced them.  So there was reference

25  of them there, but I don't think he received the report.          15:30:31

1   Q.  You did send him the record from Dr. Johnston at the AIM

2   clinic; correct?

3   A.  That was.  Yeah, he got that.  I don't think he could read

4   it, but I think he got those.

5   Q.  All right.  So you know you sent over those medical                15:30:41

6   records?

7   A.  Correct.

8   Q.  And why would you -- if you are debating about whether or

9   not you actually sent over Dr. Maric's IME, why would they not

10  have gone out just like Dr. Johnson's records gone out?              15:30:57

11  A.  Right.  Dr. Wang or Dr. Lieberman because, again, I'm just

12  sending the whole file.  When an applicant attorney asks for a

13  file, I take out work product, things of that nature.  But

14  defense counsel, I don't have to do that.  So it makes it

15  really easy because I just send the entire file.  I don't have      15:31:11

16  to go through and look to whatever is in there.  He's going to

17  get -- he can figure out what he needs and what he doesn't need

18  to look at, but he gets the entire file.

19  Q.  You would agree that would be important to send the

20  attorney Dr. Maric's review?                                         15:31:23

21  A.  Yeah, I would agree it would be important to send the file.

22  So that's what I thought I had done, was send the entire file.

23  Q.  And you knew, in fact, because you know that Dr. Maric's

24  IME was favorable, you know it's particularly relevant for the

25  attorney to know whether or not this is a claim that he wants       15:31:37

1   to fight in the ICA?

2   A.  Right.  That's what I was asking him to review, exactly.

3   Q.  Right.  Then, and this is Exhibit 41 at 737, page 473.

4   This is an e-mail that we've talked about before on March 2nd

5   where you say, I'm following up to confirm our conversation          15:32:08

6   regarding the claim denial.  The claim was denied due to the

7   fact he had preexisting, and also that he really didn't

8   indicate a specific incident.

9         That was the only basis for denial; correct?  That's

10  March 2nd?                                                           15:32:22

11  A.  Correct.

12  Q.  And then Exhibit 41 at 2245, at page 52.  I'm sorry, can we

13  go back?  Exhibit 41 at 865, page 49.  And this is from someone

14  named Marian Enriquez.

15        Do you remember who she is?                                   15:32:55

16  A.  Actually, no.

17  Q.  She's telling you about your March 2nd statement that we

18  just looked at about why Mr. Hunton's initial claim was denied.

19  She says the reason for my followup message is because this

20  type of informal response needs additional information.  Our        15:33:11

21  company needs to have a better understanding about Zurich's

22  decision to deny this Workmen's Comp. claim.  We are getting

23  ready to prepare a formal response to an outside party, and the

24  first copy only shows when the incident was reported and that

25  it was denied after Zurich's consideration assessment.              15:33:28

LYNELL BROWN - DIRECT

1   However, we need to have a formal and complete summary that

2   shows both rather than the following brief e-mail you recently

3   provided.  My understanding is that Mr. Hunton filed a

4   Workmen's Compensation claim and it was denied because he had a

5   preexisting condition.                                          15:33:45

6           And you're disputing that.  You're saying that was

7   poorly worded and you didn't mean to.

8   A.  Correct.  Correct.

9   Q.  However, we need the following, and then she goes on to ask

10  about when he filed the claim, what did he allege specifically,  15:33:58

11  and also what specifically were Zurich's findings.  We need

12  this level of professional summary to be able to appropriately

13  respond.

14          Correct?

15  A.  Yes, that's what it says, yes.                              15:34:13

16  Q.  Thank you.  And now if we could go to Exhibit 41, 2245, at

17  page 52.  Maree is saying, did you ever send Marian the letter

18  she asked for on Hunton?  We need that for denial on his

19  wrongful termination claim.

20          Did you see that?                                       15:34:42

21  A.  Yes.

22  Q.  You were aware of the EEOC claim, wrongful termination

23  claim?

24  A.  By reference, that's not something that's in my wheelhouse.

25  It wouldn't have been anything that affected my claim.          15:34:50

1    Q.  All right.  But you knew of it?  You knew?

2    A.  Based on the e-mail, yeah, she mentioned it.  I don't -- I

3    wouldn't have taken like much note of it as it related to my

4    claim.

5    Q.  My question to you is you're aware.  EEOC suit that he            15:35:04

6    filed that he was wrongfully terminated; correct?

7    A.  Yes.

8    Q.  And then Mr. Finical e-mails you, this is Exhibit 42 at

9    4977, at page 3.  He wants to know -- he's been contacted by

10   Debbie Runbeck, the claimant's attorney; left him a message to     15:35:35

11   call her back.  I'm unsure how Debbie knows I've conferred with

12   you about this claim.  Can you please give me a claim update?

13   Did you deny the claim?  Has applicant filed a request for

14   hearing?

15           This is March 16th; right?                                  15:35:51

16   A.  Um-hum.

17   Q.  Yes.

18   A.  Yes.  I'm sorry.

19   Q.  And you know the hearing is coming up in April?

20   A.  I knew there was a hearing.  I don't know when the date         15:35:57

21   was, but I knew he had filed a protest.

22   Q.  All right.  And then if we could go to Exhibit 41 at 738,

23   page 53.  This is the next day.  Maree is saying, hey, lady, I

24   haven't gotten the claim status report or the letter on Hunton

25   that was due on Friday.  I hate to keep bugging you, but I         15:36:20

 1    can't hold them off any longer.  Do you know who them is?

 2    A.  Somebody in her company.

 3    Q.  All right.  Let me know what's going on and if I can help

 4    you with anything.  Please send it in by the end of today.  If

 5    I don't receive it by then, maybe we can talk to Dana about          15:36:34

 6    your workload while your plate is so full.  Maybe she can give

 7    you some relief.  Praying that everything is working out for

 8    your brother and familia; right?

 9    A.  Right, yes.

10    Q.  In fact, you were having some personal issues?                   15:36:47

11    A.  Yes.

12    Q.  All right.  And was this the reason that you weren't

13    getting information to Maree?

14    A.  I don't necessarily fully recall, but that probably

15    contributed to it.                                                   15:37:04

16    Q.  Dana Marvell is this customer service executive that we

17    talked about before that's the liaison between Sundt and

18    Zurich?

19    A.  Yes.

20    Q.  So this is an example of Ms. Buono saying I'm going to call      15:37:16

21    -- maybe I can call Dana and help you out.

22          Did she ever do that, do you know?

23    A.  I don't know.

24    Q.  But that's something that -- that they can do, your

25    customers can ask that Dana step in and help you out with           15:37:31

1   issues that you're having?

