1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3          _____

4    Bryan Hunton,
                                    )
5                   Plaintiff,      )  **CV 16-00539-PHX-DLR**
                                    )
6          vs.                      )  Phoenix, Arizona
                                    )  **April 6, 2018**
7    **American Zurich Insurance Company,**   )
                                    )
8                   Defendant.      )
     _____)

9

10

11

12        BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE

13           REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              <u>TRIAL DAY 8 PM SESSION</u>

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared with Computer-Aided Transcription

1                     **A P P E A R A N C E S**

2

3     For the Plaintiff:

4             Dawson & Rosenthal, PC
              By: **ANITA ROSENTHAL,** ESQ.
5             By: **STEVEN C. DAWSON,** ESQ.
              By: **SANDER R. DAWSON,** ESQ.
6             25 Schnebly Hill Rd.
              Sedona, AZ  86336

7

8     For the Defendant:

9             Renaud Cook Drury Mesaros, PA
              By: **JOHN A. KLECAN,** ESQ.
10            By: **WILLIAM W. DRURY, JR.,** ESQ.
              By: **KELLY A. HEDBERG,** ESQ.
11            1 N. Central Ave., Ste. 900
              Phoenix, AZ  85004

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATION**

**WITNESS**                                                                                          **PAGE**

LYNELL BROWN

       Direct Examination By Mr. Klecan                          4

       Cross-Examination By Ms. Rosenthal                        70

DIRECT EXAMINATION – LYNELL BROWN

1                    **P R O C E E D I N G S**

2         (Proceedings resumed in open court with the jury

3    present.)

4

5              THE COURT:  Please be seated.

6              Ms. Brown, will you come up here, please.  I'll

7    remind you you're still under oath.  Please have a seat in the

8    witness stand.

9              I think I jumped ahead.  The defense's next witness

10   is?

11             MR. KLECAN:  Lynell Brown.

12             THE COURT:  Thank you.  You may proceed.

13                       **LYNELL BROWN,**

14   recalled as a witness herein, after having been previously

15   sworn or affirmed, was examined and testified as follows:

16              D I R E C T   E X A M I N A T I O N

17   BY MR. KLECAN:

18   Q   We recognize you anyway.  Been here before.

19             So, for the record, I need to start with please tell

20   us your full name.

21   A   Lynell Brown.

22   Q   Where do you live?

23   A   My actual address or just --

24   Q   Yes.

25   A   17686 West Lincoln Street in Goodyear, Arizona.

DIRECT EXAMINATION – LYNELL BROWN

13:48:49  1    Q    I'll remind you that you talk pretty fast, as do I, so we

2    need to slow down, make sure everything gets recorded.

3         Tell me a little bit about yourself.  Are you from

4    Phoenix originally?

13:49:03  5    A    Born and raised in Phoenix.  Married for 32 years.  Two

6    children, two grandchildren.

7    Q    Okay.  And outside of work, can you tell us briefly what

8    your activities would be.

9    A    Usually with grandchildren.  Otherwise occupied with my

13:49:18  10   church activities.

11   Q    Which church is that?

12   A    Name of the church is Pavilion of Praise Ministries.

13        THE COURT:  I'm sorry?

14        THE WITNESS:  Pavilion of Praise Ministries.

13:49:32  15   BY MR. KLECAN:

16   Q    All right.  Tell us how you ended up being a worker's comp

17   adjustor.

18   A    Well, it's been many moons.  I actually started working

19   for the state, and there was just an opportunity in that field

13:49:44  20   and I -- that's kind of how I ended up doing worker's comp.

21   Q    What was the field -- what was the state entity with which

22   you started?

23   A    State Compensation Fund at the time.

24   Q    Is that now what we call ICA?

13:50:00  25   A    No.  Actually they're called CopperPoint Mutual something

DIRECT EXAMINATION – LYNELL BROWN

13:50:03  1    or other.

2    Q    ICA is the administrative body?

3    A    Correct.

4    Q    Okay.  And what did you do for the State Compensation

13:50:09  5    Fund?

6    A    I started off in like the clerical pool typist area, and

7    then I was a medical only adjustor, worked in auditing for a

8    little while, and then I moved into actual claims.

9    Q    And were the claims you handled for the State Compensation

13:50:26  10   Fund similar to claims you handled for Zurich or other

11   insurers?

12   A    Different processes as far as different departments, but

13   basically the same.

14   Q    But do you have the same decision points:  Was there an

13:50:40  15   accident?  Was there an injury?  What is the injury?  What

16   treatment's needed?

17   A    Yes, it's all the same.

18   Q    All right.  So starting then to today, how many years have

19   you been doing this?

13:50:54  20   A    Almost 30.

21   Q    Okay.  And you worked with the State Compensation Fund and

22   then went to work for other insurers?

23   A    Yeah.

24   Q    Can you tell us who you went to work for and during what

13:51:06  25   periods of time?

DIRECT EXAMINATION - LYNELL BROWN

13:51:08  1    A    I won't remember the exact periods of time, but from state

2    comp I went to a company called Fremont.  They went out of

3    business.  I went to -- I think it was called CIGNA Property

4    and Casualty.  There's name changes in entities.  And I went

13:51:28  5    to CNA for insurance.  Then they sold off part of the company

6    and I was involved in the sale, so then I became an employee

7    of Cunningham Lindsey, who then became Broadbar.  And then

8    from there I was at Zurich, and then Travelers.

9    Q    Okay.  That where you are today?

13:51:51  10   A    No.  I'm working for a mutual insurance company now.

11   Q    Okay.

12         So let's talk then about your experience that you had

13   and training you had before you went to work for Zurich.  So

14   by that point can you tell me approximately how many years

13:52:08  15   you'd been in the industry?

16   A    Maybe 11 or 12.  Maybe more.  Just guestimating.

17   Q    Okay.  All right.  Is there ongoing training that you get

18   as a work comp adjustor?

19   A    There's ongoing training.  It's more or less like

13:52:28  20   seminars, continuing education credits, medical law changes

21   that type of thing.

22   Q    Okay.  Are there a certain numbers of hours you have to

23   have every year or every other year?

24   A    I don't think there's a minimum number.  I also hold a

13:52:49  25   license in California, so they had a little more technical

DIRECT EXAMINATION - LYNELL BROWN

13:52:53  1    number, I believe.  But because I'm not really handling that,

       2    I don't really keep up with that one.

       3    Q    Okay.  So can you tell us how much -- how many of those

       4    seminars you attended?  I'm trying to get a picture of you

13:53:07  5    before you went to Zurich.

       6    A    Many.  At least maybe on average two per year, and that's

       7    not counting what may be done in-house.

       8    Q    So each of these stops along the way that you've had,

       9    starting with the State Compensation Fund and the other stops

13:53:26 10    before Zurich, is there training that's done at each of those

      11    companies on how to do their procedures?

      12    A    I wouldn't necessarily call it training as much as it

      13    would be like, you know, this is how you use the system, this

      14    is where this is, click that, push that, but not necessarily

13:53:45 15    training on that.  That only happened at state comp fund.

      16    They have a very, very intense six-week training class, so I

      17    did have that.

      18    Q    Okay.  That's what got you started?

      19    A    Yes.

13:53:57 20    Q    Okay.  And how many hours a day on that six-week training

      21    class?

      22    A    It was a full 40 hours.  Per week.  So it was extensive.

      23    Q    Six weeks times 40 hours.  240 hours of training.

      24    A    Um-hmm.

13:54:17 25            THE COURT:  Is that a yes?

DIRECT EXAMINATION - LYNELL BROWN

13:54:19  1          THE WITNESS:  Yes.  I'm sorry.  Yes.

2          THE COURT:  All right.

3     BY MR. KLECAN:

4     Q    All right.  And in that training, are you trained about

13:54:26  5     identifying what's compensable and what's not?

6     A    That was part of the training.

7     Q    And are you trained an how to handle the medical issues?

8     A    Yes.

9     Q    Are you trained on how to compute average wages and the

13:54:41  10    compensation that might be due as a result?

11    A    Yes.

12    Q    So is all of that covered in your initial training?

13    A    It was covered in initial training, um-hmm.

14    Q    And since that time, up to the time you start with Zurich,

13:54:53  15    you've been doing that same thing?

16    A    Yes.

17    Q    Is there any way you could estimate how many claims you

18    handled at subsequent -- at the subsequent fund -- State

19    Compensation Fund, pardon me, and the other places?

13:55:10  20    A    Thousands.

21    Q    Really?

22    A    Um-hmm.

23    Q    All right.  So when you went to work with Zurich,

24    approximately when was that?

13:55:19  25    A    September of 2005.

DIRECT EXAMINATION - LYNELL BROWN

13:55:23  1   Q   Would you consider yourself an experienced worker's comp

2   adjustor at that time?

3   A   Yes.

4   Q   And all of your experience at that time was -- was all of

13:55:35  5   that experience in Arizona?

6   A   Yes.

7   Q   And then, you know, you talked about making a couple

8   changes along the way.  Are there any periods in there where

9   you were unemployed for any substantial time?

13:55:48  10   A   No.

11   Q   Those times you've changed, did you have any difficulty

12   finding a new position?

13   A   No.

14   Q   And has the same been true since you left Zurich?  You

13:56:02  15   found different positions since then?

16   A   Yes.

17   Q   Okay.  Were you unemployed for very long?

18   A   No.

19   Q   How long do you think?

13:56:09  20   A   A month.

21   Q   A month?

22   A   A month.

23   Q   Okay.  Tell us a little bit about when you went to work

24   for Zurich, what training you got there.

13:56:21  25   A   Systems training.  Different, like, medical trainings, if

DIRECT EXAMINATION - LYNELL BROWN

13:56:28  1    you will.  Seminars.  They had in-house training for some

2    things, procedure changes, branding, you know, whatever

3    changes the company was going through, those type of meetings.

4    Q    Okay.

13:56:44  5         During the time you were at Zurich, were you at that

6    time required to have a certain number of hours of continuing

7    training?

8    A    I don't know that it was necessarily required, but I had

9    so many that I would have met the requirement.  And because I

13:56:59 10   handle California, I'm pretty sure I met the requirement, and

11   I don't at this point because it's been a while since I

12   handled California.  But I'm pretty sure I was up to whatever

13   the requirement was at that time.

14   Q    Okay.  So what brought you to that field in the first

13:57:20 15   instance back with the State Compensation Fund?  What was your

16   interest in doing that?

17   A    Like I said, I was in a clerical pool.  Clerical pool for

18   the state.  Once I got there I was interested in that line of

19   work, so I've been there ever since.

13:57:34 20   Q    And do you remain interested in that kind of work?

21   A    I do.

22   Q    Why?  What is it about that?

23   A    Well, I do like being in a position to be able to be

24   helpful to someone and help people get back to work and help

13:57:48 25   people get benefits.

DIRECT EXAMINATION - LYNELL BROWN

13:57:55  1   Q   I'll come back to customer relations or customer

2   satisfaction in a bit.

3        Let's talk about your years there with Zurich.  What

4   position did you come in as?

13:58:15  5   A   As an adjustor.  I'm sure there's a more technical term to

6   it, everybody has a name for it, but senior claims adjustor.

7   Q   Did you remain in that position throughout the time?

8   A   Yes.

9   Q   Were there any other adjustors in Arizona for Zurich

13:58:31  10  during the time that you were there from 2005?

11  A   Yes.

12  Q   How many others were handling Arizona?

13  A   Maybe four.

14  Q   Were you the only person living here at the time that was

13:58:49  15  handling claims or were there other resident --

16  A   At the time when I first started they actually had an

17  office, and we were in the office.

18  Q   Okay.  And when did that change?

19  A   I don't remember the exact year.

13:59:05  20  Q   Okay.

21  A   But they subsequently closed the office and we were laid

22  off.

23  Q   Okay.  And then did you continue as a home adjustor

24  working out of your home?

13:59:15  25  A   At that point in time, yeah, they brought me back and I

DIRECT EXAMINATION - LYNELL BROWN

13:59:17  1    worked -- I actually worked in the office by myself for a

2    while, and eventually I transitioned to work from home.

3    Q    Okay.  So what's that like when you're working at home?

4    A    Lonely.  No.  I can be really focused.  I don't have small

13:59:35  5    children, so I enjoyed it and I was successful at it.

6    Q    What's a day like for a worker's comp adjustor?  What kind

7    of things do you do on a day-to-day basis?

8    A    Taking new claims, manage the claims that you currently

9    have.  That could include talking to physicians, talking to

13:59:57  10   employers, talking to medical doctors.  Attending seminars,

11   training.  Phone calls, e-mails.

12   Q    So we know at the time that we're involved with here that

13   you were working with Sundt Construction.  What are some of

14   the other major employers that you were handling claims for

14:00:22  15   with Zurich, if you can remember?

16   A    Intel.  The Abengoa Project, which was a water treatment

17   facility plant out far west.  I handled the civic center

18   construction.  Those are the ones that pop to my mind

19   immediately.

14:00:43  20   Q    Okay.

21         Let's get to the Bryan Hunton claim.  Tell us when

22   did you first get involved with that.

23   A    I don't remember the exact date.  It was 2015.

24   Q    '14, I think.

14:01:04  25   A    '14.  Okay.

DIRECT EXAMINATION - LYNELL BROWN

14:01:06  1   Q   I should tell you -- I should ask you about that.  When

2   you were testifying here last week, I think, and when you were

3   deposed, were you shown documents or were you testifying from

4   what you could recall?

14:01:26  5   A   Some from what I could recall.  I did see some documents.

6   Q   Okay.  So if we want to put together the documents

7   involving Bryan Hunton, what would we need to look at?  From

8   your perspective.

9   A   It would be like the actual claim file.

14:01:44  10   Q   Okay.

11           Let me show you what's been marked as Exhibit 2.

12           I'll show you Exhibit 1 is the policy.  That's the

13   first part.

14   A   Okay.

14:02:18  15   Q   Exhibit 2 is marked as a claims file.  Is this a copy of

16   the claim file?

17           You don't have to go through the whole thing.

18   A   Okay.

19           Yes.

14:02:33  20   Q   Okay.

21           So when you worked on the file, is it a paper file or

22   electronic?

23   A   Electronic.

24   Q   But when you print it out it's this stack of papers.

14:02:45  25   What, three inches or four inches?

DIRECT EXAMINATION - LYNELL BROWN

14:02:47   1   A   Yes.

2   Q   All right.  And I notice when we're talking about these

3   various things that there's also e-mails in the Sundt file

4   that reflect some of your activity.

14:03:00   5   A   Yes.

6   Q   Okay.  And then we have e-mails between and you

7   Mr. Finical in a separate file.

8   A   Yes.

9   Q   Point being we have to put together all different files to

14:03:16   10   do the time line.

11   A   Yes.

12   Q   Okay.  We won't do that here.  We'll go to them as needed.

13        So first tell me what you recall about first getting

14   the Bryan Hunton file.

14:03:33   15   A   I believe it was transferred to me from a different

16   adjustor.  It had been assigned to a coworker.

17   Q   Okay.  And did you have a basic understanding what the

18   claim was after getting the file and taking a review of the

19   file?

14:03:49   20   A   Yes.

21   Q   What did you understand the claim to involve?

22   A   That he was at work and was complaining of some pain.  He

23   didn't really like -- the key that stuck out it was not a

24   specific incident.  I believe the prior adjustor had spoke

14:04:06   25   with Mr. Hunton and taken his statement, and at that point in

DIRECT EXAMINATION – LYNELL BROWN

14:04:10  1   time I'm sure we had the employer's report of injury.  And

2   whatever medicals, if he had been to the doctor at that point.

3   I think that was in the file when it came to me as well.

4   Q    Okay.

14:04:27  5        One of the documents in the file reflects, and we

6   talked about it yesterday, we talked about the six pack.

7   A    Yes.

8   Q    What's the six pack?

9   A    So that's a pack of documents that goes out to every

14:04:37  10  injured worker, just some basic things.  A mileage form, like

11  a statement that you can fill out about how you were injured,

12  a prior medical records authorization release so that we can

13  obtain medical records, and then a form that asks about

14  different physicians that you may have treated with.  And then

14:05:01  15  there was something else and I don't recall exactly what that

16  was.