2   A.  Yes.

3   Q.  All right.  Exhibit 42, 4815, at page 8.

4           And this is from Mr. Finical?

5   A.  Um-hum.                                                  15:37:56

6   Q.  This is on March 18th, 2015?

7   A.  Yes.

8   Q.  Saying please call me as soon as possible; right?

9   A.  Yes.

10  Q.  And then on the 19th, this is at -- well, let me -- so you   15:38:04

11  did send Mr. Finical the Maric IME after this; correct?

12  A.  I don't recall.  At some point, I did get it over to him,

13  yes.

14  Q.  All right.  And how did you get it over to him?

15  A.  I don't know if I e-mailed it or -- I don't remember.      15:38:24

16  Q.  All right.  But you gave it to him after he said I

17  understand there's an IME from Dr. Maric; right?

18  A.  Yes.

19  Q.  All right.  And after he gets that, he e-mails you, and

20  this is Exhibit 42 at 4975, page 1.  This is again March 19th,   15:38:37

21  2015.  He says, thank you, Lynell, for providing us with a copy

22  of Dr. Maric's IME this morning.

23          So it was the 19th you gave it to him; correct?

24  A.  I would agree.

25  Q.  Based on the applicant history, Dr. Maric has concluded     15:39:04

1    that the applicant's recurrent L4-5 disc herniation is related

2    to the alleged 9/18/2014 work injury.  As we have discussed, we

3    have not had the opportunity to review any medical records from

4    Dr. Wang or Dr. Lieberman.  In absence of medical or other

5    substantial factual evidence that applicant continued to have          15:39:25

6    ongoing back and leg symptoms following his 2009 surgery by Dr.

7    Pootrakul in June, 2009, which could be provided to Dr. Maric

8    for further review and consideration.

9           And this is, if you would highlight this, there is not

10   a present basis to continue to deny this alleged injury claim.         15:39:46

11          Do you see that?

12   A.  Yes.

13   Q.  Doesn't that tell you that Mr. Finical is saying on

14   March 19th there is no basis to continue denying this claim?

15   A.  There's not a present basis to continue to deny the alleged        15:40:05

16   claim, yes.

17   Q.  And you still didn't accept it?

18   A.  I did accept it.

19   Q.  You accepted it later.  You didn't accept it when you got

20   this e-mail, did you?                                                  15:40:15

21   A.  I don't remember what date.  It probably wasn't the same

22   day, I'm sure.

23   Q.  All right.  There's no reason why you couldn't have

24   accepted the claim that day after you're being told by your

25   attorney that there is no reason to continue to deny this             15:40:26

1   claim; isn't that true?

2   A.  That would be fair, but I don't know what was going on that

3   day.  So, I mean, I can't recall.  I think I did it in short

4   proximity, I just didn't do it the same date I got the e-mail.

5   Q.  All right.  And you know that this is important, as we've          15:40:40

6   been going over, that Mr. Hunton all this time has been without

7   comp benefits since you denied the claim back in October the

8   previous year; right?

9   A.  He was not getting compensation from me.  I don't know --

10  he continued to work a little bit after the injury.  I don't          15:40:55

11  know the date, but I think he continued to work a little while

12  after the injury occurred.

13  Q.  Well, you know he was fired October 31st of the prior year?

14  A.  I knew he was terminated at some point, yes.

15  Q.  And you know that he has been without comp benefits all           15:41:08

16  that time, including March 19th, 2015?

17  A.  Right.  He hadn't been paid at that point.

18  Q.  And as we went over before, you know this has consequences

19  for him, both medically and financially; correct?

20  A.  That's fair.                                                      15:41:27

21  Q.  He says, if you intend to accept this claim, please inform

22  Debra Runbeck, the applicant's attorney, as soon as possible.

23  As you know, Runbeck called us yesterday and explained she

24  intends to file a bad faith complaint with the ICA.  If you

25  prefer, we can call Runbeck on your behalf, just let us know.        15:41:43

1           Correct?

2    A.  Yes.

3    Q.  He is asking you to act immediately; true?

4    A.  True.

5    Q.  Then on -- this is Exhibit 42 at 4827, page 10.  This is          15:41:54

6    the next day.  Mr. Finical writes you and says, Lynell, did you

7    call Debra Runbeck, applicant's attorney?  She says, she

8    intends to file the bad faith complaint with the ICA today if

9    she didn't hear from someone about the acceptance of the claim.

10          Correct?                                                       15:42:29

11   A.  Yes.

12   Q.  And you still didn't accept the claim; correct?

13   A.  I don't know that I -- I don't remember whether I called

14   her.  I know at that point I had already made the determination

15   that the claim would be accepted.                                     15:42:38

16   Q.  At this point in March 20th?

17   A.  Right, because he had told me the day before.  I just

18   hadn't had an opportunity to issue the actual notice.

19   Q.  All right.  And if we could go to Exhibit 2 at 590 through

20   594.                                                                  15:42:54

21          This is the case summary report.  We briefly showed

22   this before.  Date of the report is March 24th, 2015; correct?

23   A.  Correct.

24   Q.  So days after Mr. Finical has told you you need to accept

25   this claim; right?                                                    15:43:14

UNITED STATES DISTRICT COURT

1    A.  Correct.

2    Q.  And days after he again reminds you you need to call Debbie

3    Runbeck, are you going to accept this claim; correct?

4    A.  Yes.

5    Q.  All right.  And you say you had made up your mind you were        15:43:22

6    going to accept it.

7    A.  Well, based on his opinion, yes.  I had.

8    Q.  Instead, what you do is you file this case summary report

9    with Sundt, which is justifying why you denied the claim; isn't

10   that true?                                                            15:43:39

11   A.  Yes.  They needed some case summaries, and so that was -- I

12   don't remember date of report is when it was printed.  I don't

13   know exactly when I entered it, but that was the report that I

14   sent them was because they were having a file review and I was

15   trying to get something out to them.                                  15:43:52

16   Q.  All right.  And if we could go to claim file, Exhibit 2, at

17   591.

18        Under compensability rationale.  Compensability

19   rationale, as you testified before, this is the reason the

20   claim is being denied; correct?                                       15:44:16

21   A.  Yes.

22   Q.  That we read this before, that basically it's -- he did not

23   have a specific incident and delayed reporting of the claim,

24   and it also mentions prior back injuries; correct?

25   A.  Yes.                                                              15:44:30

1   Q.  The same three reasons that Sundt had been asking you to

2   deny this claim on; correct?

3   A.  They were asking -- they were questioning it because of the

4   prior back injury, but there were other items as well.