17  Q    That was five and we need one more to make a six pack.

18  A    Yes.

19  Q    If the file reflects that that was sent by you on

14:05:12  20  September the 29th of 2014, would that seem about right to

21  you?

22  A    It's -- it's something I don't personally issue but that

23  sounds about right.

24  Q    Okay.  All right.  So let's talk about the period of time

14:05:30  25  when you're working on the file, we'll take it from date of

DIRECT EXAMINATION - LYNELL BROWN

14:05:34  1    accident, claimed date of accident is I think September 18th,

2    to the time of denial, October 22nd.  Okay.

3         So during that period of time what are you doing?

4    What's your job at that point when you first get the claim and

14:05:49  5    up to the point you have to make a decision about accepting or

6    denying?

7    A   I'm looking to get additional information.  Information

8    either from the injured worker, medical provider, the

9    employer.  Anything that would be pertinent, deemed pertinent

14:06:05 10    to the file.

11   Q   Okay.  And in Bryan Hunton's case, did you get infor- --

12   did you get the initial report of accident, the one filled out

13   by him and the doctor?

14   A   Yes, that was in the file.

14:06:19 15   Q   Okay.  Do you recall what information you got from the

16   employer?

17   A   It had been on the employer's report of injury.  I believe

18   I spoke with her again -- I'm just doing this top of my head.

19   I'm sure I spoke with them at some point in time as well.

14:06:34 20   Q   Who is "her"?

21   A   I'm sorry.  Maree Buono.

22   Q   And she's at Sundt?

23   A   Yes.

24   Q   We've heard from her, as you probably know.

14:06:54 25        Did you speak with Mr. Hunton.

DIRECT EXAMINATION - LYNELL BROWN

14:06:55   1   A   I believe I spoke with him at some point in time.  Maybe

2   more than once.

3   Q   At the time you got the initial information about the

4   file, were there things that caused you concern about the red

14:07:06   5   flags about whether this was compensable or not?

6   A   Well, yes.  First thing is usually the employer will let

7   you know I think that there might be something to the claim or

8   there's an issue we'd like you to take a look at.  Other thing

9   would be that there was -- I was looking for, like, specific

14:07:24  10   arising out of and in the course and scope of employment.

11   Q   Can you say that again?

12   A   Arising out of and in the course of employment.  I look

13   for the medical documentation to review to see what the doctor

14   is diagnosing, as well as the cause of accident or -- what's

14:07:42  15   the word I'm looking for?  Causation.  Like, they will

16   sometimes add causation from a medical standpoint.

17   Q   Okay.  So were you advised by the employer of anything

18   about whether Mr. Hunton had a previously existing back

19   problem?

14:08:00  20   A   She did reference that.

21   Q   Okay.  And what is the significance of that to you when

22   you're doing this initial investigation?

23   A   Well, part of that is just to determine whether whatever's

24   going on is due to the preexisting problem or is there

14:08:15  25   something from the employment that may have what we call

DIRECT EXAMINATION – LYNELL BROWN

14:08:19   1    permanently aggravated it or changed the -- changed the

2    position that it was in prior to the accident.

3    Q    Did you have any information as to when Mr. Hunton first

4    reported his accident?

14:08:35   5    A    The date of injury is listed on the employer's report of

6    injury.

7    Q    But do you know when it was reported to the employer?

8    A    I believe he reported it the following day.

9    Q    What's the significance of that in your initial

14:08:46  10    investigation?

11    A    This particular company has a pretty strict reporting

12    policy, and so they want to know the same day, as quickly as

13    possible.  That was their standard.

14    Q    Okay.  Is that a red flag?

14:09:06  15    A    Not necessarily always, but in this case, yes.

16    Q    Why in this case?

17    A    Because this insurer, they have many safety meetings.

18    They do a lot of training.  It was their requirement that the

19    employees reported the claim right away.  They had -- if I'm

14:09:24  20    not mistaken, I think they have what they call "toolbox

21    meetings," and the foreman would get together with their crew

22    or whatever and safety and, you know, something happens let us

23    know type thing.

24    Q    Okay.

14:09:39  25         And then did you get from Mr. Hunton and from the

DIRECT EXAMINATION - LYNELL BROWN

14:09:45  1    other things in the file a consistent description of when the

2    injury occurred?

3    A   I don't think there was like a specific -- he gave the

4    date of injury, reported as the day before.  But there wasn't,

14:10:02  5    like, a lot of specificity as far as like time or an actual, I

6    picked this up, boom, I felt this.  I didn't find that.

7    Q   All right.  Let me show you --

8           MR. KLECAN:  Could you pull up 2-709, please.

9           And highlight the top box.

14:10:32  10   BY MR. KLECAN:

11   Q   Do you recognize what this document is?

12   A   Yes.

13   Q   What is it?

14   A   It's a 102 form, which is the employee's and -- excuse me,

14:10:41  15   employee and doctor's report of injury.

16   Q   Okay.  And you can see it's dated 9/19?

17   A   Yes.

18   Q   Is this what gets the ICA claim started?

19   A   Yes.  If it's completed and signed, yes.

14:10:58  20   Q   And then that goes into ICA?

21   A   Yes.

22   Q   That opens up his file, so to speak, at the I- --

23   A   Correct.

24   Q   I want you to look at his writing which is there for line

14:11:10  25   or box 11:  Describe where and how accident or cause of

DIRECT EXAMINATION – LYNELL BROWN

14:11:15  1    disability occurred, including location and department.

2            Do you see that?

3    A    Yes.

4    Q    Okay.  In this one, can you read that for us, what she's

14:11:27  5    highlighted in yellow?

6    A    Layout for curb stakes at 19th Avenue and Maryland at 6:30

7    a.m.  Got back in truck to move areas and was unable to move

8    without severe pain in lower back.  Took ibuprofen but didn't

9    work.

14:11:54  10   Q    Okay.

11            MR. KLECAN:  Could you then go to Exhibit 2-694.

12   BY MR. KLECAN:

13   Q    Is this part of the six pack?

14   A    Yes.

14:12:10  15   Q    What we see on this is all Mr. Hunton's writing?

16   A    Yes.

17            MR. KLECAN:  Could you go to the next page.

18   BY MR. KLECAN:

19   Q    I want to pause on this page because it asks about

14:12:27  20   witnesses.

21            Do you see none filled in?

22   A    Correct.

23            MR. KLECAN:  And then if we go to the last page,

24   we'll get a description of his situation.

14:12:37  25            If you could, if you start with the fourth line down

DIRECT EXAMINATION - LYNELL BROWN

14:12:46   1   and highlight in yellow, "when we first start."

2   BY MR. KLECAN:

3   Q   On this description of the onset of the injury, does he

4   indicate that first start at 6:30 a.m., laying out, felt

14:13:07   5   discomfort at first in lower back?

6   A   Yes.

7            MR. KLECAN:  Can you go back to page 1.

8            All right.  And then if you could go to Exhibit 2 of

9   page 48.

14:13:39  10            And highlight -- actually, the top paragraph, please.

11   BY MR. KLECAN:

12   Q   This, I'll show you in a minute, was a report to your

13   coworker, and in this description of the accident, can you

14   read that for us under description?

14:14:03  15   A   "EE," which is short for employee, "was hammering stakes

16   into the curb when he began feeling pain in his lower back."

17   Q   All right.  Thank you.

18            MR. KLECAN:  Then we should go back a page just so we

19   can get a date on that.

14:14:25  20   BY MR. KLECAN:

21   Q   Do you see that at the bottom, what you just read was

22   entered on October 2nd, 2014?

23   A   Correct.

24   Q   By Erik Brong?

14:14:36  25   A   Yes.

DIRECT EXAMINATION - LYNELL BROWN

14:14:37  1    Q    And he is also a Zurich adjustor?

2    A    Yes.

3            MR. KLECAN:  Please go to 2-729.

4    BY MR. KLECAN:

14:14:50  5    Q    Can you identify what this is?

6    A    Yes.  Employer's report of injury.  We refer to it as a

7    101 form.

8    Q    Okay.  Is this something that was in your file?

9    A    I believe so.

14:15:04  10   Q    Okay.

11           MR. KLECAN:  And if you could highlight cause of

12   accident right where you are.

13   BY MR. KLECAN:

14   Q    Do you see what is described there?  Finishing staking

14:15:16  15   curb and gutter from east side of 19th and felt pain in his

16   low back.

17   A    Yes.

18   Q    These explanations, do they give you any concern, red

19   flag, or any concern about different descriptions of how it

14:15:43  20   occurred?

21   A    Yeah.  There were different descriptions, and I believe

22   even slightly different descriptions as well to the doctor

23   when he sought treatment as well.  So it's a red flag because

24   it's less, it's more, it's different, it was after I finished,

14:15:58  25   after I got out of the truck.  So there are some differences.

DIRECT EXAMINATION - LYNELL BROWN

14:16:04  1   Q   The reason I ask you about all of those is any one of

2   those -- is any one of those reason for denial of the claim?

3   A   Well, in totality, it makes it questionable.

4   Q   Okay.  I wanted to jump ahead because we'd heard about

14:16:25  5   claim reviews.  Talked about them.  The process where you meet

6   with Sundt, you and others --

7   A   Yes.

8   Q   -- get together with Sundt, can you describe what that

9   process is.

14:16:41  10   A   So whenever -- different clients have different increments

11   of when we meet.  So it would depend on what they -- when they

12   wanted to get together.  It could be once a year, twice a

13   year, quarterly.  I believe it was semiannually with them.  It

14   would be myself, another representative from Zurich, and

14:17:00  15   usually no less than a room of maybe seven to ten people, and

16   we would go over the claims and discuss the status of the

17   claims and the plan to bring the claims to resolution.

18   Q   Okay.

19        MR. KLECAN:  Could you pull up 41.  Exhibit 41,

14:17:14  20   page 48, please.

21   BY MR. KLECAN:

22   Q   Is this one of those -- does this reflect one of those

23   claim reviews?

24   A   Yes.

14:17:27  25   Q   Okay.

DIRECT EXAMINATION – LYNELL BROWN

14:17:28  1          MR. KLECAN:  If you could, could you highlight the

2    strategy portion.

3    BY MR. KLECAN:

4    Q    Can you read that for us, Lynell?

14:17:45  5    A    "The claim has been denied based on the fact there is no

6    mechanism of injury to support the claim.  The claimant also

7    has significant preexisting injury.  The claimant also failed

8    to report the injury timely."

9    Q    Okay.  So what -- is this your description for the claim

14:18:01 10    review, or is this something you wrote?  Or is this something

11    somebody else who was attending puts it together?

12    A    I believe I wrote this.

13    Q    Okay.  What do you mean by "no mechanism of injury"?

14    A    Mechanism is like the cause of the accident.  I lifted

14:18:18 15    this book and it was heavy and I strained my back.  Or I fell

16    and banged my knee or cut my finger with the knife.

17    Q    Some description of how the accident occurred, how the

18    injury occurred?

19    A    Correct.

14:18:33 20    Q    So let's talk more generally then for a second.  Obviously

21    Mr. Hunton's claim involves a back claim.  Any idea of what

22    percentage of worker's comp claims are back injuries?

23    A    It's one of the top three.  I don't know which -- where it

24    falls into, but knees, shoulders, and backs.

14:18:55 25    Q    So how much experience do you have with back injury claims

DIRECT EXAMINATION - LYNELL BROWN

14:18:59  1   as a worker's comp adjustor?

2   A    Quite a bit.

3   Q    Okay.  In this case we come to learn there was a herniated

4   disc.

14:19:12  5   A    Yes.

6   Q    Have you had those kinds of claims before?

7   A    Yes.

8   Q    In your experience, with herniated disc back claims, is

9   there usually an incident?

14:19:25 10   A    On most occasions, yes.

11   Q    I'm sorry?

12   A    Yes.

13   Q    Tell us the kinds of things you've experienced, you've

14   dealt with before about back injuries and onset of back

14:19:35 15   injury.

16   A    Usually I would say the majority are from lifting.

17   Lifting.  Second biggest cause are falling.  Compression,

18   falling off of ladder.  Falling down from a different level.

19   Q    Okay.  So from your perspective, from your experience, not

14:19:55 20   as a doctor but as an adjustor, what is the significance that

21   there was no specific injury, no mechanism of injury with

22   Mr. Hunton's claim?

23   A    Well, it raises a flag because it could be a level of

24   something that was going on before.

14:20:12 25   Q    Okay.  Well, aggravation's covered by worker's comp, isn't

DIRECT EXAMINATION - LYNELL BROWN

14:20:19  1    it?

2    A    Yes.

3    Q    And why -- why is aggravation covered?

4    A    Because an employer hires a person as they are.  If you

14:20:29  5    have arthritis and they hire you, you have arthritis.  If you

6    get injured, you can't have an incident that will require --

7    that would change that.  Not change the diagnosis, but add to

8    it.

9    Q    So you can have an aggravation?

14:20:44 10    A    Yes.

11    Q    Okay.  Does it have to be a major aggravation?

12    A    No.

13    Q    What's required?

14    A    One percent.

14:20:55 15    Q    Have you had those kinds of claims with back claims where

16    somebody had a preexisting back problem, maybe years before,

17    and then has an industrial injury?

18    A    Yes.

19    Q    What do you see in those cases, in your experience in

14:21:11 20    those cases?  Do you find a specific incident?

21    A    I -- typically with those that I have accepted, there was

22    a specific -- not necessarily specific incident, but specific

23    moment in time they can say, I picked something up and it

24    hurt, or I pushed it and I had onset of pain.  I had something

14:21:34 25    radiate down my leg or pushed it and my elbow hurt or, you

DIRECT EXAMINATION - LYNELL BROWN

14:21:40   1    know, something more -- that drew them to know, boom, right

2    then it was different than it was a minute ago.

3    Q   Okay.

4           In this case with Mr. Hunton, did he describe

14:21:52   5    anything like that?

6    A   I didn't -- I did not take him to give me an explanation

7    as to what, you know, changed it, other than he was just in

8    pain.  I couldn't -- I didn't delineate an actual point that

9    he could point to.

14:22:11  10    Q   We've gone over a few descriptions, getting out of the

11    truck at 6:30, hammering, after finishing layout.  When you

12    get those different descriptions, what does that tell you?

13    A   That maybe he didn't recall.  And just the fact that it's

14    like the story's kind of changing or different aspects,

14:22:36  15    there's some points he gives more specificity, other points

16    it's not really clear.

17    Q   Okay.  Did you also talk to him -- we understand from his

18    testimony that you talked -- he talked to you about three

19    times.  In any of those times did he, in those conversations,

14:22:55  20    did he tell you a specific incident, mechanism of injury?

21    A   Not that I recall.

22    Q   Okay.

23           So I think we know you're working on the claim by

24    September 29.  Did you have a response date by when you needed

14:23:28  25    to respond to the ICA filing?

DIRECT EXAMINATION - LYNELL BROWN

14:23:33  1  A   They sent out a notification sheet, and it's 21 days from

2  whenever the date is on the form.

3  Q   Okay.  We know from all the testimony here that you denied

4  the claim on October 22nd.

14:23:47  5  A   Yes.

6  Q   Why did you deny it?

7  A   Because the injury was questionable.  I was concerned that

8  there were different things that were going on and I didn't

9  really have a specific -- I keep -- my issue was there was no,

14:24:01  10  like, specific mechanism.

11  Q   Okay.  In the meantime, had you scheduled an IME?

12  A   Yes.

13  Q   Okay.  Tell us about how that got scheduled.  How do you

14  go about scheduling an IME?

14:24:16  15  A   So we use -- there's a couple different vendors.  No

16  preference, really, one to the other.  And the appointments,

17  we refer it over and they schedule the appointment.  I send

18  medical records, they write a letter, send it to me for

19  approval or review, and all that gets bundled up and given to

14:24:35  20  the doctor.

21  Q   We know in this case it was a company called Pax, P-A-X?

22  A   Correct.

23  Q   I assume that was a company you used?

24  A   Yes.

14:24:46  25  Q   When you do that request, do you specify I want a certain

DIRECT EXAMINATION - LYNELL BROWN

14:24:49  1  doctor?

2  A   No.  I usually ask for who's first available.  Lot of

3  times it's a matter of who we can get.  We have to give the

4  injured worker or the employee a certain number of days

14:25:00  5  notice.  So once -- after that notice, it's like who's

6  available.