5   Q.  Right.  They were questioning these three things and that's          15:44:43

6   what you put in your compensability rationale?

7   A.  Right.

8   Q.  And as we've gone over, you knew you didn't have to have a

9   specific incident.  You knew he had not delayed reporting of

10  the claim.  If anyone did, it was Sundt, and you knew it was          15:44:56

11  not a preexisting claim; correct?

12  A.  He did delay reporting the claim, but it was just he

13  reported it the next day.  But in that inference that you're

14  asking me, I was referring to Sundt.

15  Q.  Right.  It's not considered a late claim report?          15:45:09

16  A.  Not in the eyes of the Industrial Commission.  You have

17  one year.

18  Q.  And if we can pull back and show the medical summary.  Go

19  through various medical summaries from 11/12/2014, 10/28/2014,

20  10/21/2014, 10/07/2014, and another 10/7/2014.          15:45:51

21        Are there some on the next page too?

22        The other medical records that you reference in this

23  case summary sent to Sundt is from one from October 3rd, 2014,

24  and September 26th, of course, 2014; right?

25  A.  Um-hum, yes.          15:46:25

1    Q.  Nowhere in here is Dr. Maric's IME report; correct?

2    A.  I think I put -- can you go back to the prior page?

3    Q.  Pardon me?

4    A.  Can you go back to the prior page?

5    Q.  Sure.                                                    15:46:36

6    A.  I referenced it, but I don't think I put the report in

7    there, the very first one.  Dr. Maric, he was referred to Dr.

8    Maric for the IME.

9    Q.  Why would you not state what Dr. Maric's report said?

10   A.  I don't recall.  I don't know why.                       15:47:03

11   Q.  Isn't that -- isn't Dr. Maric's report probably the most

12   important medical record that you had with regard to

13   compensability of his claim?

14   A.  I wouldn't say that.  I mean, everything in its totality

15   contributed to eventually it being accepted.  Dr. Maric's     15:47:20

16   opinion was that, based on what he had to deal with, that he

17   thought it could be related to his employment.

18   Q.  My question to you is:  Don't you agree that Dr. Maric's

19   opinions in this case -- well, I'll just leave it at -- were

20   extremely relevant to compensability issues on this claim?    15:47:38

21   A.  I would agree it's relevant.

22   Q.  And that should have been sent to Mr. Finical; right?

23   A.  Correct, and I thought I had.

24   Q.  And it should have been sent to Mr. Hunton?

25   A.  Yes.                                                      15:47:52

1    Q.  And it should have been sent to Sundt?

2    A.  They get a copy as well, but they have access.  So I don't

3    necessarily always have to send them copies because I believe

4    they had some type of access to our system.  I don't recall.

5    But most of the insureds, they can see medical records and

6    things that are on the system and online.

7    Q.  Ms. Brown, isn't the reason that Dr. Maric's report is not

8    being sent to all these people and not being talked about is

9    that you knew it flew in the face of your denial on this claim?

10   A.  I disagree.

11   Q.  So on March 24th, you were still continuing to deny this

12   claim; right?

13   A.  Well, it hasn't -- I hadn't issued the notice yet at that

14   point.  I think I issued it on the 25th.

15   Q.  Right.

16   A.  The following day.

17   Q.  So on March 24th, you're still sending information talking

18   about preexisting late report and no specific incident; isn't

19   that true?

20   A.  That was in the -- you're referring to the case summary.

21   Q.  Yeah.

22   A.  Yeah.  Yeah, I was just trying to get a case summary out to

23   them, yes, because they needed some reports, correct.

24   Q.  Right.  Days after you were told by Mr. Finical you need to

25   pay this claim; right?

15:48:07

15:48:25

15:48:48

15:48:58

15:49:12

1    A.  I would agree.

2    Q.  Now, at -- on 3/25, and this is Exhibit 42 at 4826, page 9,

3    this is another e-mail from Mr. Finical:  Lynell, sorry to be a

4    pest.  I'm just following up.  I just want to confirm that you

5    called Debra Runbeck, the applicant's attorney.                    15:49:50

6         And, in fact, you hadn't; right?

7    A.  I'm assuming not, based on his e-mail.

8    Q.  And Runbeck and you hadn't accepted it at that point;

9    right?

10   A.  On the 25th, I think -- I think is that the day of the         15:50:03

11   notice.

12   Q.  This is March 25th at 12:47 p.m.  You see that at the top?

13   A.  Um-hum.

14   Q.  Yes?

15   A.  Yes.  I'm sorry.                                               15:50:11

16   Q.  And so you know as of March 25th, 12:47 p.m., you

17   apparently had not accepted the claim; right?

18   A.  It could -- I don't know what time I accepted the claim.  I

19   don't know what time the notice was done.  You can infer that

20   from -- I don't know when I did the notice.  I don't know what    15:50:29

21   time I did the notice.

22   Q.  All right.  And then let's go to Exhibit 42, 4826 and 4843

23   at page 9.

24        This is March 25th at 12:50 p.m. right after the

25   e-mail from Mr. Finical; correct?                                  15:51:04

1    A.   Um-hum.

2    Q.   Yes?

3    A.   Yes.  I'm sorry.

4    Q.   That's okay.  And you say, hi Scott.  I've accepted -- I

5    have issued acceptance.  I will follow with Debra.  Also          15:51:14

6    calculating comp benefits at this time.  Did she by chance send

7    surgical report?

8         So it's March 25th at 12:50 p.m. you finally accept

9    this claim; correct?

10   A.   Well, I'll agree that's when I responded to him.  I don't    15:51:27

11   know what time I did the actual notice, but that's when I

12   responded to him.

13   Q.   All right.  And you had received a telephone call from --

14   do you remember the name CameLa, I think I'm pronouncing her

15   name correctly, saying that she had spoken to you about the       15:51:45

16   EEOC suit?

17   A.   I don't remember, but she could have.

18   Q.   I mean, you had some contact with people at Sundt with the

19   -- when they were trying to settle the EEOC suit; right?

20   A.   If she said I spoke to her, I don't recall.  But yes.        15:52:05

21   Q.   All right.  We'll go to Exhibit 41, 4620, at page 26.  And

22   you see Monday, this is Monday, March 2nd.  It says, I spoke

23   with Lynell Brown on Friday, and she was going to send you an

24   e-mail and copy me, however, I did not receive a copy.

25        Did you receive the e-mail from her?  If yes, please         15:52:40

1    forward it to Marian and myself, thanks.

2           That's from Ms. Russell.

3           So you apparently had conversations with Ms. Russell?

4    A.  Yes.  I'm not sure who she is, but yes.

5    Q.  And are you aware that Sundt had settled the EEOC suit          15:52:53

6    right around the time that you are sending Scott Finical the

7    e-mail saying you're going to accept the claim?