7  Q   Okay.  Eventually is there a form that comes out that

8  lists who asked for the appointment?

9  A   I believe there's -- well, there's an appointment letter

14:25:16  10  that goes to the injured worker.  It says on there scheduled

11  by whom and who requested the evaluation.

12  Q   Okay.  And did you request the evaluation?

13  A   I did.

14  Q   Does that mean that you specifically requested Dr. Maric?

14:25:32  15  A   Not necessarily.

16  Q   Okay.  And is it your practice to select the physician

17  when you ask for an IME?

18  A   No.  Again, I try to get whoever's available.  Some

19  doctors avail themselves more, so you see their names more

14:25:52  20  because they're more available, make themselves available.

21  Q   We've been through this, but if you could briefly tell us

22  a little bit about when you do make that request, are there

23  boxes you check for questions to be asked of the doctor?

24  A   There's a standard -- there's standard questions that

14:26:08  25  automatically get asked.  Sometimes we're looking for

DIRECT EXAMINATION - LYNELL BROWN

14:26:11  1    something more specific so we can change them or I address

2    them.  I might only want to know if a person has permanent

3    impairment, so that would be my only question.  So it depends

4    on the case.  It goes from case to case.

14:26:24  5    Q   Do you recall in this case you added a question, once you

6    found out it was Dr. Maric, a question -- maybe you didn't

7    know that at the time, but did you add a question to the

8    process?

9    A   At the point I probably got the letter I would have known

14:26:36  10   it was him because the letter's already addressed to him, but

11   I might have made changes to the letter --

12   Q   Okay.

13   A   -- if I was looking for something specific.  It's not

14   uncommon to change it.

14:26:46  15   Q   Okay.  And did you add something about specific injury?

16   A   I believe so.

17   Q   What were you asking in that regard?

18   A   I don't remember what I phrased the question, but I was

19   looking to ask if there was something specific that he could

14:27:01  20   relate from an etiology standpoint the complaints he said he

21   had.

22   Q   Okay.  And when you got the report from Dr. Maric, what

23   did he report regarding whether Mr. Hunton reports a specific

24   injury to Dr. Maric?

14:27:18  25   A   He didn't give him a specific incident, if I remember

DIRECT EXAMINATION - LYNELL BROWN

14:27:21  1   correctly.  He did address medical issues, but he didn't give

2   a specific response to being asked the question, you know,

3   what happened.

4   Q   Okay.  There may be too many he's in that answer.

14:27:36  5   A   I'm sorry.  He, being Dr. Maric, didn't give a response --

6   different -- I believe he said that there was no specific

7   incident.  He asked the question and something to the degree

8   that he didn't really give him a specific incident.

9   Q   Okay.

14:27:48  10       I think we've had the report up a couple times, so I

11   don't think I need to show it to you.  But am I understanding

12   that Dr. Maric asked Mr. Hunton whether there was a specific

13   incident, and Dr. Maric reported that Hunton, Mr. Hunton, said

14   no specific incident?

14:28:03  15   A   I would say that's fair.  He probably asked him what

16   happened, and maybe did not get a description of what

17   happened.

18   Q   All right.  Let's talk about that IME report, because

19   Mr. Hunton didn't get the IME report like he was supposed to,

14:28:20  20   did he?

21   A   No.

22   Q   Do you know why?

23   A   No, I don't.  It's my normal practice -- it's something

24   that a file can be looked at by the injured worker at any

14:28:29  25   time.  So it's not anything that he wouldn't have been

DIRECT EXAMINATION - LYNELL BROWN

14:28:32  1    entitled to.

2    Q   Not anything he would have been --

3    A   He wouldn't have been entitled to.  But I don't know.

4    It's just something I normally do is send out -- send the

14:28:41  5    records out.  But I don't know.  He said he didn't get it, so

6    I have no reason to question that.

7    Q   Tell me a little bit about that process.  When you get the

8    report, is it electronic or is it hard copy?

9    A   Both sometimes.

14:28:56 10    Q   Okay.  So if -- how do you get it to the worker?

11    A   I usually print it off and put it in an envelope.  I don't

12    cover letter it or anything, I just send it, send a copy out.

13    Q   Okay.  So you don't use a transmittal letter saying here's

14    a copy of the IME?

14:29:14 15    A   No.

16    Q   Do you make a file note about, I got the IME report and

17    sent it on to, in this case, Mr. Hunton?

18    A   I typically don't.

19    Q   Okay.  Was anybody else supposed to send the report on,

14:29:29 20    like the doctor or Pax or anybody else?

21    A   They're not required to.

22    Q   Okay.  Do you know who else gets the report?  Obviously

23    the doctor has a copy, but does anybody else besides you get a

24    copy of the report when the IME is done?

14:29:45 25    A   Typically just comes to me.

DIRECT EXAMINATION - LYNELL BROWN

14:29:48  1  Q   Okay.

2        If I can jump ahead, do you remember sending the file

3  to Scott Finical?

4  A   Yes.

14:30:01  5  Q   And when you do that, how do you -- how do you send the

6  attorney the file?

7  A   I believe it's electronic transfer.

8  Q   Okay.  And also when a claimant gets attorney -- gets an

9  attorney, or even the claimant himself, herself, can they get

14:30:19  10  a copy of the file?

11  A   Yes.

12  Q   How do you do that?

13  A   Print a hard copy.

14  Q   Okay.  Do you recall in this case that both Ms. Runbeck

14:30:30  15  and Mr. Finical didn't get a copy of Dr. Maric's IME?

16  A   Yes.

17  Q   Why would that be?

18  A   I don't know.  I don't know if it was placed in the wrong

19  file.  I know that he did at some point ask me for it.  When I

14:30:49  20  sent the file to defense attorney, it ticks the whole file.

21  If it was in there, he would have received it.

22  Q   So you don't believe it was in the file?

23  A   I don't recall.  But based on the fact he asked me, no.

24  Q   Okay.  All right.  In the meantime, I got a request from

14:31:06  25  Mr. Hunton where he said, "You promised to send it to me and I

DIRECT EXAMINATION - LYNELL BROWN

14:31:10  1    haven't gotten it."

2            What do you recall about that?

3    A   He said -- if I'm not mistaken, I think it was even a

4    certified letter.  And I probably spoke to him because -- I

14:31:21  5    know I spoke to him, you know, a couple of times maybe or

6    whatever he recalled, but if he asked for it, I probably told

7    him I would mail it because it is something that he can have.

8    Q   Okay.  Do you recall whether you were able to find it and

9    mail it?

14:31:36 10   A   I make the assumption I mailed it.  But he said he didn't

11   receive it, so I can only assume it didn't go out.

12           THE COURT:  I'm confused.  You're talking about after

13   you got the letter, you think you mailed it again?

14           THE WITNESS:  Well, he asked for it and it's

14:31:49 15   something I kind of -- like, I don't know how to explain it,

16   like you just note things and throw it in an envelope, and I

17   told him I would mail it out.  And he said he didn't get it.

18   So I don't -- I don't recall whether he did, I don't recall

19   whether he didn't.  I just know that's something that he said

14:32:07 20   he didn't receive, so --

21   BY MR. KLECAN:

22   Q   So you really don't have a full explanation --

23   A   No.

24   Q   -- why it went out?

14:32:15 25   A   No.

DIRECT EXAMINATION - LYNELL BROWN

14:32:16  1   Q   Was there any reason for you not to send it to him?

2   A   No.

3   Q   Did the IME report have anything to do with the denial or

4   the continuation of the denial?

14:32:25  5   A   Well, it was -- the report actually said that, you know,

6   that there was some cause or that etiology he could

7   contribute, but he still didn't have any report of what

8   happened.  To the doctor.  So that was still, you know, a red

9   flag for me.

14:32:44  10  Q   So in your field, you talked about causation.  Are there

11  medical causation and legal causation issues?

12  A   Yes.

13  Q   Okay.  Did Dr. Maric's report address the medical

14  causation?

14:33:01  15  A   He addressed the medical causation, yes.

16  Q   What's the legal causation issue?

17  A   He didn't -- he -- it's not for the doctor really to do

18  the legal causation.  He basically asked him how he was

19  injured, and I don't believe he gave him any kind of -- he

14:33:18  20  said he didn't know, or something to that effect.

21  Q   So whose call is it on the legal causation?

22  A   It is my call on the legal causation.

23  Q   Okay.  All right.  So when you got -- I assume you got

24  Dr. Maric's report and reviewed it at some point?

14:33:35  25  A   Yes.

DIRECT EXAMINATION - LYNELL BROWN

14:33:36   1   Q   Did that change your opinion about compensability?

2   A   It didn't, because he was still saying that he really

3   couldn't -- you know, he didn't know what happened.  He had

4   some back pain.  I'm not looking at the report, but I'm just

14:33:48   5   summarizing what I remember it to say.

6   Q   All right.  Let's fast-forward, then, on to January.

7   Actually, the end of December.

8            We understand from the testimony in this case that

9   Mr. Hunton filed, I think he called it a protest.  Is that --

14:34:06   10   is that the term used in worker's comp?

11   A   That's the right term.

12   Q   Okay.  And that was the end of 2014, December 28, I

13   believe, somewhere towards the end?

14   A   I would concur with that.

14:34:20   15   Q   So what does that trigger?

16   A   At that point that gets filed with the industrial

17   commission and gets assigned for a hearing.

18   Q   Okay.  And are you copied on that?

19   A   Yes.

14:34:33   20   Q   By this point do you have a lawyer on this case?

21   A   I don't think I had one at the time.  I don't recall

22   exactly when I brought Scott in.  I don't know if I had him at

23   that point.

24   Q   While we're on that, I need to take a side track.  I think

14:34:49   25   the file indicates that a Casey Kurth was going to be involved

DIRECT EXAMINATION - LYNELL BROWN

14:34:53  1   or somehow was involved earlier.  Do you know anything about

2   that?

3   A    That's a possibility.  I don't remember.  Because -- and I

4   apologize, Casey does applicant and defense work, and there's

14:35:05  5   brothers and -- I don't remember.  He may have been involved

6   at some point.

7   Q    Okay.  All right.

8        Okay, so once you get notice in January, what does

9   that trigger?

14:35:20  10   A    It will trigger the fact that a hearing will be set, and

11   then I would assign the file to counsel.

12   Q    Okay.  Now, you have a supervisor that you're dealing

13   with?

14   A    Yes.

14:35:32  15   Q    And is it the same supervisor on all of your cases?

16   A    Yes --

17   Q    What's her name?

18   A    Eva Barclay.  She changed it, so I don't know which name

19   she was using at the time.  But it's Eva.

14:35:48  20   Q    We've been using Barclay.

21   A    Barclay.

22   Q    That shows up in the deposition, et cetera.

23        So what's your interaction with Ms. Barclay about

24   these cases?

14:36:03  25   A    She's just my supervisor.  She would review or let me know

DIRECT EXAMINATION - LYNELL BROWN

14:36:07  1    if something needed to be done or -- basically just my

2    immediate-report manager.

3    Q    Okay.

4         MR. KLECAN:  Could you pull up Exhibit 2, Page 45,

14:36:33  5    please.

6    BY MR. KLECAN:

7    Q    So we're in January.

8         MR. KLECAN:  Ask if you would highlight the middle

9    paragraph.

14:36:46  10   BY MR. KLECAN:

11   Q    So this is from the claim file, and it's Eva Barclay.

12   Category, Supervision.  Title, File Workup.

13        What text did she send to you?

14   A    E-mail CP today to make this file a priority and

14:37:05  15   completeness re work up including compensability reserves and

16   POA.

17   Q    Okay.  I guess the e-mail to CP is claims professional.

18   A    Claims professional.

19        MR. KLECAN:  All right.  Go to the next -- the bottom

14:37:19  20   of the page.

21   BY MR. KLECAN:

22   Q    So this is called TM 60 Day Review, is the title.

23        Do you see that?

24   A    Yes.

14:37:30  25   Q    What does that mean?

DIRECT EXAMINATION – LYNELL BROWN

14:37:31  1   A   TM is team manager.

2   Q   Okay.  And 60 day review, what's the significance of 60

3   days?

4   A   I think the management had so many days that they were

14:37:41  5   supposed to -- they had a set amount of days that they were to

6   review a file.

7   Q   Okay.  So is it usually every 60 days or is it this one --

8   the first one is in 60 days?

9   A   It changes.  I don't recall the exact, but there were

14:37:58 10   increments of time they were supposed to review.

11        MR. KLECAN:  Okay.  And if you could go to the next

12   page.

13        If you would highlight the first part there.

14   BY MR. KLECAN:

14:38:19 15   Q   So do you see -- first I need to know who fills this part

16   out?  Who supplies this information?

17   A   I believe this was part of the same note from the

18   supervisor, from Eva.

19   Q   Okay.  And so tell us what these various things mean.

14:38:46 20        TTD or PD?

21   A   Temporary total disability or permanent disability.

22        CMC.  I apologize, I don't remember what that is.

23        I think the LAR had something to with the legal

24   screen.

14:39:01 25        POA is plan of action.

DIRECT EXAMINATION - LYNELL BROWN

14:39:06   1          WS is work status.

       2          NCM is nurse case manager.

       3   Q   So is this indicating that these are the things Eva wanted

       4   you to handle?

14:39:22   5   A   This was her review, and she would just document that and

       6   would give me direction.

       7   Q   Okay.  And then in response to that, do you prepare

       8   information for the file?

       9   A   Usually I just -- what I'm supposed to do is just update

14:39:39  10   what she's given me.

      11   Q   Okay.

      12          MR. KLECAN:  So could you go to page 44, please, of

      13   Exhibit 2.

      14          Actually, I guess since it starts mid part, let's go

14:39:54  15   to 45 first.

      16          MS. HEDBERG:  44 at the bottom.

      17          MR. KLECAN:  I'm sorry?

      18          MS. HEDBERG:  That's where it starts, 44 at the

      19   bottom.

14:40:18  20          MR. KLECAN:  I'm corrected.  44 at the bottom.  The

      21   beginning of this e-mail, okay.

      22          THE WITNESS:  Um-hmm.  Yes.

      23   BY MR. KLECAN:

      24   Q   And this is in the file as electronic, I don't know if

14:40:30  25   it's an e-mail or some other kind of document.  Is this a

DIRECT EXAMINATION - LYNELL BROWN

14:40:34  1    special form with Zurich or simply your e-mail and response to

2    the request for 60-day review?

3    A    It's just the note in the file.   The notes are electronic.

4    When you put it in, it automatically puts this stuff in.

14:40:49  5    Q    Gotcha.   Okay.

6          This is one you authored on January 28th?

7    A    Yes.

8    Q    At 7:36 in the morning?

9    A    Yes.

14:40:58  10    Q    Okay.   All right.

11          MR. KLECAN:   Could we go to the next page.

12    BY MR. KLECAN:

13    Q    So is this what you then put in the file as to

14    compensability?

14:41:14  15    A    Yes.

16    Q    So can you tell us -- I think you told us the other day,

17    claim compensable P stands for pending?

18    A    Yes, I believe so.

19    Q    Can you read the compensability rationale and explain the

14:41:30  20    abbreviations for us?

21    A    EE, which is employee, states he was finishing --

22    Q    Read slowly, please.

23    A    I'm sorry.   "EE states he was finishing staking curb and

24    gutter from the east side of 19th Street and he felt pain in

14:41:46  25    his low back.   The insured questions the validity of claim

DIRECT EXAMINATION – LYNELL BROWN

14:41:51  1   because the EE has prior back injuries.  EE did not have a

2   specific incident and delayed reporting the claim.  AOE

3   arising out of the course and COE, course and scope of

4   employment, is questionable for treatment of the low back

14:42:06  5   injury."

6   Q    Okay.  So is this the explanation for the issue about

7   compensability?

8   A    Yes.

9   Q    Okay.  I think you also did another one that you covered

14:42:24  10  the medicals.

11          MR. KLECAN:  If we look at page 43 first, I believe.

12          Yes, at the bottom.

13  BY MR. KLECAN:

14  Q    So you get the 60-day review on the 15th -- the request

14:42:42  15  for 60-day review.  On the 28th you fill out your

16  investigation on compensability.  And do you also do a medical

17  summary?