8    A.  I probably knew, but it didn't really register with me

9    because I really had nothing to do with that part of the -- I

10   don't have anything to do with the EEOC.                           15:53:14

11   Q.  Okay.  But would you agree that you did not accept this

12   claim until the EEOC suit was settled, and you heard that Sundt

13   was no longer disputing this claim?

14   A.  No, I don't think one had anything to do with the other.

15   Q.  You're not here to say that you made some kind of a -- that    15:53:33

16   you didn't intend to deny this claim originally on

17   October 22nd, are you?

18   A.  I don't know what the date of October 22nd.  I think at

19   some point I was looking at the notification date and I was

20   trying to -- and I knew I was going to do the IME.  The IME was    15:53:59

21   after the notification was due, so I think I issued the denial,

22   you know, not to miss the deadline that had been established by

23   the Commission.

24   Q.  You could have accepted the claim and then decided later

25   when you received information back if you thought it refuted      15:54:18

1   the claim then denied the claim after that; true?

2   A.  That could be done.

3   Q.  All right.  I want to go back to an evaluation.  It's

4   Exhibit 9 at 1765, page 15.  And this is -- that's you, entry

5   date 9/26/2005?                                              15:54:57

6   A.  Yes.

7   Q.  Okay.  And then if we could go to the 1769 at page 19.  And

8   if you could enlarge that.  And this is from your supervisor;

9   correct?

10  A.  Yes.                                                     15:55:17

11  Q.  And she says, active contribution to claims strategy.  Your

12  continued focus on customer service helps contribute to the

13  Zurich global claims strategy in that customer is at the center

14  of everything we do.  Zurich is moving away from a

15  product-focused company to a customer-focused company, and that 15:55:34

16  means we need to put all of our customers at the center of all

17  we do.

18          And that's consistent with your understanding of

19  Zurich's philosophy; right?

20  A.  Yes.                                                     15:55:44

21  Q.  Now, when they moved away from a product-focused company,

22  you were still -- you were working at the company -- let me

23  start again.

24          When you first started at the company, they were more

25  of a product-focused company rather than a customer focus?     15:55:53

1    A.  I can honestly tell you I was there when this, you know,

2    when this came out.  I don't know -- when they say "product,"

3    I'm not even really for sure how they are establishing, you

4    know, we sell insurance, so that's the product.  So I don't

5    really -- I can't give you any definitive.  I don't know.          15:56:11

6    Q.  Didn't the claim handling emphasis change at Zurich while

7    you were there to have a much bigger push for customer

8    centricity while you were there?

9    A.  I would say so.  I mean, it's constantly -- I mean, it

10   constantly changes, so that wouldn't be out of the realm of     15:56:28

11   possibility, so...

12   Q.  After you accepted the claim, you then were required to

13   start issuing checks; right?

14   A.  Yeah, all benefits.  Medical and -- medical benefits and

15   indemnity.                                                       15:56:50

16   Q.  All right.  And are you aware of the fact that it took, I

17   think, roughly two months before you were able to get that

18   first check out to the attorney?

19   A.  Yes.

20   Q.  Okay.  And what was the basis for that?                      15:57:01

21   A.  I had a certain amount of authority, and it had to go

22   through some different levels, so I'm not sure when I actually

23   got the approval of the authority.  But as soon as I got that,

24   I think is when I issued the check.  And then there was also

25   some question with regard to his earnings, but if I'm not       15:57:18

LYNELL BROWN - DIRECT

1    mistaken, I just went ahead and paid for that period of time.

2    And I think Debbie might have sent a check back, I'm not -- if

3    I remember correctly.

4    Q.  There was a slight overpayment?

5    A.  Something, yeah.                                    15:57:32

6    Q.  Okay.  We just have to be careful.  The court reporter

7    can't take us both down at the same time.

8          Wouldn't you agree that once this claim was finally

9    accepted in March, 2015, that it was incumbent upon you to get

10   this thing done as quickly as possible.  You know, Mr. Hunton   15:57:49

11   has been going months and months without any comp benefits;

12   right?

13   A.  I knew that payment needed to be issued, yes.

14   Q.  Well, and my question is:  Don't you agree that you needed

15   to do it in an expedited form, given the fact that this claim   15:58:02

16   had taken so long to accept?

17   A.  I would agree that I could have certainly moved a little

18   faster.  I would agree with that.

19   Q.  Once you got a report back from one of his treating

20   doctors, Dr. Wang, that said MMI.                         15:58:21

21          Do you recall that?

22   A.  At some point, yes.

23   Q.  All right.  And I want to talk to you about what happens

24   when you get a report back that says MMI.  That's when you take

25   it into a vocational analysis that needs to be done; correct?   15:58:35

A.  Not always, but sometimes depending.  There's different

types of injuries.  So depending on the type of injury, his

injury, yes.

Q.  Okay.  And what you are doing is you need to establish

whether or not there's been a loss of earning capacity; right?    15:58:50

A.  Yes.

Q.  And that loss of earning capacity is going to be based on

whether or not there's some kind of permanent impairment;

correct?

A.  Permanent restrictions, not impairment.  The impairment is    15:59:00

not a factor.

Q.  Okay.  I misspoke.  Permanent restrictions.  And that means

that they can't -- the question is:  Can we still earn what

they were earning before, or is there going to be a loss of

earning capacity; correct?                                        15:59:16

A.  Correct.

Q.  And you had a report done by Mayer, I believe is the name?

A.  Yes.

Q.  And that's a company that Zurich uses frequently?

A.  It's one of -- one of several vendors, yes.                   15:59:27

Q.  All right.  And that is what you're supposed to do when you

have a finding of MMI?

A.  Again, if it's appropriate, yes.

Q.  Okay.  Now, there was a question when Dr. Wang put in that

he was MMI, he was also still asking for a spinal cord            15:59:43

1    stimulator to be implanted as well.

2           Do you recall that?

3    A.  I do recall.

4    Q.  All right.  And that's more active care and less medical

5    stationary, would you agree with that?                              15:59:58

6    A.  I would agree.

7    Q.  So it's -- you were aware of the fact that Dr. Wang, while

8    he put down MMI, apparently was either confused or didn't know

9    what MMI meant?

10          Would you agree with that?                                   16:00:11

11   A.  Yeah.  Some doctors that may not handle work comp, I mean,

12   I've had reports where they say they are regular duty and can't

13   work in the same sentence, so they can be confused.