18  A    Yes.

19  Q    Okay.  All right.

14:42:59  20          So the medical summary there that you deal with here

21  is just summarizing sort of appointment by appointment what

22  the medical treatment and conditions were?

23  A    Right.

24          MR. KLECAN:  Okay.  If you could go to the next page,

14:43:18  25  I think.

DIRECT EXAMINATION – LYNELL BROWN

14:43:23  1        There we go.

2    BY MR. KLECAN:

3    Q   Trying to put together e-mails on separate pages.  We're

4    having trouble.  But I just want to indicate how much of the

14:43:36  5    medical you were covering here.  Did you do a comprehensive

6    medical summary?

7    A   Yes.

8    Q   Okay.  All right.

9            MR. KLECAN:  If you could go to page 40, please.

14:43:55 10            Exhibit 2, page 40.

11    BY MR. KLECAN:

12    Q   This is a couple days later.

13            MR. KLECAN:  Go ahead and highlight the whole thing,

14    if you would, please.

14:44:09 15    BY MR. KLECAN:

16    Q   And tell us what this is.

17    A   It's just contact with the employer.

18    Q   Okay.  And is this an additional part of your medical --

19    your summaries that you're doing both on compensability

14:44:26 20    medical and contacts?

21    A   It's part of the contacts.  You should have contact with

22    the employee --

23    Q   Okay.

24    A   -- employer, and medical doctor.

14:44:36 25    Q   Okay.  This is -- is this to suggest this is the first

DIRECT EXAMINATION - LYNELL BROWN

14:44:39   1   time you talked to the employer?

2   A    Not necessarily.  Sometimes they call before and say, hey,

3   this is coming or -- but this is the date that I did the

4   contact for the file.

14:44:53   5   Q    Okay.  If you could kind of scan through there and see if

6   there's things of significance with respect to compensability

7   and point those out to us.  I have something I want to ask you

8   about when you get through.

9   A    One thing that would pop out is that in accordance with

14:45:16  10   their timeline for reporting claims that he didn't report it

11   on the same day, it was the following day, if I'm not

12   mistaken.  He said he was finishing staking a curb and he felt

13   pain.  The fact that he had had prior surgery, back issues

14   that he treated for.  And the employer questioned the validity

14:45:44  15   of the claim and just the fact that he denied any falling or

16   twisting.  I guess they must have asked him that and he denied

17   any of those things happening.

18   Q    Okay.  And that's actually what I wanted to ask you about,

19   because the very last phrase is "EE denied falling or

14:46:01  20   twisting."  At the very bottom.  And what I wanted to know is

21   if that was something he told you in the phone calls that you

22   had with him or is this information that he told the employer?

23   A    It was information he told the employer.

24   Q    Okay.  And what's the significance of denying falling or

14:46:23  25   twisting in your analysis of the claim?

DIRECT EXAMINATION - LYNELL BROWN

14:46:26   1   A   Those are things that could potentially cause an injury.

2   Q   Okay.

3           All right.  So this, this is at the end of January,

4   2015?

14:46:37   5   A   Yes.  January 30th.

6   Q   Okay.  Do you recall that during the month of January you

7   also had conversation with, I think it was at the end of the

8   month as well, with a lawyer, Runbeck, on his behalf?

9   A   I believe so.  Debbie Runbeck.

14:46:58  10   Q   Okay.  She's testified here, so we know more than you do

11   about what's already happened, but I want to first ask you if

12   you remember having a phone call with Debra Runbeck?

13   A   More than likely I did.  I don't specifically remember,

14   but more than likely I did.  I talk to a great deal of people,

14:47:20  15   so if she says I talked to her, I did.

16   Q   Okay.  And I want to talk -- I want to ask you some

17   questions about what the conversation involved.  But first ask

18   you if you remember the specifics of the conversation?

19   A   I don't remember.  I'm sure we would have discussed the

14:47:39  20   specifics of the claim or the status or, you know, to that

21   effect.

22   Q   Okay.  As she testified about it, she thought she could

23   just call and you would accept the claim and she wouldn't have

24   to get involved and not even represent Mr. Hunton.

14:47:55  25           Does that ring any bells with you?

DIRECT EXAMINATION - LYNELL BROWN

14:47:58  1    A    It doesn't ring a bell but, I mean, I talk to a lot of

2    attorneys all the time, so it wouldn't be out of the realm of

3    possibility.

4    Q    Okay.  All right.  Assuming that's the first time she

14:48:08  5    called you on the Hunton claim, to see whether she was even

6    going to take him on as a client or whether she needed to take

7    him on as a client, would that be something that -- would that

8    be out of the ordinary?

9    A    No.

14:48:27  10    Q    Okay.  During -- you already talked about having

11    conversations with Mr. Hunton.

12    A    Yes, um-hmm.

13    Q    Okay.  The fact that an attorney's now calling you, does

14    that change any of the dynamics of the call?

14:48:47  15    A    No.

16        THE COURT:  Of the call?

17        MR. KLECAN:  Pardon me?

18        THE COURT:  Dynamics of the call?

19        MR. KLECAN:  Yes.  Sorry.  I'll reask it.

14:48:57  20    BY MR. KLECAN:

21    Q    Is it more concern to you when you get a call from an

22    attorney as opposed to talking directly to the claimant?

23    A    No.

24    Q    Okay.

14:49:10  25        She indicates that your response to the call in that

DIRECT EXAMINATION - LYNELL BROWN

14:49:15   1   call, and she was asking about whether you're going to accept

2   the claim was something to the effect that you had to contact

3   the employer.

4   A   Okay.

14:49:25   5   Q   Okay.  Does that ring any --

6   A   It doesn't ring a bell.  I'm sorry.

7   Q   Okay.  But would it be out of the ordinary for you to say

8   that?

9   A   It may not be, depending what the conversation was and why

14:49:36   10   I was calling.  I don't remember.

11   Q   Okay.  Did you have obligations to contact the employer

12   about this -- this employer about cases?

13   A   Yes.

14   Q   And are some employers -- well, with some employers do you

14:49:52   15   have a special protocol that they get to have more involvement

16   than others?

17   A   Yes.

18   Q   Tell us about that with Sundt.

19   A   They have what they call special handling instructions,

14:50:05   20   and whatever those instructions were, you know, I was

21   accountable to follow the instructions.

22   Q   Okay.  So if you got a call about a claimant that involved

23   Sundt, were you required to call Sundt?

24   A   Yes.

14:50:24   25   Q   And if the question was are you going to pay this claim,

DIRECT EXAMINATION - LYNELL BROWN

14:50:28  1   would that be something you would discuss with Sundt?

2   A    Yes.

3   Q    Okay.  Who makes the decision about whether you pay the

4   claim?

14:50:36  5   A    I do.

6   Q    But why would you need to talk to Sundt then?

7   A    Well, they're still allowed to have input.  But at the end

8   of the day, it was not their decision to make.

9   Q    Okay.  If it's suggested that you wanted to pay the claim

14:50:53  10  but you just needed permission from Sundt first, would that be

11  accurate?

12  A    No.

13  Q    Had anything changed about compensability when you were

14  first contacted by Ms. Runbeck?

14:51:06  15  A    Not at that time, no.

16  Q    Okay.

17       So then the process now we're -- we have an ICA

18  process started, okay?  I think you said one of the first

19  things that happens is they send out a notice of hearing?

14:51:25  20  A    Correct.

21  Q    If I tell you it was originally set for April 7th and

22  later changed to April 30th, does that ring any bells?

23  A    No.  That happens frequently for whatever reason.  Judge's

24  schedule, the attorney's schedule.  So it's not uncommon for

14:51:39  25  hearings to be rescheduled.

DIRECT EXAMINATION - LYNELL BROWN

14:51:41   1    Q    Okay.  So what's going on during that time when you're

2    waiting for the hearing?  Are you continuing your

3    investigation?

4    A    I think at that point I did assign it.  I don't remember

14:51:53   5    exactly when I assign it, but I at some point sent it to Scott

6    Finical.

7    Q    Is that because he's going to be the attorney handling the

8    hearing?

9    A    Yes.

14:52:03  10    Q    Okay.  Can you handle the hearings?

11    A    No.

12    Q    You have to have a lawyer there?

13    A    Yes.

14    Q    Claimants don't have to have a lawyer, do they?

14:52:15  15    A    No.

16    Q    They can be what they call pro se?

17    A    Correct.

18    Q    Employer insured you're not entitled to appear --

19    A    Correct.

14:52:22  20    Q    -- as counsel?

21    A    No.

22    Q    Let's talk then about what else you do during that period

23    of time, if anything.  You've got a hearing set in April.  You

24    know that Mr. Hunton's got counsel.  In fact, do you get a

14:52:48  25    copy of the retention letter that she sends in to the court?

DIRECT EXAMINATION - LYNELL BROWN

14:52:52   1   A   Yes.

2   Q   So you know that she's not just called you on the phone,

3   but she's actually representing?

4   A   Yes.

14:52:59   5   Q   Then what's happening in that period of time now?  We're

6   looking at, say, the end of January up until whatever is

7   supposed to occur in April.

8   A   More than likely I would have sent it over to defense

9   counsel, because there's certain timeframes they have to file

14:53:17   10   motions or whatever they need to get in for discovery.

11   Q   Okay.  So tell me how it works with counsel once you get a

12   defense counsel involved.  What's your decision -- what are

13   your decisions and what are counsel's decisions from there

14   forward?

14:53:37   15   A   Well, we work together.  I seek them for advice.

16   Q   Okay.  And had you known Mr. Finical for a number of

17   years?

18   A   I knew him for a while because I think he had been on our

19   cases for a while.  I don't know how many years.  He

14:53:54   20   originally wasn't their counsel.  So I knew him for, I would

21   say, at least maybe a year or two.

22   Q   Okay.  All right.  And how did you find it to be working

23   with him?  How did that working relationship go with

24   Mr. Finical?

14:54:10   25   A   It was okay.

DIRECT EXAMINATION - LYNELL BROWN

14:54:18    1           MR. KLECAN:  Let's -- if we could pull up Exhibit 42,

        2    page 6, please.

        3    BY MR. KLECAN:

        4    Q   Sorry for the small print.  There's actually -- I'll tell

14:54:34    5    you under Exhibit 42 there's two copies, but we've been using

        6    this copy.  There's a later copy, another copy that's bigger

        7    print.  Easier for me.  But we've been use thing one, so let's

        8    stick with it.

        9           MR. KLECAN:  So if you could highlight the top

14:54:52   10    e-mail.

       11           Yeah, just far enough to cover her name.

       12           That's perfect.

       13    BY MR. KLECAN:

       14    Q   So take a look at this and see if this refreshes your

14:55:00   15    memory about when you got Mr. Finical involved.

       16    A   It would have been February 23rd, because I reference I

       17    spoke to him the day before.

       18    Q   Okay.  And it looks like you sent this at 7:30 a.m. on the

       19    24th.

14:55:15   20    A   Yes.

       21    Q   Okay.  What is new package notification?

       22    A   I think it's the file.  I think when you're sending the

       23    file over, it's just saying there's some attachments or

       24    documents.

14:55:31   25    Q   All right.  And then the message you gave to Mr. Finical

DIRECT EXAMINATION - LYNELL BROWN

14:55:34   1   here, could you summarize that for us?

2   A   Basically I said I sent him -- this is the file I talked

3   to you about yesterday, if he could let me know his thoughts.

4   Sundt strongly questioning the claim because of his prior back

14:55:45   5   complaints and treatment.  Also, he did not -- also, initially

6   he did not report the claim right away.  Thank you for your

7   assistance.

8   Q   Okay.

9         MR. KLECAN:  And lower part of the page.

14:56:04  10         A little higher.  There.

11   BY MR. KLECAN:

12   Q   Okay.  And is this the -- I don't know if you sent this or

13   somebody else sends this.  Can you tell?

14   A   I think I sent it.  It was -- it's like the link for the

14:56:19  15   medical records, if I'm not mistaken, or the file, when you

16   send the file over.

17   Q   At the top it says exportclaims@ZurichNA.com.  What is

18   that?

19   A   So it's exporting the documents.  I just electronically

14:56:36  20   submit the file over.  So it is exporting them out of our

21   system and sending them over.

22   Q   Okay.  All right.  And then the lower part of this is

23   setting out the whole thing about having sent it over?

24   A   Yes.

14:56:51  25   Q   Okay.  So this was on February 24th?

DIRECT EXAMINATION - LYNELL BROWN

14:56:56  1    A    Yes.

2    Q    Okay.  So on that day you had that earlier e-mail about

3    this is the file we're talking about, and here's the file

4    material; right?

14:57:07  5    A    Yes.

6    Q    Should that include the whole file?

7    A    It should, yes.

8    Q    Okay.  We'll get back to that.

9         MR. KLECAN:  Then if you could go, please, to 42,

14:57:18 10    Exhibit 42, page 5.

11         On the lower part I think is the right order.

12    BY MR. KLECAN:

13    Q    So you sent it on the 24th, and here it is the 25th, 8:11

14    in the morning, Mr. Finical's already responding.

14:57:48 15    A    Yes.

16    Q    Pretty fast turn around, isn't it?

17    A    Yes.

18    Q    And he's indicating that he's reviewed the records, but

19    the records of Johnston, Dr. Johnston and the AIM clinic, are

14:58:04 20    too big and text is cut off and can you resend.  And also can

21    you send the file number.

22         See that?

23    A    Yes.

24         MR. KLECAN:  If you could go, then, to Exhibit 42,

14:58:14 25    page 4.

DIRECT EXAMINATION - LYNELL BROWN

14:58:20  1        There was actually another e-mail there, but I'm

2   going to skip over it, but I'm looking for the e-mail on March

3   the 3rd at 9:06 in the morning.

4        There we go.

14:58:45  5   BY MR. KLECAN:

6   Q   All right.  So the prior one was March 25th.  Now we're

7   approximately not even eight days later.  This is from

8   Mr. Finical again?

9   A   Yes.

14:59:00 10   Q   Okay.  So he's asking you to give him a call.  He's

11   reviewed additional records.  And then what does he say in the

12   last paragraph there?

13   A   "Based upon what I know, I think that you should be

14   cautious about accepting this claim but we should talk

14:59:18 15   further.  Thanks."

16        MR. KLECAN:  Okay, I do need to back up to 2/25.  So

17   I think it's maybe -- there's an e-mail, February 25th at

18   8:30.  That is either page 3 or 4 of Exhibit 42.

19        Great.  Thank you.

14:59:39 20   BY MR. KLECAN:

21   Q   This is the one I skipped that I shouldn't have.

22        Do you see this is an e-mail on the 25th?  This is

23   the second e-mail on the 25th?

24   A   Yes.

14:59:55 25   Q   In the second paragraph he's referring to the IME not

DIRECT EXAMINATION - LYNELL BROWN

14:59:59  1    being there as well as some examinations by Dr. Wang and

2    Dr. Lieberman, and asking whether those were ever held.  What

3    does this tell you about where the IME ended up?

4    A    That he didn't receive it.

15:00:14  5    Q    Right.  And if you sent him the whole file, why isn't it

6    in there?

7    A    It should have been.  Obviously it wasn't because it

8    wasn't attached.  He was asking for it, so it wasn't in the

9    electronic file I sent over.

15:00:28  10   Q    Okay.  And when you sent the file to Ms. Runbeck, same

11   deal, Dr. Maric's IME report was not in that file?

12   A    I don't believe so.  And her file was a paper file.  Just

13   to be clear.

14   Q    Okay.  All right.

15:00:44  15        And then the third paragraph, does he set out his

16   initial impressions?

17   A    Yes.

18   Q    He talks about preexisting and prior problems.  He talked

19   about that just the other day, so we don't need to go over

15:01:01  20   that in detail, but I'd like for you to look at the fourth

21   paragraph.  "From your e-mail" paragraph.

22        Tell us what he expressed there?

23   A    "From your e-mail there appears to be an untimely report

24   which warrants further investigation.  Also, based upon the

15:01:23  25   medical records that we were able to read, it would be helpful

DIRECT EXAMINATION - LYNELL BROWN

15:01:26  1    to know if applicant reported to his supervisors or other

2    co-employees he had periodic ongoing back and leg

3    complaints" -- excuse me, "leg symptoms prior to the alleged

4    injury as prior medical records --"

15:01:45  5  Q    We know the next page says "suggested."