14   Q.  So it was apparent to you that Dr. Wang was still seeking

15   active medical care for Bryan; true?                               16:00:29

16   A.  He said he was maximum medical improvement, so I probably

17   took that -- I don't -- I took him that he was stationary.  So

18   I think I moved forward with sending out for labor market.

19   Q.  But I thought you agreed you were aware of the fact that he

20   was still looking for active care spinal cord stimulator?          16:00:51

21   A.  I think it was a recommendation.  I need to see the report,

22   and I can probably look at it a little further.  I know he

23   mentioned it.  I don't know if he mentioned it at that point,

24   because that's always like a last resort.  That's a last resort

25   type procedure.  And so sometimes they recommended it in, you      16:01:06

LYNELL BROWN - DIRECT

1    know, they don't mean to do it right then, but if symptoms get

2    worse, or, you know, so I don't remember how he referenced it

3    in the report.

4    Q.  And we can, somebody find the Bates on that.

5            But moving forward, assuming it was a valid MMI          16:01:20

6    finding by Dr. Wang, you did the appropriate thing by getting

7    this report from Dr. Mayer; correct?

8    A.  He's a vocational specialist, yes.

9    Q.  I'm sorry.

10   A.  You said Dr. Mayer?  He's a vocational specialist.          16:01:37

11   Q.  I mean, Mr. Mayer.  And any reason to question the Mayor

12   report that you received back?

13   A.  Not that I can think of off the top of my head, because his

14   report is just a recommendation that we submit to the

15   Industrial Commission, and then the Industrial Commission has   16:01:58

16   the final determination.  So we submit one, his attorney

17   submits one, and then the Commission, you know, however they

18   figure that out, they make the determination.

19   Q.  All right.  And if we could pull up the Dr. -- Mr. Mayer

20   report.  So it's Exhibit 2 at page 133.  This is the Mayer       16:02:18

21   report; right?

22   A.  Yes.

23   Q.  And if we could go to the end page.  I think you have that

24   pre-highlighted.

25           What Mr. Mayer is doing is he's giving you three         16:03:10

1   different approaches, so I guess if we can go to Exhibit 2,

2   136.  The first one, he gave three options.

3          Do you recall that?

4   A.  Yes, he does high, low, and medium.

5   Q.  Okay.  And he gives you $1,230.77 as one recommended award;   16:03:31

6   correct?

7   A.  Yes.

8   Q.  And explain to the jury what it means to have an award.

9   How does that work?

10  A.  So basically when you have an injury, we look at what you   16:03:47

11  can do after your injury versus what happened to you before.

12  So, what can you go back in the labor market and actually earn.

13         So if you're heavy laborer, say, with minimal

14  education, you're not going to be able to go back into the open

15  labor market if you can't do a lot of physical capacity work.   16:04:05

16  So in that instance, you would have a higher monthly benefit

17  versus, say, if you're an administrator and your job is

18  sedentary and your restrictions are you can't lift more than

19  30 pounds, that's not included in your job anyway, so you

20  wouldn't have a loss of earning capacity.   16:04:21

21         So it's basically looking at what is your earning

22  potential after the injury, based on the permanent restriction

23  s that are sustained.  And then we -- the Commission determines

24  an entitlement per month that you receive for the rest, either

25  until you die, or until the situation changes, or your medical   16:04:35

UNITED STATES DISTRICT COURT

1   condition changes.

2   Q.  All right.  So going to these three awards, it runs from

3   $1,230 and change to $1,353 and change?

4   A.  So basically the difference is, again, this is a

5   recommendation to the Industrial Commission.  So to be fair, he      16:04:54

6   kind of goes middle, low, high.  Sometimes it's only high and

7   low, just depending on what he can actually find on the labor

8   market.

9        So you can notice the difference of $10.36, that's per

10  hour, versus $11.41 per hour versus $11.65 per hour.  And as         16:05:08

11  you go up, the dollars go up, the amounts go down.  So why

12  there's a difference in the range, it's actually pretty close

13  from top to bottom, but that's the difference.

14  Q.  Right.  Right.  So if this -- if things had worked out

15  differently and this report would have been submitted to the        16:05:25

16  ICA, some kind of award would have been given to Mr. Hunton?

17  A.  Yes, it would have -- they would have agreed.  They would

18  have changed it.  They would have said, yes, no, or whatever

19  their decision would, yes.

20  Q.  And you continued paying comp benefits while you were            16:05:40

21  waiting for this analysis; correct?

22  A.  I believe so.

23  Q.  And that's because that's the way it's appropriately done

24  when you have a compensable claim that you're waiting for

25  vocational analysis on?                                              16:05:52

LYNELL BROWN - DIRECT

1   A.  Technically you don't have to do it.  That is my practice.

2   I opt to do that.

3   Q.  Right.  Because you know that that's the right thing to do

4   under the duty of good faith and fair dealing that you owe?

5   A.  Well, I think that it's fair.                        16:06:01

6   Q.  Right.

7   A.  It's not required.  I'm just saying it's not something

8   that's required.  We can actually terminate benefits and wait

9   until the Industrial Commission comes out with their ruling

10  and/or decision.                                          16:06:13

11  Q.  But you agree the fair thing to do is to continue paying

12  the claim because you owe a duty of good faith and fair

13  dealing?

14  A.  That's just my personal choice.

15  Q.  Okay.  In fact, the Mayer report was not used because Mr.  16:06:22

16  Hunton got a different doctor, Dr. Adarmes; correct?

17  A.  I recognize the name.  I believe so.

18  Q.  I want to talk for a minute about a little bit about the

19  Perry case.

20          You had some problems on the Perry case; correct?     16:06:54

21  A.  Indeed.

22  Q.  That was part of what was going on with your personal life,

23  or no?

24  A.  It probably was more than that, but yes.

25  Q.  All right.  This was -- you say more than that.  There were  16:07:06

1    other things going on that were preventing you from being able

2    to pay the Perry claim; is that right?

3    A.  No, I thought you mean just like, you know, just regular

4    life problems, issues, you know.  But yes, there was a claim

5    that --                                                    16:07:26

6    Q.  And the Perry claim involved the same employer, Sundt;

7    right?

8    A.  Yes.

9    Q.  And that it also involved Maree over at Sundt?

10   A.  More than likely, yes.                                 16:07:38

11   Q.  You had some, a bad faith finding at the ICA; correct?

12   A.  Yes.

13   Q.  And, in fact, bad faith at the ICA is different than bad

14   faith in the kind of suit --

15   A.  Yes.                                                   16:07:53

16   Q.  -- that we're in here, yeah.

17         And Zurich was fined some money because of your

18   actions; right?