6  A    Yes.

7  Q    All right.

8          MR. KLECAN:  So those are 2/25.  We looked at March

9    the 3rd.  Let's jump ahead to March 16th, which is Exhibit 42,

15:02:00 10    page 3.

11          I'm looking for the one at 9:06.

12          I think that's it.

13          Okay.  Let's look at that.

14  BY MR. KLECAN:

15:02:24 15  Q    This is at 11:46 a.m.  This is about Debbie Runbeck now

16    talking to Mr. Finical.

17          Do you see that?

18  A    Yes.

19  Q    Do you recall what communication you had with Mr. Finical

15:02:42 20    in response to this e-mail from him to you?

21  A    No.

22          MR. KLECAN:  If you could go ahead to 42, Exhibit 42,

23    page 2.

24          I'm looking for one at 1:56 in the afternoon.

25

DIRECT EXAMINATION - LYNELL BROWN

15:03:02    1    BY MR. KLECAN:

2    Q   This is -- skip pages again here in just a second, but to

3    orient you, March the -- I think it is --

4    A   Eighteenth.

15:03:17    5    Q   Okay.  1:56.  Mr. Finical to you.

6         MR. KLECAN:  And then if we go -- I think we need to

7    go the other way to pick up the rest of the e-mail.

8         Okay.  Let's go to Exhibit 42, page 8.

9         I think there was an e-mail at 4:11 in the morning.

15:04:10   10         Yeah, the one at the top.  Perfect.

11    BY MR. KLECAN:

12    Q   What is this e-mail?

13    A   This is a copy of the IME report that I sent to Scott.

14    Q   And it looks like you were up pretty early that morning.

15:04:31   15    A   Not uncommon.

16    Q   Okay.  All right.

17         And that's on the 19th.

18         MR. KLECAN:  And if we go to Exhibit 42, page 1, I

19    think we see his response.  And this is the same day, looks

15:04:57   20    like.

21         Can you read that?

22    A   It says, "Thank you, Lynell, for providing us with a copy

23    of Dr. Maric's IME report this morning.  Based on applicant's

24    history, Dr. Maric has concluded that the applicant's

15:05:13   25    recurrent L4-5 disc herniation is related to the alleged

DIRECT EXAMINATION - LYNELL BROWN

15:05:17   1   9/18/14 work injury.  As we have discussed, we have not had

        2   the opportunity to review any medical records from Dr. Wang or

        3   Dr. Lieberman.

        4        "In the absence of medical or other substantial

15:05:28   5   factual evidence that the applicant continued to have

        6   ongoing" --

        7        THE COURT:  Can you slow down, please.

        8        THE WITNESS:  I'm sorry.

        9        "In the absence of medical or other substantial

15:05:37  10   factual evidence that applicant continued to have ongoing back

       11   and left leg symptoms following his 2009 surgery by

       12   Dr. Pootrakul in June 2009 which could be provided to

       13   Dr. Maric for further review and consideration, there is not a

       14   present basis to continue to deny the alleged injury claim.

15:06:03  15        "If you intend to accept this claim, please inform

       16   Debra Runbeck, applicant's attorney, as soon as possible.  As

       17   you know, Runbeck called us yesterday and explained that she

       18   intends to file a bad faith complaint with ICA.  If you

       19   prefer, we can call Runbeck on your behalf.  Just let us

15:06:23  20   know."

       21   Q    Okay.  And that was on the 19th of March.

       22   A    Yes.

       23   Q    Okay.  Same day, actually?  Like nine hours later.  You

       24   sent it at 4:00 in the morning, and he's responding about 1:00

15:06:44  25   in the afternoon?

DIRECT EXAMINATION - LYNELL BROWN

15:06:45  1   A    Yes.

2   Q    All right.

3             MR. KLECAN:  Then let's go to Exhibit 42, page 9.

4             The top one, please.

15:06:58  5   BY MR. KLECAN:

6   Q    And is this the e-mail where you informed Scott that you

7   have done -- you have changed the status?

8   A    Yes.

9   Q    And accepted the claim?

15:07:10 10   A    Yes.

11   Q    Okay.  And why did you change status?  Was it after

12   consulting with Mr. Finical?

13   A    Yes.

14   Q    Okay.  All right.  And then what happens in the process?

15:07:27 15   A    I -- I at some point issued a notice rescinding the prior

16   notice and accepting the claim.

17   Q    Okay.  And then since it's been -- since middle of

18   September, you have to figure out what he's owed and to catch

19   him up?

15:07:46 20   A    Correct.  And obtain his -- see if he's had any earnings,

21   because sometimes people get unemployment or other -- you may

22   have other earnings, so I would need to get that to determine

23   what we would owe him.

24   Q    Okay.  Did that process take some time to get that done?

15:08:11 25   A    Yes.  I believe I requested wages from the insured and I

DIRECT EXAMINATION - LYNELL BROWN

15:08:20  1  believe there was -- I think he filled -- there's a form the

2  employee can fill out, and I don't remember whether he filled

3  it out or not, but I was basically trying to track down his

4  wages, so I'm sure there was some time.

15:08:36  5          MR. KLECAN:  Could we go to Exhibit 2, page 36,

6  please.

7          And highlight that top -- yes.

8  BY MR. KLECAN:

9  Q  Okay.  Obviously from Exhibit 2, this is part of the claim

15:08:58  10  file.  Do you know the author there, Lana Yaroshenko?

11  A  No.

12  Q  This indicates check for 19,638.08 was sent on 4/28/15

13  overnight delivery and gives tracking number.  Did you receive

14  any information to the contrary it didn't go through?

15:09:26  15  A  No.

16  Q  Anybody ask you for a tracking number?

17  A  I don't recall, but I don't think so.

18  Q  Ms. Runbeck indicated it wasn't entered into her

19  accounting system for one reason or another until May the

15:09:37  20  13th.

21          Do you know why?

22  A  No.

23  Q  Okay.  All right.  So you issued the check to cover --

24  what is that check covering, the 19,638.08?

15:09:58  25  A  It was for a period of indemnity, I don't remember the

DIRECT EXAMINATION - LYNELL BROWN

15:10:01  1    exact dates at this point, but for temporary partial

2    disability benefits.

3    Q    So we know from the testimony he had had a surgery he paid

4    for through the health insurance at Sundt in January of 2015.

15:10:20  5    That part of -- does that get reimbursed by Zurich to whoever

6    that insurer was?

7    A    It would go to the insurer.

8    Q    So when you catch up on benefits here, do you also catch

9    up on medical expenses?

15:10:34  10    A    That usually takes sometimes a little longer, but

11    eventually, yes.

12    Q    Okay.  What is the process from there?

13    A    We continue to follow up with the doctor, obtain his work

14    status, kind of see where he's at until such time the doctor

15:10:56  15    deems him stationary.

16    Q    Okay.  Do you recall who his treating physician was at

17    this period of time?

18    A    I think it was Dr. Wang.  I think.

19    Q    Okay.  All right.  And do you recall that Dr. Wang at some

15:11:12  20    point did find him medically stationary?

21    A    Yes.

22    Q    Do you recall the date?

23    A    No.

24    Q    Let me just tell you it was June the 5th of 2015.

15:11:25  25    A    Okay.

DIRECT EXAMINATION - LYNELL BROWN

15:11:26   1   Q    Everybody's seen the report already.

2   A    Okay.

3   Q    So what does that mean if Dr. Wang finds him to be

4   medically stationary?  Is that MMI?

15:11:36   5   A    MMI.  Which is maximum medical improvement.  Basically

6   indicating he's plateaued.  He's as well as he's going to be

7   at that point.

8   Q    Okay.  Tell us how that's supposed to work in the worker's

9   comp system.  What -- what's the significance in this whole

15:11:53  10   recovery process of the worker reaching MMI?

11   A    So once he's discharged from care or reaches MMI, at that

12   point then we start to assess his work restrictions, permanent

13   work restrictions, and he may -- the doctor may have indicated

14   that he needed what we call supportive care, which is

15:12:15  15   basically maintenance type of medical treatment.  It's not

16   active, so maybe he goes once, twice, three, four times a

17   year, different -- depending on injuries, it could vary.

18   Q    Okay.  And so in the process, in the worker's comp

19   process, is MMI a time when things are stabilized?  Is there

15:12:36  20   an expectation the worker now is able to find another

21   employment?

22   A    They could, yes, depending on their restrictions.  Yes.

23   Q    Okay.  So do you, at the point of him reaching MMI and you

24   sending out for a loss of earning capacity report, are you

15:13:02  25   required to continue to pay him?

DIRECT EXAMINATION - LYNELL BROWN

15:13:04  1   A   No.

2   Q   Why not?

3   A   It doesn't have to be paid until the commission issues a

4   findings and award.  Now, I would have to go back and back pay

15:13:15  5   him once the award comes out based on whatever they issue, but

6   it's not required.

7   Q   Okay.  But in your practice, did you?

8   A   Yes.  I volunteered to advance payment.

9   Q   Okay.  And is that a customary practice or just to

15:13:27  10  Mr. Hunton's case or just depends?

11  A   For me, it's a customary practice.

12  Q   So what's supposed to happen once that process -- once

13  he's MMI, you're getting an LEC, is there some way this gets

14  in front of the judge for decision?

15:13:49  15  A   Well, the notices are sent to the industrial commission

16  and it puts them on notice they need to issue a findings and

17  award with regard to the loss of earning capacity.

18        I'm able to submit a labor market report.  He is

19  able, probably through his counsel, to submit a labor market

15:14:07  20  report.  And then the -- I'm not sure when they're

21  represented, but I think the industrial commission sends

22  something to the injured worker to complete to be included in

23  their assessment.

24  Q   So what starts that process?  I know the doctor report of

15:14:24  25  MMI initiates it, but what starts that process at the ICA?

DIRECT EXAMINATION – LYNELL BROWN

15:14:29  1    A    It's once I issue the notice.  So once I issue the notices

2    and submit them to the commission, they set it kind of on a

3    shelf for about 90 days or so, and then they make their

4    decision.

15:14:43  5            THE COURT:  Is this a good place for a break?

6            MR. KLECAN:  Would be great.

7            THE COURT:  Let's take our afternoon recess.  Come

8    back at 3:30.

9        (The jury exited the courtroom at 3:14.)

15:15:10  10           THE COURT:  You can step down.

11           Okay.  How much longer?

12           MR. KLECAN:  I'm trying to cut it down.

13           THE COURT:  You're the worst estimator of time.

14           MR. KLECAN:  I'm sorry?

15:15:24  15           THE COURT:  You're the worst estimator of time.

16           MR. KLECAN:  I really am.  With that caveat, maybe a

17    half hour.

18           THE COURT:  Will you be able to finish your cross in

19    a half hour?

15:15:38  20           MS. ROSENTHAL:  I would like to, but I can't

21    guarantee that.

22           THE COURT:  I'm trying to get a sense whether we

23    should break after he's done and come back and finish

24    cross-examination next week or push on through.

15:15:50  25           MS. ROSENTHAL:  I hope I could finish up.  I don't

DIRECT EXAMINATION – LYNELL BROWN

15:15:52  1   know.  30 minutes, but maybe 45.  I'll try to do it quickly.

2        THE COURT:  We've got a jury who we kept long a few

3   days and worked them hard last Friday.  I didn't really want

4   to keep them late this afternoon.  We'll see what we can do.

15:16:05  5        MS. ROSENTHAL:  Well, up to the Court.

6        THE COURT:  All right.

7      (Recess taken from 3:16 to 3:29.  Proceedings resumed in

8   open court outside the presence of the jury.)

9        THE COURT:  I have a 4:30 matter I forgot about, so

15:31:30 10   we're going to have to quit at 4:30 no matter where we are.

11        MR. KLECAN:  Okay.  I'll cut it way down.

12      (The jury entered the courtroom.)

13        THE COURT:  Please be seated.

14        Mr. Klecan, you may continue.

15:32:08 15        MR. KLECAN:  Thank you, Your Honor.

16   BY MR. KLECAN:

17   Q   Lynell, I have a few things I need to go back and pick up.

18        First thing, when we were talking about MMI before

19   the break, who was the doctor that found Mr. Hunton MMI during

15:32:20 20   the time that you were on the file?

21   A   It was his treating physician, Dr. Wang.

22   Q   Okay.  We briefly touched on Maree.  Are some customers a

23   little more demanding than others?

24   A   Yes.

15:32:34 25   Q   How would you characterize Maree at Sundt?

DIRECT EXAMINATION - LYNELL BROWN

15:32:37  1   A   I would consider her to be demanding.

2   Q   She used terms like are you denying the claim, are you

3   going to issue denial.  Is that kind of just her manner of

4   speaking to you or writing to you?

15:32:50  5   A   Yes.

6   Q   Okay.

7         I want to talk about the Perry claim.  Do you

8   remember the Raymond Perry claim?

9   A   Yes.

15:33:10  10  Q   To understand the Raymond Perry claim, do we have to talk

11  about the Joe Hernandez claim?

12  A   Yes.

13  Q   What happened to Joe Hernandez?

14  A   The jury?

15:33:21  15  Q   No.  Actually, was there something that occurred during

16  the Hernandez claim that particularly affected you?

17  A   Yes.  That was the lawsuit that he filed.

18  Q   Please tell us -- and did you attend a mediation

19  conference?

15:33:35  20  A   Yes.

21  Q   Okay.  Was there statements made at the mediation

22  conference about your personal liability?

23  A   Yes.

24  Q   Just give us an idea what that was about.

15:33:45  25  A   I don't remember, like, the specifics, but it was, you

DIRECT EXAMINATION - LYNELL BROWN

15:33:49   1   know, because of something I did, they were asserting they

2   wanted a certain figure, dollar figure.  Rather large.

3   Q   Okay.  Had anybody ever made those kinds of claims,

4   accusations against you before?

15:34:03   5   A   No.

6   Q   Even at the ICA, had you ever had any bad faith findings

7   at the ICA?

8   A   No.

9   Q   Ultimately, the Hernandez case went to trial.

15:34:13  10   A   Yes.

11   Q   And the jury found -- how did the jury come out?

12   A   I don't think there was a finding.  There was no finding.

13   Q   The jury found in favor of Zurich and against

14   Mr. Hernandez.

15:34:25  15   A   Correct.

16   Q   So how does that play in to the Perry case?

17   A   They were very similar in nature.  I was -- I think I got

18   that case during the time I was in trial for the Hernandez

19   file, so it was difficult.  It was hard because I was going

15:34:47  20   through that at the same time that I got that file.

21   Q   Okay.

22        We know from what's gone on before that there were

23   three separate findings at the ICA about bad faith because you

24   hadn't responded to communication, hadn't made payments,

15:35:04  25   et cetera.  Do you know why those happened?  What your conduct

DIRECT EXAMINATION - LYNELL BROWN

15:35:10  1  was that led to that happening?

2  A    Well, it was because I wasn't responding, but I was still

3  dealing with the Perry case and, for lack of a better word, I

4  was just really -- kind of got in a space I couldn't dig my

15:35:24  5  way out.

6  Q    Okay.  At the same time as Perry, we have the Hunton case.

7  Or maybe not the exact same time, but close to that?

8  A    Close proximity.  I don't remember the exact time frame,

9  but it came probably during that latter part of that as well.

15:35:41  10  Q    Okay.  So what happened in Hernandez affected the Perry

11  case.

12           Did it affect the Hunton case?

13  A    Not like it -- no, no.

14  Q    In the Hunton case, were there any findings of bad faith

15:35:56  15  in front of the ICA?

16  A    No.

17  Q    Okay.  So in this case are you aware that they claim the

18  conduct of Zurich was done intentionally?  With an evil mind,

19  aggravated malicious and outrageous conduct and conscious

15:36:23  20  disregard of plaintiff's rights?

21           Do you think any of those allegations are true as to

22  the way you handled this case?

23  A    No.

24  Q    Do you think that you had a good faith basis for denying

15:36:33  25  the claim?

CROSS-EXAMINATION - LYNELL BROWN

15:36:34   1   A   I do.

2   Q   Even after you got Dr. Maric's report, did you think you

3   had a good faith basis for denying the claim?