19   A.  Yes.

20   Q.  And then there was a second finding of bad faith at the  16:08:01

21   ICA; correct?

22   A.  Yes.

23   Q.  And, again, fined even more money; correct?

24   A.  I didn't see the -- I don't remember, but yes.  Yes, I know

25   that there were fines or penalties, yes.                   16:08:13

```
1    Q.  All right.  And then, in fact, there was a third finding of
2    bad faith at the ICA on Perry?
3    A.  Yes.
4    Q.  And another fine?
5    A.  Yes.                                                          16:08:25
6    Q.  And it was after this third finding that you were actually
7    terminated at Zurich; correct?
8    A.  Yes.
9    Q.  You were not terminated for anything you did on Hunton;
10   right?                                                            16:08:38
11   A.  My termination, I made the assumption.  They didn't give --
12   I don't think they gave me, like, because of this file or
13   because of that file.
14   Q.  Well, you knew you were fired because of the Perry claim?
15   A.  I assumed that's what it was.  I'm just saying I didn't       16:08:56
16   have anything in writing to say what they considered or didn't
17   consider, but it made sense that it was for Perry case.  You're
18   asking me if it had anything to do with this case.  I don't
19   know if that was something that they took into consideration.
20   Q.  To your knowledge, you weren't fired for the Hunton case?     16:09:11
21   A.  Correct.
22   Q.  During this time period when you're getting fines levied at
23   Zurich for the Perry case, that went over a period of how many
24   months?
25   A.  I can't recall.  It was a couple months, several.  I don't    16:09:30
```

1    know the exact, whatever the document states I would agree that

2    was correct.

3    Q.  All right.  During that time period, did anybody, your

4    supervisor, or any other management person come to you and say,

5    what can we do to take a look at other claims that you were          16:09:48

6    handling at the same time?  Did anyone come to you and --

7    A.  I don't recall.

8    Q.  Okay.  No one asked you about other cases that you were --

9    that you were involved in in handling, like the Hunton case?

10   A.  I don't recall that being the case.                             16:10:07

11   Q.  Now, I asked you at the beginning of this examination if

12   you believe that you did everything that Zurich asked you to

13   do, with the exception of the Perry claim, and you said yes.

14        Do you recall that question and answer?

15   A.  Yes.                                                            16:10:34

16   Q.  Yeah.  And is it fair to say that what you did on the

17   Hunton claim, the claim handling that you were involved in, was

18   the result of what you were told how to handle claims at

19   Zurich?

20   A.  I would disagree with that.  I had autonomy to work my          16:10:53

21   desk.  I never placed blame where it doesn't go.  I did it.  I

22   handled the claim.  What's in the -- is in the file is in the

23   file, and I own -- I own that.

24   Q.  Okay.  I'm not sure what you mean.  You -- my question is:

25   You're not apologetic for denying this claim, are you?             16:11:16

1    A.  I think I had a basis for denial.

2    Q.  And you're not apologetic for keeping the Maric IME and not

3    accepting the claim for another four, five months; isn't that

4    true?

5    A.  I disagree.  I mean, when you say apologetic, like, did I          16:11:32

6    called the injured worker and say I apologize?  I, like I say,

7    you can always look back and see how you could have done some

8    things in a better fashion.

9    Q.  Well, I thought you were trying to make the point before

10   that you didn't think that this was an acceptable claim, a             16:11:48

11   compensable claim as of, let's say, November 10th when you had

12   the Maric IME; isn't that true?

13   A.  At that point, I hadn't made the determination, because I

14   after that reached out to Scott to talk to him about it.

15   Q.  Okay.  And we know that was many, many months later in             16:12:06

16   March?

17   A.  That was later, um-hum.

18   Q.  All right.  And it sounded to me like earlier in your

19   testimony you were suggesting that you still didn't think it

20   was a compensable claim.  Isn't that what your testimony was?         16:12:17

21   A.  It's still -- I feel like it still had some red flags.

22   Q.  You knew it was a compensable claim -- well, we heard your

23   deposition testimony, you knew it should have been accepted

24   when Maric gave you the IME?

25   A.  I felt it could have been accepted.                               16:12:32

1  Q.  All right.  And my question to you about the claim handling

2  that you did, the claim handling was based upon how you've been

3  trained at Zurich; isn't that a fair statement?

4  A.  No.

5  Q.  So you -- you did claim handling that was outside of what          16:12:47

6  Zurich's claim handling guidelines were?

7  A.  I would say in this case, yes.  I mean, I didn't -- I

8  wasn't as timely probably as I should have been.

9  Q.  I'm sorry.  You weren't as what?

10  A.  I'm sorry.  I wasn't as timely as I probably should have          16:13:05

11  been, but they didn't have training -- I'm not clear what

12  you're asking really.  Because are you saying they trained me

13  to not respond or not issue something or deny a claim or...

14  Q.  Well, all the basic actions that you took, the denial, the

15  holding on to the claim for all those months and not accepting          16:13:25

16  it until March 25th, are you telling us that you think that was

17  not in accordance with the way Zurich teaches you to handle

18  claims?

19  A.  Yeah, I wouldn't agree with that because we would have

20  many, many more cases, you know, that would have that way.  I          16:13:40

21  don't believe that they gave me the training to say, you know,

22  to handle.  I handled the claim, and I just own ownership for

23  it.  I don't know how otherwise to answer that.  I don't feel

24  like they trained me to deny a claim or hold on to -- hold on

25  to documents, or whatever you just indicated.  It was my          16:14:02

1    decision.

2    Q.  Well, it sounds like you're saying now that you realize,

3    yeah, this -- you did handle this claim wrongly, wrongfully.

4             Is that what you're saying?

5    A.  Well, initially, I felt that I had basis to deny it, so I'm    16:14:18

6    not going to go back and say that I didn't think I had basis to

7    deny it.  I think I had, once I got the IME report, I could

8    have said, yes, it was compensable.  But I still had, I just

9    wanted to get an additional opinion, and I didn't get it right

10   away, but I did eventually obtain one.    16:14:36

11   Q.  What investigation did you do from the date that you got

12   the IME Maric -- the Maric IME in November until March 25th in

13   terms of investigation of compensability of the claim?