4   A   Yes.

15:36:43   5   Q   And even when you talked to Debra Runbeck in January, did

6   you believe you had a good faith basis for denying the claim?

7   A   Yes.

8   Q   What changed between that time and March the 25th, when

9   you issued the acceptance?  Was there any additional

15:37:02  10   investigation or was it simply your looking to Mr. Finical for

11   additional advice?

12   A   Ultimately it was my -- the opinion from Scott.

13           MR. KLECAN:  All right.  That's all I have.  Thank

14   you.

15:37:19  15           THE COURT:  Cross-examination.

16           MS. ROSENTHAL:  Thank you.

17                C R O S S - E X A M I N A T I O N

18   BY MS. ROSENTHAL:

19   Q   Good afternoon.

15:37:25  20   A   Hi, how are you?

21   Q   Ms. Brown, I want to start with one of the first things

22   you were asked about, and that was this idea that there are

23   inconsistencies in the reporting.  You remember the questions

24   that were asked of you?

15:37:40  25   A   Yes.

CROSS-EXAMINATION - LYNELL BROWN

15:37:47  1   Q   Isn't it true that these so-called inconsistencies or

2   perceived inconsistencies is a whole new idea that's just been

3   made up for purposes of this trial?

4   A   I didn't make that up.

15:38:02  5   Q   Well, Ms. Brown, that's not the reason that you denied the

6   claim; correct?

7   A   The reason of my denial basically was there was no

8   mechanism of injury.  There were other intervening facts as

9   well.  I mean the file -- whatever was in the file at the time

15:38:17  10  I made the decision was everything that was taken into

11  consideration.

12  Q   My question to you is much simpler than that.  Isn't it

13  true that you did not deny this claim having anything to do

14  with inconsistent reporting or perceived inconsistent

15:38:32  15  reporting?  Isn't that true?

16  A   That was considered in the denial, but in my documentation

17  what I noted was that it was more about the mechanism of

18  injury, as well as his preexisting, that there was

19  consideration for that as well.

15:38:45  20  Q   All right.

21       MS. ROSENTHAL:  Liz, if you would pull up Exhibit 41

22  at 737.

23  BY MS. ROSENTHAL:

24  Q   This is what we know you told Sundt the reasons were for

15:38:56  25  the denial.  This is an e-mail you wrote on March 2nd.  You've

CROSS-EXAMINATION – LYNELL BROWN

15:39:00   1    seen this before?

2    A    Yes.

3    Q    And you state here the claim was denied due to the fact he

4    had preexisting medical condition.  Also, initially when he

15:39:09   5    reported he did not really indicate a specific incident.

6          That was the only basis for denial; correct?

7    A    Yes.  I'm referring to the specific incident in this

8    sentence.

9    Q    Right.

15:39:20  10    A    I don't know if I –– it's poorly written, but I was

11    referring to the fact there was no specific incident.

12    Q    And we'll get to that in a minute, but what I'm asking you

13    right now is you don't say anything in there about so-called

14    inconsistencies.  Isn't that true?

15:39:36  15    A    That's not mentioned.

16    Q    That is true?

17    A    That's true, it's not mentioned.

18    Q    All right.

19          And there's nothing that you can point to that tells

15:39:48  20    us that that was a concern of yours, notes in the claim file

21    and so forth; correct?

22    A    That was a concern –– I'm sorry?

23    Q    Yeah.  That these so-called inconsistencies were a concern

24    of yours.

15:40:01  25    A    Well, it was the way that he reported the injury, so I

CROSS-EXAMINATION – LYNELL BROWN

15:40:04  1   would say how he's giving the description of the incident.  So

2   that spoke to the specific incident.  He didn't really have

3   one.  And that was part of my -- that was a part -- that was a

4   big part for me because there wasn't any specificity as to

15:40:20  5   when it actually occurred.

6   Q   All right.  Those are two different things, are they not?

7   One is you claim that there needs to be a specific incident;

8   right?

9   A   Well --

15:40:31 10   Q   That's just a yes or no.

11            Correct?

12   A   I'm sorry, will you repeat it.

13   Q   Yeah.  I'm talking about two different things here.  One

14   is your basis that there wasn't a specific incident.  That's

15:40:43 15   one thing; correct?

16   A   Correct.

17   Q   But what I'm asking you about is this other idea that you

18   had some kind of a perceived inconsistency in the reporting.

19   That was never a basis for anything, was it?

15:40:58 20   A   I -- again, when I issued the denial, there were other

21   things, and I don't know that I necessarily outlined them

22   and --

23   Q   Did you ever put that down?  Did you ever put anything --

24            MR. KLECAN:  Excuse me.  Can she finish her answer?

15:41:11 25            THE COURT:  Go ahead and finish your answer.

CROSS-EXAMINATION – LYNELL BROWN

15:41:13  1          THE WITNESS:  Okay.  I was saying I didn't maybe

2      necessarily outline them, but there is a lot of things I take

3      into consideration when issuing the denial.  And not always

4      did it necessarily get written out the way maybe that it

15:41:24  5      should have, but in this instance this was my key factor was I

6      was concerned with how the incident happened or, you know, how

7      he was reporting what happened.

8          MS. ROSENTHAL:  Okay.

9          THE COURT:  Listen to the question and answer her

15:41:41 10      question.  Thank you.

11      BY MS. ROSENTHAL:

12      Q   Don't you agree it's important in situations such as

13      having a trial about what you did and why you did it, to put

14      down the reasons why you think this claim should be denied?

15:41:54 15      Isn't that important?  That's a yes or no.

16      A   Yes.

17      Q   All right.  You did not put down any indication that you

18      had a question in terms of inconsistent reporting.  Isn't that

19      true?

15:42:07 20      A   Correct.

21      Q   So, for example --

22          MS. ROSENTHAL:  Liz, if you could pull up from the

23      claim file 590, which is a CSR.

24      BY MS. ROSENTHAL:

15:42:17 25      Q   And while she's pulling that up, can you remind the jury

CROSS-EXAMINATION - LYNELL BROWN

15:42:21   1   what CSR is?

2   A   Case summary report.

3   Q   All right.  And it's at 591 and it states compensability

4   rationale.

15:42:38   5           And this is something that you fill out; correct?

6   A   Correct.

7   Q   And once again, this is your basis for your denial of this

8   claim; right?

9   A   Yes.

15:42:48  10   Q   And it says, "The insured questions the validity of the

11   claim because the EE" -- that's Mr. Hunton?

12   A   Correct.

13   Q   -- "has prior back injuries."

14           That indicates preexisting; correct?

15:42:59  15   A   Correct.

16   Q   And that Mr. Hunton did not have a specific incident and

17   delayed reporting of the claim.  AOE and COE is questionable

18   for treatment of the low back injury.

19           Once again, you never mention anything about

15:43:12  20   inconsistent reporting.  Isn't that true?

21   A   That's correct.

22   Q   All right.  And in addition to that, didn't you agree last

23   week when you testified that you didn't think that the forms

24   that Mr. Hunton filled out himself were in fact inconsistent,

15:43:26  25   but one was just shorter than the other?

CROSS-EXAMINATION – LYNELL BROWN

15:43:30  1    A    Well, it was different -- well, he added more to

2    substantiate the injury, I believe, on the second report that

3    he filled out.  There's like a long form and short form.

4    Q    Right.  And don't you agree and didn't you agree that

15:43:44  5    those forms are not inconsistent; one is just much shorter

6    than the other?

7    A    One was more detailed.

8    Q    Right.  But not inconsistent.

9    A    I wouldn't say inconsistent.  It was just longer and he

15:43:57  10   gave a little bit more description.

11   Q    Okay.  And to the extent that you do have any questions

12   about if you're wondering why he wrote a particular sentence

13   or used a particular word, don't you agree you need to

14   investigate that?

15:44:13  15   A    That's fair.

16   Q    Yeah, I mean isn't that part of the duty of good faith and

17   fair dealing that adjustors have to investigate the claim?

18   A    Correct.

19   Q    And investigate whatever the basis for denial is and make

15:44:27  20   sure that it's a proper denial.

21   A    Correct.

22   Q    So can we agree that inconsistent reporting was not in any

23   way a basis for this denial?

24   A    I can't say -- it isn't documented as such and I would

15:44:44  25   agree with that, but I take in totality everything I had up to

CROSS-EXAMINATION - LYNELL BROWN

15:44:48  1   the time I issued the denial.

2   Q    But my question is, can we agree that this so-called

3   inconsistent reporting was not a basis for denial?  Yes or no?

4   A    It would -- I don't know if I can answer it yes or no.

15:45:03  5            MR. KLECAN:  Object to the form of the question.  It

6   may not be a yes or no answer.

7            THE COURT:  Overruled.

8            Yes or no.

9            THE WITNESS:  I'm sorry, one more time.

15:45:11 10  BY MS. ROSENTHAL:

11  Q    Don't you agree this was never put down as a basis for

12  denial?

13  A    Yes.

14  Q    Let's talk for a minute about preexisting.  The jury has

15:45:19 15  seen both of these notes that seem to indicate that you also

16  denied this on preexisting; correct?

17  A    They've seen notes?  Yes, I'm in agreement with that,

18  um-hmm.

19  Q    But you know for a fact this claim was not considered a

15:45:36 20  preexisting condition under the workmen's compensation act;

21  right?

22  A    It is not a preexisting -- he had preexisting complaints

23  or preexisting problems, but his claim was not filed for

24  the -- based on the preexisting injury.

15:45:51 25  Q    Okay.

CROSS-EXAMINATION - LYNELL BROWN

15:45:52  1   A   I'm not sure if I'm answering what you're asking.

2   Q   I'm not sure you did either.  But you do agree that

3   Mr. Hunton's claim was never a preexisting condition claim

4   such that it would be denied for that reason?

15:46:06  5       You knew this wasn't a claim that could be denied for

6   preexisting; correct?

7   A   Well, it can be denied solely based on preexisting,

8   correct.

9   Q   Well, isn't it true you knew this was not a preexisting

15:46:22 10   claim?

11   A   Well, he had preexisting problems --

12   Q   I understand.

13   A   -- so was claiming that -- I'm sorry.  He was alleging

14   that were aggravated or increased or whatever word you might

15:46:35 15   want to use, that he was working that day that caused him to

16   have pain.

17   Q   And as you've explained a couple of times, that -- that's

18   not a basis for denial when somebody's prior back problems

19   have been aggravated by a new injury.

15:46:50 20   A   Not on its own, correct.

21   Q   All right.  So preexisting was not a basis, and you knew

22   that from the beginning of this claim?

23   A   It was not a basis, but it was a consideration.

24   Q   I'm sorry?

15:47:02 25   A   It was not the basis for denial, but I took that into

CROSS-EXAMINATION - LYNELL BROWN

15:47:04  1   consideration as well.

2   Q   All right.  But you discarded it as a reason to base a

3   termination or denial.

4   A   I can't say I discarded it because I knew about it, but

15:47:15  5   I'm just saying that it was one of the facts of the claim, so

6   it was taken into consideration.

7   Q   Here's my question.  I'm trying to find out whether or not

8   we have to explore if this was, in fact, a legitimate

9   preexisting condition that you had a right to use as part of

15:47:32  10  your basis for denial.  Did it form any basis of your denial?

11  A   Initially when I -- it was a red flag because of the fact

12  there was no specific recollection of what happened per se, so

13  I didn't -- I'm not saying I denied it solely based on

14  preexisting, but it was part of my consideration with all of

15:47:53  15  the other facts of the file.

16  Q   All right.  Well, then, don't you know that preexisting,

17  if you have even a 1 percent aggravation of a prior condition,

18  that's not considered a preexisting condition under the act?

19  A   Correct.  It's not -- that's not a preexisting, it could

15:48:11  20  be either aggravation or there's another terminology that they

21  use as well.

22  Q   All right.  It was a basis that Sundt wanted you to deny

23  this claim on; correct?

24  A   Well, they had two things they were questioning, or one

15:48:26  25  was the fact that he had priors and then the other was because

CROSS-EXAMINATION - LYNELL BROWN

15:48:30   1   he didn't report it on the date of the injury.

2   Q    Okay.  But you knew for a fact that Sundt wanted this

3   claim denied in part on preexisting condition; correct?

4   A    That was a concern of theirs, yes, that's correct.

15:48:45   5   Q    Is that why you put in the e-mail that we just looked at

6   to Sundt that you denied it on preexisting as well as no

7   specific incident?

8   A    Well, I wrote in what the red -- what they initially had

9   addressed as well, that was their concern.  I don't know -- at

15:49:04  10   the time that I wrote it, I can't tell you where my frame of

11   thought was, I was just trying to put an explanation in there

12   as to what the status was.

13   Q    All right.  Let's talk about no specific incident.  I know

14   we went over this to some extent the other day when you were

15:49:21  15   in court, and I just want to make sure it's clear to this

16   jury.

17            You know that it doesn't have to be a specific

18   incident, a particular moment, to be compensable.  Isn't that

19   true?

15:49:34  20   A    You can have a gradual injury.

21   Q    And that gradual injury --

22            MR. KLECAN:  Excuse me.  I think she's interrupted

23   the answer.

24            THE COURT:  Were you finished?

15:49:46  25            THE WITNESS:  I wasn't quite.

81

CROSS-EXAMINATION – LYNELL BROWN

15:49:47  1        THE COURT:  Go ahead and finish.

2        THE WITNESS:  I was going to say you can have a

3  gradual injury, but usually there's a point in time where you

4  know something happened from one moment to the next.  And so

15:49:57  5  there are times that we accept claims for gradual injuries or

6  aggravations.  But usually the person can tell me, you know,

7  this is what happened.

8  BY MS. ROSENTHAL:

9  Q    Okay.  And Mr. Hunton did, in fact, tell you what

15:50:10  10  happened.  He told you he was hammering stakes into the ground

11  and that's when he began to feel pain; right?

12  A    That was one thing he said.  And then another thing he

13  said he was just having pain.  I believe he said pain at the

14  end of the day; I need to look at the document again.  I

15:50:26  15  believe he was just having pain.

16  Q    Well, I won't go over the forms again, but you remember

17  the proof of loss form that I think --

18  A    That was the most descriptive one, yes.

19  Q    Didn't he tell you he was hammering stakes into the ground

15:50:44  20  when he --

21  A    I think he gave a couple things.  He was hammering stakes,

22  so was doing something every so many feet, there was other

23  things in there, and that he felt pain.

24  Q    Okay.  And you knew that the pain was coming about based

15:50:59  25  upon whatever he was doing on the job on that particular day?

CROSS-EXAMINATION – LYNELL BROWN

15:51:03  1   A   Well, he was alleging that that was what the source of his

2   pain was or cause of his pain was.

3   Q   And you don't have any reason to doubt that, do you?

4   A   At that point I was looking at it -- because there was an

15:51:13  5   issue with the reporting, so I'm not -- I would never question

6   a person's pain.  If you tell me you're hurting, you're

7   hurting.  I can't really address that.  But I still had

8   questions.

9   Q   Okay.  And what did you do to answer the questions?

15:51:26  10  A   I just -- at the time I made the decision.  I just

11  reviewed what I had in the file and the notes that were in the

12  file, as well as medical documentation.

13          MS. ROSENTHAL:  Let me pull up page 41 of Exhibit 2,

14  the claim file.

15:51:43  15  BY MS. ROSENTHAL:

16  Q   I believe you saw this on direct examination.

17          This is a medical summary that you did on

18  January 28th, 2015; correct?

19  A   Yes.

15:52:06  20  Q   This is the first medical summary that you did on the

21  file; correct?

22  A   It's probably the first one I put in the note, um-hmm.

23  Yes.

24  Q   And this is long after the claim was denied.  It was

15:52:17  25  denied on October 22nd, 2014, the prior year; correct?

CROSS-EXAMINATION - LYNELL BROWN

15:52:21  1  A   Correct.

2  Q   You hadn't done any kind of medical summary or medical

3  investigation prior to this?

4  A   Well, I had the medical records, I just hadn't entered

15:52:30  5  them into the notes.  So I was going back and putting the

6  medical into the file.

7  Q   Well, you hadn't done any kind of summary or investigation

8  what those medical records were until January 28th, 2015;

9  correct?