14   A.  I don't recall.  Whatever -- I don't remember if I did any

15   additional at that point.    16:14:55

16   Q.  For all those months?

17   A.  I don't recall doing any.

18             MS. ROSENTHAL:  Thank you.

19             THE WITNESS:  You're welcome.

20             THE COURT:  Cross-examination?    16:15:15

21             MR. KLECAN:  We'll reserve our questions --

22             THE COURT:  Okay.

23             MR. KLECAN:  -- for our case.

24             THE COURT:  All right.  You can step down.

25        (Witness excused.)    16:15:25

```
 1              THE COURT:  Do we have a 15-minute witness?

 2              MS. ROSENTHAL:  Fifteen-minute witness?

 3              THE COURT:  Or video?  Do you have something we can do

 4    for 15 minutes?

 5              MS. ROSENTHAL:  We could start Barclay.                16:15:40

 6              THE COURT:  Do you want to start the video depo or

 7    come back tomorrow?

 8              MS. ROSENTHAL:  Whatever the Court's pleasure is.  We

 9    could start it, if you want, or we could just start fresh in

10    the morning.                                                    16:16:03

11              THE COURT:  Well, if it would make sense, I would like

12    to start tonight.  But I don't want to break up something if

13    there's not a good way to do it.

14              MS. ROSENTHAL:  Maybe we will start for 15 minutes and

15    continue it.                                                    16:16:14

16              THE COURT:  All right.  What is this, a video

17    deposition?

18              MR. STEVEN DAWSON:  Yes.

19              THE COURT:  Okay.  A deposition is a testimony taken

20    usually in a lawyer's office.  The lawyers are there, the       16:16:24

21    witness is under oath, and the testimony is just like it is

22    here in court, except for some reason the witness isn't

23    available or isn't here.  So you're to consider the deposition

24    testimony just like you would any other witness's testimony.

25              MR. STEVEN DAWSON:  Your Honor, just for clarity, this 16:16:40
```

```
 1   is going to be playing both sides designations of this witness.

 2          THE COURT:  Okay.

 3          MR. STEVEN DAWSON:  So it's not just what we

 4   designate.

 5          THE COURT:  All right.  You know what, I went through    16:16:50

 6   those designations, I didn't see the defendant's objections.  I

 7   didn't the plaintiff's objections to defendant's designations.

 8   Were there some objections?

 9          MS. ROSENTHAL:  There probably were, but probably not

10   very many.                                                      16:17:12

11          THE COURT:  Okay.  All right.

12          MS. ROSENTHAL:  We'll just start.

13          THE COURT:  Okay.  All right.

14          (Whereupon, video deposition of Eva Barclay was played

15   for the Court and jury.)                                        16:17:37

16          (Video interrupted.)

17          THE COURT:  Okay.  We'll come back tomorrow and finish

18   this up.  Let's start at 8 o'clock tomorrow.  During the

19   recess, remember the admonition.  Don't talk to anybody about

20   the case.  Don't let anybody talk to you about the case.  Keep  16:28:35

21   an open mind.  See you at 8 o'clock tomorrow.

22      (Jury exits the courtroom.)

23          THE COURT:  Do we have anything to take up?

24          MR. STEVEN DAWSON:  One, Your Honor.  Assuming back to

25   this case about claiming privilege, waiving privilege, Ms.      16:29:17
```

UNITED STATES DISTRICT COURT

1    Brown, we just heard I guess attorney-client communications

2    have never been disclosed in the case.  She's saying that Mr.

3    Finical told her there's a 50/50 chance that they would lose

4    before the ICA.

5           Once again, the only communications we've been given    16:29:33

6    are the ones the Court ordered, which are these discrete

7    e-mails, and there's nothing in those e-mails talking about

8    50/50.  We saw today it was not qualified advice to her about

9    accepting the claim, so I don't know if they are -- so, first

10   of all, I think we have a problem with this and we'd ask that    16:29:57

11   the Court instruct the jury to disregard her testimony about

12   her lawyer told her something that's not been disclosed to us

13   because, in fact, they have been maintaining privilege

14   throughout the case.

15          And then secondly, I guess more precautionary matter,    16:30:12

16   I don't know what they are planning on having Mr. Finical

17   testify to, but I'm suspecting it's going to be more of the

18   same.

19          THE COURT:  Well, the letter that he sent her didn't

20   suggest there was any 50/50 issue.  It was a matter of this    16:30:25

21   claim is supported by evidence and needs to be accepted right

22   away.  So I think she -- it sounds like she was just misstating

23   what he told her, but do you guys have something different?

24          MS. HEDBERG:  As far as her testimony or --

25          THE COURT:  Yeah.  How do you respond to him, to Mr.    16:30:46

UNITED STATES DISTRICT COURT

```
1    Dawson?  What Miss Brown said there was a conversation where
2    Mr. Finical told her, you know it's a close call.  It's 50/50,
3    but we might as well accept this.  Where the letter he sent
4    her, doesn't say anything like that.  The letter says, this is
5    a claim you need to accept immediately.                              16:31:06
6         So is there something, some other communication?  I
7    don't remember seeing that in the documents I reviewed.
8         MS. HEDBERG:  Well, it's not in the documents
9    reviewed, but she testified the way she testified in response
10   to the answers that she was posed by Miss Rosenthal.                 16:31:20
11        THE COURT:  I think she -- I think she volunteered
12   that, if I remember right.  Miss Rosenthal was asking why you
13   did this.  And she says, well, the lawyer told me we had a
14   50/50 chance, so we might as well accept it.  I think that kind
15   of summarizes what she said.                                         16:31:40
16        MS. HEDBERG:  Well, sure, but --
17        THE COURT:  It got my attention when she started
18   talking about Mr. Finical's advice too, that's why I remember
19   it.  You guys have the dailies, you can take a look at it and
20   see how that played out, but I'm not sure.  What are you asking      16:31:51
21   for, Mr. Dawson?
22        MR. STEVEN DAWSON:  Well, you know, my concern is
23   that.
24        THE COURT:  I know what your concern is.  What are you
25   asking me to do?                                                     16:31:59
```

1          MR. STEVEN DAWSON:  I'm asking that Court order that

2    Ms. Brown's testimony about advice from her lawyer that goes

3    outside of what's been disclosed in this case, specifically, he

4    told me a 50/50 chance, that it be stricken from the record and

5    the jury be instructed to disregard that testimony.                  16:32:19

6          Otherwise, if we have a verdict returned in this case

7    based upon a jury deciding, well, the lawyer said it was a

8    50/50 chance, that would be unjust.

9          THE COURT:  Well, I don't know how I can strike what

10   she believes she remembers.  I mean, if she -- if she is        16:32:38

11   mis-remembering that, that's just her -- her testimony.

12         I mean, is there something different -- what you're

13   basically asking me to do is say she lied, disregard it.

14         MR. STEVEN DAWSON:  No.  No.  I guess, and obviously

15   I'm thinking aloud which is always dangerous, but I guess I      16:33:00

16   would suggest something along the lines that the defense has

17   claimed attorney-client privilege in this case, which is their

18   right to do, and they have chosen not to disclose

19   communications between Zurich and Mr. Finical but for the

20   e-mails that are in evidence.  And any testimony or suggestion   16:33:24

21   of communications that go beyond that should not be considered.