15:52:42  10  A   Well, I would have reviewed them, but this is actually

11  when I put it in the file.  So the records that I had, then

12  I'll put them in chronological order and then enter them in

13  the file.  It's not that I didn't necessarily review it, it's

14  just I hadn't put -- I was going back and putting the notes

15:52:58  15  back in the file from the medical reporting that we had

16  received.

17  Q   Well, do you remember, sitting here today, when you

18  actually made those notes?

19  A   It would be dated this date.  This is when I entered.

15:53:09  20  January 28th, 2015.

21  Q   Okay.  And that's long after this claim was denied;

22  correct?

23  A   Correct.

24  Q   So going back to this, you agree you can have a gradual

15:53:22  25  injury that can be compensable; right?

CROSS-EXAMINATION – LYNELL BROWN

15:53:26   1    A    Yes.

2    Q    And you've known that since the beginning of when you

3    first began training as an adjustor in workmen's compensation,

4    that gradual injuries can be compensable.   True?

15:53:38   5    A    Over time it became more accepted, yes.

6    Q    All right.   Certainly by, let's say, 2010, that was a well

7    accepted concept in workmen's compensation --

8    A    Yes.

9    Q    -- correct?

15:53:50   10        All right.

11        You were asked questions about Dr. Maric and the

12   report that he did in November.

13   A    Yes.

14        MS. ROSENTHAL:   Let me have you pull up 606 from

15:54:13   15   Exhibit 2, the claim file.

16   BY MS. ROSENTHAL:

17   Q    Now, I know we've all seen this before.

18        MS. ROSENTHAL:   Liz, if you could pull up

19   paragraph 2.

15:54:30   20   BY MS. ROSENTHAL:

21   Q    This is a question that you are asking Dr. Maric to give

22   his opinion on, whether or not his diagnosis related to the

23   described incident or has his preexisting condition been

24   aggravated or temporarily exacerbated; correct?

15:54:47   25   A    Correct.

CROSS-EXAMINATION – LYNELL BROWN

15:54:48  1    Q    This is your question to him?

2    A    Yes.

3    Q    And really this is answering.

4          You used the expression before "mechanism of injury."

15:54:56  5    Is that what this is?

6    A    I'm asking him is diagnosis related to incident or

7    preexisting condition that's been aggravated.  Or -- yes.

8    Q    When you mentioned "mechanism of injury" before, is that

9    what you -- is that included in this kind of a question?

15:55:15 10    A    Well, the mechanism would have been addressed like in his

11    initial -- like when he's asking him questions.  What

12    happened?  Tell me -- it's more addressed there.  This is just

13    addressing the medical -- his medical finding.

14    Q    All right.  And doesn't he answer your question that

15:55:31 15    whether or not the disc herniation was the result of his work

16    activity on September 18th?

17    A    Yes.  He did.

18    Q    So you know Dr. Maric is of the opinion that his

19    activities that were described to him were most likely cause

15:55:49 20    of his disc herniation?  Isn't that true?

21    A    I'm sorry.  Are you saying that his injuries were caused

22    because of disc herniation?  I'm -- I might have missed what

23    you were saying.

24    Q    My question to you is, didn't this answer the question you

15:56:04 25    were asking?  That Dr. Maric was of the opinion that the

CROSS-EXAMINATION – LYNELL BROWN

15:56:10  1   herniated disc was the result of the activities that were

2   described that he was doing on the job that day?  True?

3   A   I don't know if he said the herniated disc, but he's

4   saying that he feels the activities that he described could

15:56:23  5   have definitely been the result of the work on 9/18.

6   Q   And you know the activities he described to Dr. Maric were

7   the same activities he described to you, hammering stakes into

8   the ground; correct?

9   A   I don't -- can you put it back on the first page because I

15:56:39  10   don't remember what he --

11   Q   Sure.

12       MS. ROSENTHAL:  602.  If you could, the incident date

13   paragraph.

14   BY MS. ROSENTHAL:

15:57:03  15   Q   Do you see Mr. Hunton stated he was doing his regular work

16   activities, which included carrying surveying equipment and

17   pounding stakes into the ground?

18   A   Yes.

19   Q   That's when he began to experience low back pain; correct?

15:57:16  20   A   Yes.

21   Q   He also, because you asked him to ask this, he asked him

22   if he recalled any specific incident which caused the acute

23   episode of pain, and he said he couldn't recall a specific

24   incident.  He just said that he began experiencing pain when

15:57:32  25   he was doing regular work activities; correct?

CROSS-EXAMINATION - LYNELL BROWN

15:57:35   1    A    Yes.

2    Q    All right.  And isn't that clear to you, going back to

3    606, that when Dr. Maric is answering your question that he is

4    saying those activities are likely the cause of the disc

15:57:52   5    herniation?

6    A    He used the word certainly, but I would agree.  He said

7    they certainly could have caused his disc herniation to occur.

8    Q    All right.  And you still didn't accept the claim after

9    this?

15:58:04  10    A    I had not accepted it at this point, no.

11    Q    Why not?

12    A    I still had some question.  I think eventually --

13    Q    What were your questions?

14    A    My question was still about the specific incident.  I know

15:58:18  15    he said -- he reported he didn't have a specific incident, and

16    there was no really -- he didn't still really clarify what

17    was -- you know, boom, this happened and I hurt my back.  And

18    I know Dr. Maric was saying, you know, he couldn't attribute

19    to anything else because we didn't have any additional of the

15:58:37  20    prior records.  So that was still kind of like a little

21    question in my mind as to whether that would be compensable.

22    Q    And what did you do to answer that question?

23    A    Eventually I think at some point I reached out and asked

24    Scott to take a look at it and give me his legal opinion.

15:58:52  25    Q    That was the following year, wasn't it?

CROSS-EXAMINATION - LYNELL BROWN

15:58:55  1    A    I'll concur with whatever date.  I don't think I did it,

2    like, immediately.

3    Q    Well, you know that this Dr. Maric IME was November 5th;

4    correct?

15:59:05  5    A    Yes.

6    Q    And you know that you didn't contact Mr. Finical until

7    2015.

8    A    I would agree.

9    Q    So it was the following year that you contacted

15:59:16  10   Mr. Finical after you got this report; right?

11   A    Yes.  I -- yes.

12   Q    What investigation did you do right after the Maric IME

13   was received November 5th to answer whatever question you had?

14   A    I think I had already requested the prior medical records

15:59:36  15   and I had the -- I want to say ISO report.  Prior to the IME

16   he had already requested those records I don't know that we

17   ever received any priors, but I had already, you know, sent

18   the request out.  So that was the only other additional

19   investigation.

15:59:54  20   Q    That's the only investigation you did?

21   A    Was to request the priors, yes, at that point.  Yes.

22   Q    And the requesting medical records, that's not going to

23   answer this question that you had as to what exactly he was

24   doing that morning when the pain began; correct?

16:00:11  25   A    I can't say yes or no because if I got prior medical

CROSS-EXAMINATION - LYNELL BROWN

16:00:15 1    records and he was continuing to treat, that would have had an

2    impact if there was still treatment going on.  So I don't know

3    because I -- I don't recall whether we got the records or not.

4    Q   Well, the question that I thought you said you had, the

16:00:28 5    reason you didn't accept this claim on November 5th when you

6    got the Maric IME, is you still had a question as to what he

7    was doing that morning.  Did I understand that?

8    A   Correct.

9    Q   And requesting prior medical records isn't going to answer

16:00:43 10   that for you, is it?

11   A   It's not going to answer that, but it would answer whether

12   he was still continuing to treat for the preexisting back

13   injury that he had.  I don't know whether at that point he was

14   continuing treatment.  I later found out we didn't get

16:00:57 15   anything, but it could have potentially had impact.

16   Q   So now it sounds like you're saying you were investigating

17   to see if it was a preexisting condition and not a specific

18   incident?

19   A   No.  I'm saying that it is not uncommon to request prior

16:01:13 20   medical records to see if there's anything that is -- that we

21   need to take into consideration going forward.  He could

22   have -- you know, could you have preexisting and still have a

23   compensable claim.

24   Q   Right.

16:01:29 25   A   But where were you at this point versus where you are at

CROSS-EXAMINATION – LYNELL BROWN

16:01:33  1    now.  The difference in the medical.  Does that make sense?

2    The difference in where you are medically.

3    Q    No, frankly.

4    A    All right.

16:01:42  5    Q    I want to stay on this one topic --

6    A    Okay.

7    Q    -- because this is important.

8         You did not accept this claim even after getting

9    Dr. Maric's opinion that answered your question as to whether

16:01:54  10   or not this was related to his work activity, and you're

11   telling us, I think, that you didn't accept the claim because

12   you wanted more information about what he was doing that

13   morning; is that correct?

14   A    What I --

16:02:09  15   Q    Yes or no?

16   A    Yes.

17   Q    What investigation did you do to try to find out whatever

18   question you had about what he was doing that morning to be

19   answered?

16:02:20  20   A    I don't recall if I did any additional from that point

21   until I followed up or discussed it with Scott.

22   Q    In fact, you didn't do any investigation, you just sat on

23   Dr. Maric's IME until the following year.  Isn't that true?

24   A    I don't recall that I did anything additional at that

16:02:39  25   point.  I just -- the facts are what's in the file, so I

CROSS-EXAMINATION - LYNELL BROWN

16:02:43  1    don't -- I reported -- followed up with Scott whatever the

2    date was that you have.

3    Q   All right.

4        But you knew that he had been hurt and, in fact,

16:02:53  5    needed surgery for his herniated disc, did you not?

6    A   I believe Dr. Johnston had indicated in one of the reports

7    that he wrote that surgery was something for consideration.

8    Q   And you know that failure to get medical care for

9    something like a herniated disc, that can cause medical

16:03:14 10    consequences to the person.  You know that, don't you?

11    A   It could.

12    Q   You know that someone is probably in a fair amount of pain

13    from a herniated disc, do you not?

14    A   I would agree.  I never question any person's pain.

16:03:29 15    That's not my place to do that.  I would agree with that.

16    Q   All right.

17        I think that your testimony on direct was that you

18    accepted this claim because Mr. Finical told you in that

19    e-mail to accept it.

16:03:55 20        Did I understand that correctly?

21    A   Well, I accepted it based on his opinion.  Yes.  That's

22    correct.

23    Q   But that's a new story, too, isn't it?  Like the story

24    about inconsistent reporting.  This isn't something that you

16:04:11 25    actually couldn't --

CROSS-EXAMINATION - LYNELL BROWN

16:04:14  1        MR. KLECAN:  Finished?

2        MS. ROSENTHAL:  No.

3   BY MS. ROSENTHAL:

4   Q   -- you couldn't remember.  You said, "I can't remember why

16:04:19  5   I accepted the claim on March 25th," in your deposition.

6   Isn't that true?

7   A   That's probably correct --

8        MR. KLECAN:  Excuse me.

9        Object as argumentative.

16:04:27 10        THE COURT:  Overruled.

11        MR. KLECAN:  This new story stuff.

12        THE COURT:  Let's rephrase that question.

13        MS. ROSENTHAL:  Okay.

14   BY MS. ROSENTHAL:

16:04:34 15   Q   This is a new story that you are telling here today.  At

16   your deposition you said you claimed you couldn't recall why

17   you accepted this claim on March 25th.  Isn't that true?

18        MR. KLECAN:  Object to the form of the question if

19   you use the deposition.  There's a proper way to do it and

16:04:54 20   this is not the way to do it.

21        THE COURT:  Use the deposition.  Show her the

22   deposition.

23        MS. ROSENTHAL:  Liz, pull up 123, page 23, lines 24

24   to 1 -- there's three of them, actually.

16:05:09 25        (The following video clip was played:)

CROSS-EXAMINATION - LYNELL BROWN

16:05:09  1   "Question:  Why did you not say that answers the question and

2   we need to pay this claim?"

3   "Answer:  I need to look back in the notes.  I don't recall

4   what my process was at that point."

16:05:27  5   "Question:  So is there anything you can point us to in this

6   claim file that says it still wasn't a compensable claim in

7   your mind?  And I'm talking about November of 2014."

8   "Answer:  I'm not sure.  Again, I know I subsequently accepted

9   it.  It's been a while.  I don't remember, you know, what my

16:05:53  10   thought process was or -- I know from the -- it's accurate

11   what you're saying as far as when I accepted it and when we

12   got the report.  You know, what he noted on his report."

13   "Question:  What was it that changed from all these records

14   that we've been going over till March 25th, 2015, that made

16:06:15  15   you accept this claim?"

16   "Answer:  I don't recall.  I don't know if I had some

17   additional conversation.  I don't remember.  We were trying to

18   go over this to kind of recollect my memory and I don't

19   remember exactly what happened during that span of time."

16:06:30  20   BY MS. ROSENTHAL:

21   Q    That's what you said back in 2016.

22   A    Correct.  And I probably did not remember at that point.

23   Q    All right.  Wouldn't you agree that if you have

24   information that tells you a claim is compensable, you should

16:06:45  25   accept that claim at the point that you receive that

CROSS-EXAMINATION - LYNELL BROWN

16:06:47  1    information?

2    A   It would -- it would vary from case to case.  You know.

3    If I thought the claim's compensable, it just depends on the

4    facts of the case.  If I felt it was compensable based on the

16:07:05  5    information I had, then I would accept the case.

6    Q   Okay.  Just to make sure I understand your answer, are

7    there times when you get information that tells you it's a

8    compensable claim when you won't accept it at the time?

9    A   If I'm waiting for -- there could be.  I mean, not always.

16:07:22  10   If it's a clear-cut case and it's clear-cut compensable, then

11   I would accept the claim.  Not always by notice because we may

12   not issue a notice, and I might be paying benefits and claim

13   would be accepted and, other than you knowing I paid the

14   bills, you may receive something that said, yes, my claim is

16:07:40  15   accepted.

16   Q   All right.  But the fact of the matter is when you receive

17   information that tells you the claim is compensable, you

18   should act on it promptly.  Quickly.  True?

19   A   That's fair.

16:07:50  20   Q   Again, you know people have medical conditions that need

21   attention and they need their benefits; right?

22   A   If they're filing for claim, yeah, I would make that

23   assumption, absolutely.

24   Q   Sure.  And if it's not medical care they need, people like

16:08:04  25   Bryan Hunton, you knew he was out of a job.  He needed his

CROSS-EXAMINATION - LYNELL BROWN

16:08:08  1   comp benefits.   True?

2   A   Well, at some point he continued to work.  I know

3   subsequently that he wasn't there, but initially I believe he

4   was still working.

16:08:18  5   Q   You know that he was fired on October 31st; correct?

6   A   I think, through the documents, yes.

7   Q   All right.  And it's after that that you got the Maric IME

8   a few days after that; correct?

9   A   I don't remember the date, but I would concur with

16:08:31  10  whatever date is in the notes.

11  Q   You testified that -- well, let me -- before I leave this

12  topic, you didn't give Mr. Hunton Dr. Maric's IME; correct?

13  You didn't send it out?

14  A   I don't recall sending it, I don't recall not sending it.

16:09:04  15  But based on the conversation and some of the documents, he

16  requested it.  I remember he did request it in writing.

17  Q   Well, he requested it on the phone and then he sent you a

18  letter saying "I've requested it several times" and you still

19  didn't send it out.  True?

16:09:16  20  A   I'm not going to say I didn't send it.  I don't recall

21  sending it.  Based on the fact he said he didn't receive -- I

22  don't remember.  It's something I do so automatic.  I don't

23  know whether I sent it or not.

24  Q   And you know it wasn't sent to Mr. Finical the following

16:09:28  25  year; correct?

CROSS-EXAMINATION - LYNELL BROWN

16:09:29  1   A    Correct.

2   Q    And you know it wasn't sent to Ms. Runbeck the following

3   year?

4   A    I would agree, because if Scott didn't get it, she

16:09:36  5   wouldn't have received it either.

6   Q    All right.

7            Are you saying it's a coincidence that the Maric IME

8   was not given to Bryan Hunton, Mr. Finical, and Debbie

9   Runbeck?

16:09:55  10  A    I don't know --

11  Q    Is there a reason why you didn't want to give up that IME

12  report?

13  A    There's no reason to withhold it from either of those

14  parties.  And with Scott Finical and Debbie Runbeck, when I

16:10:06  15  sent out a file I just print the file.  Or with him, just

16  automatically it goes.  So apparently it wasn't in there

17  because he didn't get it and she didn't either.