22         THE COURT:  Oh, I see.  Okay.  All right.  Do you have

23   a response to that?

24         MS. HEDBERG:  Sure.  Here's the problem with it, Your

25   Honor.  They fought tooth and nail to have this court waive our  16:33:42

1    attorney-client privilege.  The Court ruled that we waive the

2    attorney-client privilege with respect to this matter, we

3    disclosed the documents.  They have elicited testimony from our

4    witness about these documents --

5             THE COURT:  Wait.  I may be confusing this with          16:33:53

6    another case, but I thought I reviewed the communications with

7    Mr. Finical and found most of them were, in fact, privileged.

8    Is this the same case?

9             MR. STEVEN DAWSON:  This is the same case.  And on a

10   motion to reconsider, you allowed those e-mails disclosed.        16:34:05

11            THE COURT:  Okay.  So there's e-mails that haven't

12   been disclosed that have been determined to be privileged?

13            MS. HEDBERG:  Correct.

14            THE COURT:  And so he's saying he doesn't know what's

15   in those e-mails, but he hasn't had been able to access them.     16:34:21

16   And she's testified to things that weren't disclosed in the

17   e-mails that were disclosed.

18            MS. HEDBERG:  No, that's not true.  They were asking

19   them questions about the e-mails that you ordered that we

20   produce that we did produce, and she was asking her questions     16:34:36

21   based on those e-mails.

22            THE COURT:  Take a look at it.  I think she

23   volunteered when she was asked why she didn't immediately, why

24   she didn't do the claim or whatever, and she said -- there's

25   some questions where she volunteered I still was hesitant, but    16:34:53

1    the lawyer said there's a 50/50 chance that if we go to ICA

2    we're going to lose.  So it's a close call, but let's just go

3    ahead and give in on it.

4         That's the essence of what her testimony came out, and

5    I don't think it was requesting what did Mr. Finical tell you.      16:35:11

6    And if it was, it's still not contained in those e-mails.

7         MR. DRURY:  Can we look over the transcript?

8         THE COURT:  Take a look at it.  I don't think it

9    really matters, because she's testifying to communications that

10   weren't in those e-mails.  And all he's saying is, give him the    16:35:27

11   e-mails because it may be too late, because he wasn't able to

12   pull those out and tell you they are not in here.  When did he

13   tell you this?

14        So take a look at it and let's talk about it in the

15   morning.  But she did talk about decisions that were made based   16:35:44

16   on the advice of the attorney.  But the way she described the

17   advice, it's much different than what's in those e-mails that

18   were disclosed.

19        MS. HEDBERG:  Well, and after those e-mails were

20   disclosed, then plaintiff should have moved to re-depose Mr.       16:35:58

21   Finical, because at the time they deposed Mr. Finical, the

22   attorney-client privilege was intact.  So they kept fighting

23   past the discovery deadline to get those e-mails and now --

24        THE COURT:  You're not making any sense because the

25   e-mail says exactly what -- exactly different than what she        16:36:12

```
 1    said.  She said Finical was wishy-washy, basically.  Well,
 2    there's a 50/50 chance we go in and might lose.  The e-mail
 3    doesn't say that.  So why would they need to depose him on
 4    that?  This is the first time I think she's disclosed that kind
 5    of testimony, isn't it?  I don't know anywhere in the record        16:36:31
 6    where she said it was a 50/50 chance that it was told to her by
 7    Finical.
 8           MS. HEDBERG:  She's not required to disclose every
 9    detail of her testimony.
10           THE COURT:  I know.  That's what I'm saying.  There         16:36:41
11    was no way for anybody to know that she's going to say that,
12    and no reason for him to cross-examine or re-depose Finical
13    because that was not just disclosed until just now in this
14    trial.
15           MS. HEDBERG:  Well, they asked a question, they got an      16:36:53
16    answer they didn't like.  I mean, they opened a door.
17           THE COURT:  They got an answer that's inconsistent
18    with what's been disclosed, and it suggests there's other
19    advice that was given that hasn't been disclosed.  All right.
20    We'll take it up in the morning.                                   16:37:07
21           MR. STEVEN DAWSON:  Could I just add, the last time we
22    raised this, and this is consistent, was after counsel's
23    opening statement when he said to the jury relative to Ms.
24    Brown and Mr. Finical.  And then they start having a discussion
25    about it, and the discussion comes down to, look, on the          16:37:23
```

1    proceedings stuff, if this is all you have, there's no

2    pre-existing injury here.  They also discussed, though, the

3    rest of the report.  Scott tells her the reasons to be

4    cautious.  And you know, at that time, the answer was, well,

5    we're just talking about the e-mails.  And now here the                16:37:44

6    discussions are coming out.  It's looking to me like this --

7              THE COURT:  Are you calling Finical?

8              MS. HEDBERG:  We will be.

9              THE COURT:  Will he be testifying to anything that's

10   different in those e-mails that have been disclosed?                    16:37:58

11             MS. HEDBERG:  I can't.  I can't project what questions

12   he's going to be asked --

13             THE COURT:  Is he going to say he told her there's a

14   50/50 chance?

15             MS. HEDBERG:  Again, I don't know what his testimony         16:38:08

16   will be when he's asked certain questions.  But with respect to

17   the cautiousness, that is word for word in his e-mails to

18   Lynell.  So the cautiousness was in response to the e-mails.

19   The question that was asked today and her response was just her

20   response to the question that was asked.                                16:38:24

21             THE COURT:  Okay.  Put together what you want -- what

22   you propose as an instruction or an admonition, and I'll take a

23   look at it.  But I'm not -- I'm not sure, I'm going to do

24   anything yet.  But I need to see what it is you're requesting

25   first.  Her testimony, to me, was a lot different than what his        16:38:44

1    e-mail said regarding the reason to accept it.  His e-mail, if

2    I remember right, says accept this as soon as possible and it

3    didn't suggest there's any hedging with regard to this being a

4    close call or a 50/50 thing.  I don't know where that came

5    from, unless it's in some other communication that hasn't been      16:39:07

6    disclosed.  All right.  Anything else?

7            MR. STEVEN DAWSON:  No, Your Honor.

8        (Proceedings conclude, 4:39 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I, ROBIN G. BOBBIE, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 7th day of April,

12  2018.

13

14

15                      s/Robin G. Bobbie
16                      Robin G. Bobbie, RMR, CRR, FCRR

17

18

19

20

21

22

23

24

25
```