18  Q    All right.  I don't know what you mean by "it

19  automatically goes."

16:10:19  20  A    So when he requests a copy of the file, because he's

21  defense counsel, I don't have to go through and remove, say,

22  like, work product and things of that nature.  He gets

23  everything that's in the file.  I don't have to look.  Click

24  "send."  So based on the fact he asked me for it, it wasn't in

16:10:35  25  the file.

CROSS-EXAMINATION - LYNELL BROWN

16:10:36  1    Q    And why wasn't the Maric IME in the claim file?

      2    A    I don't know.

      3    Q    Should have been?

      4    A    It should have been.

16:10:42  5    Q    And are you saying that you coincidentally put it in some

      6    other place?

      7    A    Well, I don't -- I can enter things into the file, but

      8    they come through the mail and get scanned in and I don't have

      9    anything to do with that process.  Typically when the IME

16:10:58 10    companies, they send their bill, they send the report with it

     11    and it goes through our -- through the central -- I don't know

     12    what they call it.  Like mail processing center.

     13    Q    Okay.  And why -- I'm not clear what you're saying.  Why

     14    would you not make sure -- let me back up.

16:11:21 15         You know that Dr. Maric's IME, even though you didn't

     16    accept the claim based on it, you know that's an important

     17    document?

     18    A    Absolutely.

     19    Q    In fact, you know it's probably the most important

16:11:32 20    document when it comes to whether this claim is compensable.

     21    Would you agree?

     22    A    I wouldn't say the most, but definitely in consideration.

     23    Absolutely.

     24    Q    And wouldn't you want, if you're seeking help from an

16:11:46 25    attorney who's hired by Zurich, wouldn't you want the attorney

CROSS-EXAMINATION - LYNELL BROWN

16:11:50   1    to have that information?

2    A    Absolutely.

3    Q    Wouldn't you want Mr. Hunton to have that information?

4    A    He's absolutely entitled to it.

16:11:57   5    Q    Because you know it supports his claim.

6    A    In sending it to the defense attorney, he would need to

7    have that document.  That's why I sent him the file.  So he

8    later indicated to me it wasn't in there, so I had to

9    subsequently send it in.  I don't know why it wasn't in the

16:12:08  10    file.  I had nothing to hide from him because I didn't pick

11    and sort to send, I just sent him the whole entire file.

12    Q    And he actually asked you for it.  Didn't he specifically

13    say "Send me the Maric report"?

14    A    Yes.

16:12:20  15    Q    And you did not; correct?

16    A    No, I sent it.

17    Q    Well, you didn't send it right away.

18    A    I don't know when I sent it, but I did send it.  He was

19    looking for a couple different doctors' reports, if I remember

16:12:30  20    correctly.  I did send that.  And I don't know if I ever got

21    the -- I think he asked me for Dr. Lieberman's report and

22    Dr. Wang's report as well.

23    Q    And you sent those; correct?

24    A    I don't think I sent Wang's because I don't know if I had

16:12:45  25    them at that point.  I sent whatever I had.

CROSS-EXAMINATION - LYNELL BROWN

16:12:48  1   Q   Well, let's just go over some of these e-mails.

      2              MS. ROSENTHAL:  If you could pull up Exhibit 42 at

      3   4975, page 1.

      4   BY MS. ROSENTHAL:

16:13:04  5   Q   This is the March 19th e-mail.  This is after he finally

      6   gets the Maric IME; correct?

      7   A   Yes.

      8              MR. KLECAN:  Your Honor, unless there's specific new

      9   questions, we've been over this time and again.  Cumulative.

16:13:23 10              THE COURT:  Overruled.

     11   BY MS. ROSENTHAL:

     12   Q   So this is an e-mail that was talked about on direct

     13   examination.  You remember talking about this?

     14   A   Um-hmm.  Yes.

16:13:39 15   Q   March 19th, and he's telling you that there's no basis to

     16   continue denying this claim; correct?

     17   A   Correct.

     18   Q   You don't accept it then; correct?

     19   A   I didn't do it -- I think it was done on the 25th.

16:13:57 20   Q   Even though you have an attorney telling you there is no

     21   present basis to continue to deny this alleged injury claim,

     22   you continued to not only deny this claim, but to justify

     23   denying it.  Isn't that true?

     24   A   No.  I didn't continue to deny it, I just hadn't issued

16:14:13 25   the notice.  I didn't get the notice out until the following

CROSS-EXAMINATION – LYNELL BROWN

16:14:15   1    week.

2              MS. ROSENTHAL:  Liz, if you could pull up Exhibit 2

3    at 591.

4              Again, if you could highlight the compensability

16:14:29   5    rationale.

6              This is -- I'm sorry, go to 590 so we can see the

7    date on this.

8    BY MS. ROSENTHAL:

9    Q    This is March 24th, 2015.

16:14:48  10    A    Um-hmm.

11    Q    Correct?

12    A    Yes.

13    Q    So this is several days after Scott Finical has told you

14    accept this claim; correct?

16:14:55  15    A    Correct.

16    Q    So on March 24th you are sending this case summary report

17    to Sundt; right?

18    A     Correct.

19              MS. ROSENTHAL:  And if you could go to 594 -- I mean

16:15:07  20    591.

21    BY MS. ROSENTHAL:

22    Q    And you are telling Sundt -- this is days after you've

23    been told there's no basis to deny this claim, and you are

24    still giving your compensability rationale as to why you're

16:15:20  25    denying this claim.  Isn't that true?

CROSS-EXAMINATION - LYNELL BROWN

16:15:22  1   A   That is correct.

2   Q   You know at this point that there is no basis to continue

3   denying this claim.

4   A   That's correct.  I had this form -- it pulls the documents

16:15:38  5   from out of the file, and I had not updated it.  So it still

6   reflected that.  But I understood that he told me that at this

7   point I needed to accept it.  I just hadn't had a chance to

8   make any corrections and I issued the notice -- not this same

9   day.  I think, like I said, it was on the 25th.

16:15:57  10   Q   But why would you not -- when you're told there is no

11   basis to continue to deny the claim, why would you not

12   immediately accept that claim?

13   A   I mean, immediately?  Throughout the course of my day?  I

14   mean, I just didn't get it done the same day he sent it to me.

16:16:13  15   I knew at that point he had told me and I worked it into my

16   schedule and got the notice, but it wasn't issued until the

17   25th.

18   Q   And I'm asking you why would you not accept the claim the

19   very same day that Mr. Finical tells you to?

16:16:27  20   A   At the time I can't really answer because I don't know

21   what was going on that day.  Just depending what I had on my

22   plate.  I didn't get it done until the 25th.

23   Q   Isn't it the case that, in fact, you were waiting for

24   Sundt to give you the go-ahead to accept the claim?

16:16:43  25   A   No.

CROSS-EXAMINATION - LYNELL BROWN

16:16:43   1   Q   What were you waiting for?

2   A   I could have just been busy, honestly.  I don't know.  My

3   day is pretty dynamic from day to day.  I just didn't get it

4   issued until the 25th.

16:16:53   5   Q   Well, you had time to send out the day before on the 24th

6   this compensability rationale and the entire document.

7   A   Yeah.

8   Q   You had time to do that.

9   A   I printed it and sent this, yes.  This is a document

16:17:05  10   that's like pre-populated.  So --

11   Q   Well, it's not pre-populated with information particular

12   to Mr. Hunton's claim, is it?

13   A   Yes.  It's -- it pulls the notes within the file.

14   Q   But you had time to pull this together and send this over

16:17:22  15   to Sundt on the 24th; correct?

16   A   I would agree with that.

17   Q   And you say you didn't have time to accept the claim.

18   A   Well, I knew I was going to accept it, I just didn't get

19   it done until the 25th.

16:17:35  20   Q   Well, if you knew you were going to accept it on the 24th,

21   why are you telling Sundt you're continuing to deny this

22   claim?

23   A   At this point they were asking -- I believe they had a

24   file review or something that was coming up.  And I don't

16:17:45  25   think I had already got all the case summaries over to them.

CROSS-EXAMINATION - LYNELL BROWN

16:17:48  1    So I just pulled case summaries and sent them, and I didn't

2    update this one.

3    Q   Well, you say you didn't update this one.  You are sending

4    over a continuing rationale for denying this claim knowing

16:18:03  5    there's no basis to continue to deny this claim.  Isn't that

6    true?

7    A   I sent what was currently in the file.  I didn't have time

8    to -- it appears, based on my just looking at this, I just

9    pulled it directly from the file and sent it over for the case

16:18:19 10    summary.  For the file review.  This is not something that I

11    have not done before as far as not necessarily having it

12    completely up-to-date because I knew we would discuss the

13    case.

14    Q   You were in touch with Sundt regarding their EEOC suit,

16:18:34 15    were you not?

16    A   I think I saw some e-mails or something, but that really

17    is not my wheelhouse so I don't know -- they were asking for

18    some information for whatever it was they were doing.

19    Q   All right.  So the answer is yes, you were in touch with

16:18:49 20    Sundt regarding their EEOC mediation coming up.  True?

21    A   Yes.

22    Q   All right.

23        And there's been testimony in this case that the EEOC

24    suit was settled roughly around lunchtime and you accepted the

16:19:15 25    claim at 12:40.  That's when you told Scott Finical that you

CROSS-EXAMINATION - LYNELL BROWN

16:19:19  1    were going to accept the claim; correct?

2    A    Whatever date I told him, but whatever -- I don't know

3    anything about the EEOC claim because it didn't affect my

4    file.

16:19:29  5    Q    I thought you testified you knew you had been in touch

6    with Sundt, something to do with the EEOC mediation?

7    A    Right.  I think they were asking for information and they

8    mentioned the EEOC, but we didn't have discussion like why

9    there was EEOC.  Like, I didn't know what their issue was with

16:19:44  10   that.  I don't really even know how it had anything to do with

11   the claim.  But I do remember I got an e-mail or something

12   asking me for some documentation, what's the status of the

13   file, because they were working on their EEOC claim.

14   Q    All right.  Then on March 25th, and that's -- I don't have

16:20:01  15   the number, Exhibit 41 --

16             Well, I'll move on.

17             On this issue of late report, you knew that

18   Mr. Hunton -- okay.

19             MS. ROSENTHAL:  Thank you, Liz.

16:21:14  20   BY MS. ROSENTHAL:

21   Q    Sorry.

22             So you're accepting -- on March 25th you're accepting

23   it basically 12:50 in the afternoon; correct?

24   A    Yes.

16:21:28  25   Q    And, again, are you saying it is just a coincidence that

CROSS-EXAMINATION - LYNELL BROWN

16:21:31  1  the EEOC claim settled around noon and you're accepting this

2  claim at 12:50?

3  A   I had no idea when they settled the claim of the EEOC.  I

4  knew it was out there, but I had no idea when they accepted,

16:21:42  5  settled.  I don't know.

6  Q   Just happens to be an hour or so after --

7  A   Again, I didn't know.

8  Q   On this issue of late report, you know that -- you knew

9  that Bryan Hunton didn't late report his injury; correct?

16:22:00 10  A   Not in -- not in accordance with the industrial commission

11  rules.

12  Q   Sundt has their own internal policies or rules.  That's

13  not Zurich's policies or rules; correct?

14  A   No.  That's their rule.

16:22:13 15  Q   Bryan Hunton, you know that he tried to report it the same

16  day but he didn't actually talk with anybody until the next

17  day.  You recall that?

18  A   I don't recall that.  I just know it was the following day

19  is what they reported.

16:22:26 20  Q   And according to Zurich policies, that's not considered a

21  late report.  Isn't that true?

22  A   I won't say Zurich policies.  The industrial commission

23  says you have one year to file a claim from date of knowledge

24  or date of -- date you know.  So that's a commission rule,

16:22:42 25  that's not a Zurich rule.

16:22:44  1    Q    All right.

2              The claim file, in the report you mistakenly put EE;

3         you meant the employer reported it late?

4         A    That's correct.

16:22:54  5    Q    It is Sundt who reported the claim late, not Mr. Hunton.

6         A    They reported the claim late to Sundt -- to Zurich, yes.

7         Q    By "they," you mean Sundt?

8         A    Sundt.  I mean Sundt, yes.

9         Q    In terms of why you would wait so long to accept this

16:23:26 10    claim after you got the information that you did, would it be

11        fair to say that one of the reasons is because you feel you're

12        under a lot of pressure at Zurich?

13        A    No.

14        Q    You know that you're taught that the customer is the most

16:23:41 15    important thing; right?

16        A    I wouldn't say the most important, but they're -- yes,

17        they should be.  You know, our job is to keep the customer

18        happy.

19        Q    Right.  And that's something that you are not just

16:23:54 20    encouraged to do, but graded on; correct?

21        A    I think it's one of the -- it's like the survey part or

22        whatever that you're graded on.  That's not my total grade.

23        And basically, you know, when I say keep the customer -- we're

24        supposed to keep them informed, supposed to respond to them.

16:24:13 25    It's just general things we're required to do.

CROSS-EXAMINATION - LYNELL BROWN

16:24:16  1    Q   All right.  Isn't it a major portion of your evaluation?

2               MS. ROSENTHAL:  Liz, if you could pull up Exhibit 9

3        at 1765.

4               MR. KLECAN:  Your Honor, this is beyond the scope.  I

16:24:28  5    didn't go into evaluations.

6               THE COURT:  I don't remember him doing that.

7               MS. ROSENTHAL:  It's not so much that he went into

8        evaluations, but he went into her talking about why she did

9        what she did, and I'd like to be able to explore an

16:24:42  10   alternative reason as to why she did what she did.

11              THE COURT:  Okay.

12              Overruled.

13              MS. ROSENTHAL:  Exhibit 9.

14       BY MS. ROSENTHAL:

16:24:59  15   Q   This is your evaluation --

16       A   Yes.

17       Q   -- correct?

18              And on this evaluation it talks about the closure

19       ratio that you're expected to achieve; correct?

16:25:12  20   A   Yes.

21              MS. ROSENTHAL:  If you could highlight -- yeah, that

22       top paragraph.

23              MR. KLECAN:  My additional objection, Your Honor, is

24       this was gone over a week ago.

16:25:28  25            THE COURT:  I think this was covered.

CROSS-EXAMINATION – LYNELL BROWN

16:25:29    1                The objection is?

            2                MR. KLECAN:  Cumulative.

            3                THE COURT:  Sustained.

            4                I have a hearing at 4:30, so we're going to have to

16:25:42    5    recess for the evening.

            6                It's been a long week.

            7                Let's start up again Tuesday, 9 o'clock.

            8            (The jury exited the courtroom.)

            9                THE COURT:  Okay, please be seated.

16:26:17   10                Anything we need to take up before we leave?

           11                MS. ROSENTHAL:  No.

           12                MR. DRURY:  Just want to tell the Court we have

           13    Dr. Maric coming here Tuesday morning, so if we could finish

           14    Ms. Brown after that?  We had to go to a lot of effort to get

16:26:31   15    him here.

           16                THE COURT:  We're not going to mess around with

           17    Dr. Maric's schedule.  We're glad he's here.  We'll be glad

           18    he's here.  Is he your first witness Tuesday?

           19                MR. DRURY:  Yes, sir.

16:26:44   20                THE COURT:  We'll put Maric on first and work

           21    everybody else in after him.

           22                MR. KLECAN:  Would the Court consider they're out of

           23    time?

           24                THE COURT:  No.  We're not out of time.  We have four

16:26:53   25    more days to go.

16:26:55  1          MR. KLECAN:  I know, but --

      2          THE COURT:  No.  I told you how I'm going to do it.

      3   I keep track of time until we get close to the end.  If it

      4   looks like we have plenty of time, we just finish up.  I'm not

16:27:06  5   going to tie anybody's hands if we still have plenty of time.

      6              That's how we do it.

      7          All right.  We'll see you at 9 o'clock on Tuesday.

      8       (Recess taken at 4:27.)

      9       (End of transcript.)

16:27:22 10                         *  *  *  *  *

     11

     12

     13

     14

     15

     16

     17

     18

     19

     20

     21

     22

     23

     24

     25

1          **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion

9     of the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control, and to the best

12    of my ability.

13

14         DATED at Phoenix, Arizona, this 6th day of April,

15    2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25